E-FILED
Wednesday, 04 September, 2019  04:04:41 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| AOT HOLDING AG, individually and on behalf of all others similarly situated, | Case No. 19-cv-2240 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| ARCHER DANIELS MIDLAND COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

George A. Zelcs
John A. Libra
Chad E. Bell
Ryan Z. Cortazar
**KOREIN TILLERY LLC**
205 North Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile:  312-641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
cbell@koreintillery.com
rcortazar@koreintillery.com

Stephen M. Tillery
Michael E. Klenov
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
mklenov@koreintillery.com

**TABLE OF CONTENTS**

SUMMARY OF THE CASE..................................................................................................1

PARTIES .........................................................................................................................4

JURISDICTION AND VENUE .........................................................................................4

DETAILED ALLEGATIONS.............................................................................................5

      1.    The U.S. ethanol market ................................................................................5

      2.    The Argo Terminal and the Chicago Benchmark Price...................................9

      3.    Ethanol derivatives are tied to the Chicago Benchmark Price.....................11

      4.    The Chicago Benchmark Price and Chicago Ethanol Derivatives are highly

          susceptible to manipulation ..........................................................................14

      5.    The mechanics of ADM's manipulation ........................................................19

      6.    Evidence indicating that ADM engaged in manipulation...............................23

      7.    ADM's senior executives knew about the manipulation scheme ...............33

      8.    Plaintiff AOT was damaged by ADM's manipulation ..................................35

      9.    The proposed Class that AOT seeks to represent .........................................38

CLAIMS FOR RELIEF .................................................................................................40

PRAYER FOR RELIEF ................................................................................................41

APPENDIX 1 - Background on Futures And Options ....................................................... A-1

# GLOSSARY OF TERMS

**Argo Terminal**: A fuel terminal located in Argo, Illinois. Trading at the Argo Terminal during the half-hour MOC window determines the Chicago Benchmark Price that sets the value of Chicago Ethanol Derivatives.

**Chicago Benchmark Price**: The daily price of ethanol traded at Argo Terminal. It is determined by Platts based on ethanol trading during the MOC window. This price serves as the basis for the value of the Chicago Ethanol Derivatives.

**Chicago Ethanol Derivatives**: Ethanol futures contracts and options contracts traded on the Chicago Mercantile Exchange. The value of these instruments is determined wholly or in part by the Chicago Benchmark Price. The most important derivatives are (1) the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on NYMEX; (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on CBOT.

**Decay**: The phenomenon that occurs where a fixed percentage of the open position in a diminishing balance contract held by an investor is "locked in" based on each day's trading price. The amount of decay can be determined by the number of open positions held by an investor divided by the number of trading days in the particular month. This decay occurs because each trading day's settlement price has a proportional impact on the final settlement value of the contract at the end of the month.

**Diminishing Balance Contract**: Specific futures contracts whose front month position in any given contract month diminishes as the contract month progresses toward expiration at the end of the month for purposes of position limits. Diminishing balance contracts typically have a final settlement value equal to the average of the benchmark price for all trading days in the contract month. Chicago Ethanol (Platts) Futures are diminishing balance contracts.

**Hitting the Bid**: A phrase that describes a consummated trade where a seller agrees to match a buyer's posted bid quotation price. "Hitting the bid" is the opposite of "lifting the offer," where a buyer agrees to match a seller's offer quotation for the product.

**ITT**: Intertank Transfer ("ITT") transactions occurring at the Argo Terminal where ethanol is sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale. ITT transactions form the basis of the Chicago Benchmark Price.

**Long Position**: A trading position where a derivative investment earns money for a trader if the price of the underlying commodity increases. A long position contrasts with and is complementary to a short position where a trader earns money if the price of the underlying commodity decreases.

**MOC**: The Market-on-Close ("MOC") window is a 30-minute trading period for ITT ethanol transactions between 1:00 p.m. and 1:30 p.m. C.T. every trading day at Argo Terminal. Platts uses trading activity during the MOC to determine the daily Chicago Benchmark Price for ethanol.

**Platts**: S&P Global Platts ("Platts") is a provider of trading information in the ethanol market and other markets. Platts creates the daily Chicago Benchmark Price that determines the value of Chicago Ethanol Derivatives.

**Relevant Period**: The period during which Defendant ADM illegally manipulated Chicago Ethanol Derivatives. The Relevant Period runs from November 2017 to the present.

**Short Position**: A trading position where a derivative investment earns money for a trader if the price of the underlying commodity decreases. A short position contrasts with and is complementary to a long position where a trader earns money if the price of the underlying commodity increases.

## SUMMARY OF THE CASE

1.      This lawsuit seeks redress under the Commodity Exchange Act ("CEA") for ADM's manipulation of a key ethanol benchmark price—the Chicago Ethanol (Terminal) price—that is used to price and settle numerous ethanol derivatives traded on the New York Mercantile Exchange ("NYMEX") and Chicago Board of Trade ("CBOT"), both operated by CME Group, Inc.

2.      ADM is one of the largest ethanol producers in the United States. In late 2017, facing already low margins on its ethanol sales due to a supply glut, ADM tried but failed to sell three of its ethanol facilities. Rather than closing or idling some of its ethanol mills, which ADM's competitors had already begun to do in response to low prices/margins, ADM chose to take a different tack. In a plan conceived and orchestrated by two senior members of its ethanol group—Ray Bradbury and Adam Kuffel—ADM placed huge bets through ethanol derivatives that the price of ethanol would decline further (i.e., placed "short" bets). The value of these derivatives was tied directly to the benchmark Chicago Ethanol (Terminal) price, which is calculated daily by S&P Global Platts ("Platts") based on 30 minutes of ethanol trading activity at the Kinder Morgan Argo Terminal in Argo, Illinois. This 30-minute window is called the Market-on-Close ("MOC") window.

3.      To ensure that its derivatives bets would pay off handsomely, in November 2017 ADM began to aggressively sell ethanol during the MOC window by reducing prices and filling the lower-priced bids of various ethanol purchasers in these critical 30 minutes of daily trading. On its face, ADM's behavior appeared economically irrational because it chiseled away at ADM's ethanol profit margins and even drove prices below ADM's variable cost of production. ADM's competitors were largely unwilling to sell at these low prices because they (and ADM) could sell their ethanol at significantly higher prices at other terminals in the U.S. or through private contracts, even after taking additional transport costs into account.

4.      The intended and actual effect of ADM's aggressive pricing and filling of lower-priced bids during the MOC window was to manipulate the Platts benchmark price downward. ADM's downward manipulation of physical ethanol prices at the Argo Terminal in turn artificially increased the value of ADM's massive short positions in ethanol derivatives based on those same prices—thus allowing ADM's ethanol group to reap outsized profits despite low or negative margins on physical ethanol sales. ADM's public financial filings have credited this anomalous performance to "effective ethanol risk management." In truth, ADM's actions are "risk management" no more than an owner of a baseball team betting against his team while bribing his players to throw the game is "smart baseball."

5.      Plaintiff and its counsel's extensive investigation has uncovered substantial evidence of ADM's manipulative scheme. The evidence indicates that, starting in November 2017 and continuing through today (the "Relevant Period"), much of ADM's behavior was economically irrational and contrary to its self-interest as an ethanol producer—unless it was intended to manipulate physical ethanol prices at the Argo Terminal in order to benefit ADM's large short positions in related ethanol derivatives. Thus, the only reasonable conclusion to draw from the evidence is that ADM in fact engaged in precisely this kind of manipulation. The highlights of the key evidence are as follows:

- Before November 2017, when ethanol prices and profit margins were higher, ADM was one of the largest buyers of ethanol at the Argo Terminal. Starting in November 2017 and continuing thereafter, when ethanol prices were lower and profit margins were eroding or non-existent, ADM became the largest seller of ethanol at the Argo Terminal—accounting for roughly 70% of all ethanol sales there.

- Before November 2017, ADM was one the largest buyers of ethanol at the Argo Terminal during the MOC window. Starting in November 2017 and continuing thereafter, ADM became by far the largest seller of ethanol during the MOC window—accounting for roughly 90% of all such sales, and 95% in November 2018.

- Starting in November 2017 and continuing through at least March 29, 2019, ADM was only a seller during the MOC window, and never a buyer.

- Starting in November 2017 and continuing thereafter, ADM routinely sold more ethanol at low prices than it could deliver, including during the MOC window. To satisfy its obligations for those sales, ADM bought ethanol at the end of trading months at higher prices than it had sold ethanol for earlier in the month. ADM made sure to never buy this ethanol during the MOC window, where its purchases might raise the Chicago Ethanol (Terminal) price and thereby negatively impact ADM's short positions in ethanol derivatives.

- Before November 2017, there were steady and consistent differences between the average monthly prices of ethanol at the Argo Terminal and three other major terminals on the East, West, and Gulf Coasts. These differences roughly represented the additional cost of transporting ethanol to the other terminals from the Midwest, where more than 90% of U.S. ethanol is produced.

- Starting in November 2017, these differences between the average monthly prices of ethanol at the Argo Terminal and the three other major terminals suddenly increased, and these increased differentials have persisted ever since. There was no corresponding increase in transport costs that could explain this sudden and persistent increase, indicating that ADM's conduct artificially depressed prices at the Argo Terminal.

- Starting in November 2017 and continuing thereafter, ethanol producers could earn greater profits by selling their ethanol at the three other major terminals due to the substantially higher ethanol prices there, even after taking into account all transport costs. ADM nevertheless chose to dramatically increase its sales at the Argo Terminal at significantly lower prices rather than transport its ethanol to the other terminals.

- Starting shortly before November 2017 and continuing thereafter, ADM amassed huge positions in ethanol derivatives tied to prices at the Argo Terminal. The size of these positions represented a dramatic departure from ADM's previous hedging activities and can be described only as speculative bets. In some months, ADM took short positions on up to 6,000-7,000 Chicago Ethanol (Platts) Futures contracts, representing 252 to 294 million gallons of ethanol and 50% or more of the open interest in the relevant contract months. These speculative short positions dwarfed ADM's total monthly ethanol production capacity of roughly 133 million gallons.

- Due to the sheer size of ADM's positions and the way that they "decayed" over the course of a relevant "spot" month—as will be explained later—ADM was strongly incentivized to manipulate the Platts benchmark price downward during the MOC window of every trading day within a month. Accordingly, ADM did not make a single purchase of ethanol during the MOC window after November 2017 through at least March 2019, instead acting as the seller in roughly 90% of all MOC transactions.

6.     ADM's manipulation of ethanol prices at the Argo Terminal, including during the MOC window, has caused hundreds of millions of dollars in damages to entities that traded in derivatives tied to Argo Terminal prices. Plaintiff AOT Holding AG ("AOT"), which traded in such

3

derivatives and suffered damages due to ADM's manipulation, now seeks to represent a class of all similarly situated entities and to hold ADM accountable under the CEA for its willful and intentional misconduct by recovering their actual damages, plus punitive or exemplary damages equal to two times the actual damages sustained by all class members.

## PARTIES

7.     Plaintiff AOT Holding AG ("AOT") is a Swiss corporation with its principal place of business at Hinterbergstrasse 16, 6312 Steinhausen, Zug, Switzerland. AOT was one of the most active participants in the ethanol derivatives markets during the Relevant Period and routinely traded in ethanol derivatives tied to the Chicago Ethanol (Terminal) price, including Chicago Ethanol (Platts) Futures. During the Relevant Period, AOT entered into ethanol derivative transactions through traders working for AOT's subsidiary, AOT Energy Americas LLC, which was located at 5847 San Felipe Street, Suite 2850, Houston, TX 77057. Those traders, in turn, placed trades for AOT's account through brokers working in the United States, who would execute the trades on U.S.-based exchanges.

8.     Archer Daniels Midland Company ("ADM") is a corporation organized, created, and existing pursuant to the laws of the state of Delaware with its North American headquarters at 4666 Faries Parkway, Decatur, Illinois 62526. All of ADM's ethanol trading operations, including its trading in Chicago Ethanol Derivatives, was directed from its North American headquarters in Decatur, Illinois.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, and under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), which explicitly provides for the original jurisdiction of the federal courts over any class action where any member of the plaintiff class is a citizen of a state different from any

defendant, and where the matter in controversy exceeds $5,000,000, exclusive of interest and costs. The total claims of class members here exceed $5,000,000 in the aggregate, exclusive of interest and costs.

10.     This Court has personal jurisdiction over ADM because, during the Relevant Period, ADM (1) transacted business in the State of Illinois, including in this District; (2) had substantial contacts with the State of Illinois, including in this District; and (3) committed substantial acts in furtherance of the manipulative scheme alleged herein in the State of Illinois, including in this District. In addition, ADM's conduct was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the State of Illinois.

11.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d). ADM resides, transacts business, and has agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

12.     The activities of ADM were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States, including in the markets for financial derivatives based on ethanol and the market for ethanol itself.

13.     Filing this case in the Urbana Division of the Central District of Illinois is proper because ADM's manipulative activities in violation of the CEA were conceived of and directed from its North American headquarters in Decatur, Illinois, which is within Macon County, Illinois and part of the Urbana Division per Local Rule 40.1.

## DETAILED ALLEGATIONS

**1.     The U.S. ethanol market**

14.     Ethanol is a renewable fuel made primarily from corn.

15.     The current domestic ethanol market was largely created by federal law and state regulations that set renewable fuel requirements for transportation fuel. In particular, the Energy Independence and Security Act of 2007 set Renewable Fuel Standards that increased the volume of renewable fuel blended into gasoline.

16.     Renewable Fuel Standards require gasoline producers to buy a certain quantity of renewable fuels (such as ethanol) each year to blend into gasoline used as transportation fuel. Ethanol is the renewable fuel most used by obligated parties to meet this renewable fuel requirement. Legal and regulatory requirements play a large role in the demand for ethanol by creating a class of "ethanol consumers" consisting mostly of refineries, importers, blenders, and general gasoline resellers.

17.     Buyers in the ethanol market can get their ethanol primarily in two ways. First, they can buy ethanol directly from an ethanol producer, contracting to have the producer ship ethanol straight to the buyer's facilities for blending with gasoline that is then shipped to retail markets. Second, they can choose to buy ethanol at terminals located throughout the country, where ethanol producers ship and store large quantities of ethanol via railcar, tanker truck, or barge. Ethanol stored at terminals is available for immediate, or "spot," sale to buyers. At these terminals, ethanol and gasoline can be blended onsite for ease of shipment to retail end users; alternatively, buyers can transport the ethanol purchased at terminals back to their own facilities or refineries for blending.

18.     Terminals also serve as locations where other buyers who do not blend ethanol for end use can acquire and ship it for resale elsewhere at higher prices. By doing so, such middlemen and resellers can benefit from market arbitrage.

19.     Below is a diagram showing the general flow of ethanol production and distribution in the U.S.



Source: Alternative Fuels Data Ctr., U.S. Dep't of Energy, *Ethanol Production & Distribution*, https://afdc.energy.gov/fuels/ethanol_production.html (last visited September 4, 2019).

20.     The Midwest is the epicenter of U.S. ethanol production, dwarfing every other region. The U.S. Energy Information Administration reports that 176 of the 200 ethanol plants in the U.S. (88 percent) are located in the Midwest, in a region defined as Petroleum Administration for Defense District 2, or PADD 2.



21.     Ethanol mills in the Midwest also have higher capacities than plants elsewhere in the U.S. As shown in the diagram below, of the country's nearly 16.3-billion-gallon annual production capacity, the Midwest region accounts for more than 14.8 billion gallons (91 percent) of total production. Shipping ethanol out of the Midwest for sale in other regions is therefore a routine part of the ethanol production business.



22.     ADM is one of the country's largest producers of ethanol, operating eight mills (a mix of dry and wet mills located in Nebraska, Iowa, Minnesota, and Illinois) capable of producing a total of 1.69 billion gallons of ethanol, or approximately 10% of the U.S. annual ethanol production of 16 billion gallons.

## 2.     The Argo Terminal and the Chicago Benchmark Price

23.     The Kinder Morgan Argo Terminal in Argo, Illinois is a critical locus in the Midwest for the spot sale of ethanol, for price discovery in the broader U.S. ethanol market, and for transporting ethanol domestically and internationally to meet demand. Accordingly, the Argo Terminal price for ethanol influences the prices of ethanol sold at other terminals, as well as the prices that private parties negotiate in non-terminal ethanol sales.

24.     The Argo Terminal is one of the largest of the approximately 1,200 ethanol terminals in the country and the largest in the critical PADD 2 region. It can handle shipments by rail, truck, and barge. Because of this multimodal capability and its large 54.6-million-gallon capacity, the Argo Terminal serves all segments of ethanol purchasers, from blenders and other end users to resellers and middlemen.

25.     In recognition of the key role the Argo Terminal plays in the U.S. ethanol market, pricing services such as S&P Global Platts ("Platts") and the Oil Price Information Service ("OPIS")

provide benchmark price assessments that reflect the trading price of ethanol at the Argo Terminal on a daily basis. Buyers and sellers of ethanol (whether at other terminals or in private negotiated transactions) use these Argo Terminal price assessments to determine what the fair market value of ethanol is at a given time nationwide. Market participants also use Platts and OPIS data to study market trends and predict future movement in ethanol prices for purposes of strategic planning, including hedging and speculation on ethanol derivatives.

26.    One of the most important price assessments compiled by Platts at the Argo Terminal is the benchmark Chicago Ethanol (Terminal) price—what this complaint will refer to as the "Chicago Benchmark Price." The Chicago Benchmark Price is calculated every trading day during the Market-on-Close ("MOC") window from 1:00 p.m. to 1:30 p.m. C.T. and is based on Intertank Transfer ("ITT") transactions: ethanol sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale.

27.    Before each day's MOC window, ethanol buyers post bid prices and ethanol sellers post offer prices. Under normal trading practices, buyers and sellers adjust their bids and offers in response to the prices proposed by their potential counterparties—motivated sellers will decrease their offers to beat the offers of competing sellers, while motivated buyers will increase their bids to beat those of competing buyers. Once there is a match between a buyer bid and a seller offer during the MOC, a sale is consummated.

28.    When an ethanol seller agrees to sell ethanol at the posted bid price of a buyer, this practice is known as "hitting the bid." The buyer equivalent to hitting the bid is referred to as "lifting the offer," and occurs when an ethanol buyer agrees to pay the posted offer price quoted by an ethanol seller.

29.     This back-and-forth negotiation between ethanol buyers and sellers is crucial for price discovery in the ethanol market and the calculation of the Chicago Benchmark Price. Without it, the Platts price assessment would lack a strong, market-based foundation.

**3.     Ethanol derivatives are tied to the Chicago Benchmark Price**

30.     Notably, the Chicago Benchmark Price is also used to establish the value of and to settle several important ethanol derivatives: (1) the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on NYMEX; (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on CBOT.[1] The complaint refers to these futures and options contracts collectively as the "Chicago Ethanol Derivatives."

31.     A futures contract is a derivative that allows market participants to offset or assume the risk of a price change of an underlying commodity over time. Futures contracts detail the quality and quantity of the underlying commodity (including the place of delivery if physically settled), and are standardized to be identical for all participants to facilitate trading on futures exchanges such as the CME. Given the standardization of the contract specifications, the only contract variable is price, which is discovered by bidding and offering (also known as quoting) until a trade occurs. The fact that futures contracts are standardized and exchange-traded makes these instruments indispensable as means of hedging and speculating by commodity producers, consumers, traders, and investors.

32.     A futures contract can be settled in one of two ways. A physically settled futures contract is settled by physical delivery of the designated quantity of the underlying commodity at a predetermined place on a fixed date (the expiration date) at the predetermined price. A cash settled

---

[1] Appendix 1, which is incorporated by reference into this complaint, contains a detailed explanation of futures and options contracts, as well as illustrative examples.

futures contract, by contrast, results in a cash payment between the futures contract parties reflecting the difference between the originally contracted price of the futures contract and the final market price of the futures contract at the time of settlement. The value of a futures contract fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity.

33.     An option contract is a type of financial derivative that gives the buyer the right—but not the obligation as with a futures contract—to either buy or to sell a particular commodity at a predetermined price ("strike price"), on or before a specified date in the future (the "expiration date"). A "put" or "put option" is a financial contract that gives the owner the right, but not the obligation, to sell an agreed quantity of a particular commodity at the strike price, by or on the expiration date. A "call" or "call option" is a financial contract that gives the owner the right, but not the obligation, to buy an agreed quantity of a particular commodity at the strike price, by or on the expiration date.

34.     The value of an option contract also fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity. That value, as well as the decision to exercise the option, depends on whether it is "in-the-money" or "out-of-the-money." An in-the-money call option is one where the strike price is below the current price of the underlying asset. An out-of-the-money call option is one where the strike price is above the current price of the underlying asset. Whether an option is in or out-of-the-money depends on the relevant reference price at the time of option settlement—the at-the-money price.

35.     The Chicago Ethanol (Platts) Futures Contract (CME symbol: CU) is the most liquid, or most highly traded, financial derivative tied to the Chicago Benchmark Price. The Chicago Ethanol (Platts) Futures Contract has had an average monthly trading volume on the CME in excess of 99,000 contracts between November 2017 and today.

36.     Each Chicago Ethanol (Platts) Futures contract is traded on NYMEX, represents 42,000 gallons (or 1,000 barrels) of ethanol, and is valued as the size (42,000 gallons) multiplied by the floating price quoted in increments of $0.0001, or one-hundredth of a cent, per gallon.

37.     Thus, one Chicago Ethanol (Platts) Futures contract with a Chicago Benchmark Price of $1.50 per gallon would be worth $63,000 (42,000 gallons times $1.50 per gallon); if that price were to increase to $2.00 per gallon, the futures contract would be worth $84,000. In other words, any one cent change in the Chicago Benchmark Price results in a $420 change to the value of each Chicago Ethanol (Platts) Futures contract.

38.     The Chicago Ethanol (Platts) Futures contract is cash settled, meaning that the contract parties pay each other based on the difference between the contract price and the settlement price, and there is thus no requirement for physical delivery to satisfy the contract.

39.     From November 1, 2017 through August 31, 2019, total volume in the Chicago Ethanol (Platts) Futures contract as reported by CME was 2,180,005 contracts.

40.     The CME also offers Chicago Ethanol (Platts) Average Price Options contracts (CME symbol: CVR), which are financially settled, non-early exercisable options of the underlying Chicago Ethanol (Platts) Futures contract, that are traded on NYMEX. Accordingly, the value of Chicago Ethanol (Platts) Average Price Options is also directly related to the Chicago Benchmark Price calculated by Platts at the Argo Terminal.

41.     As the CME notes, for the Chicago Ethanol (Platts) Average Price Options, a "call option represents the differential between the final settlement price of the underlying futures less the strike price, or zero, whichever is greater, multiplied by 42,000 gallons. A put option represents the differential between the strike price [less] the final settlement price of the underlying futures, or zero, whichever is greater, multiplied by 42,000 gallons."

13

42.     From November 1, 2017 through August 31, 2019, CME reports that total volume in Chicago Ethanol (Platts) Average Price Options was 182,506 contracts.

43.     The CME also offers the CME's Ethanol Futures Contract (CME symbol: EH). The EH contract is a physically settled ethanol futures contract listed on CBOT, with each contract representing 29,000 gallons of ethanol to be delivered in the contract month at the price of the contract.

44.     While not settled directly to the Chicago Benchmark Price, the market price that EH contracts trade at is heavily influenced by and highly correlated to the Chicago Benchmark Price because traders incorporate changes in the Chicago Benchmark price into their bid and offer prices on the contract, reflecting the Argo Terminal's key role as the largest terminal in the Midwest in price discovery across the United States ethanol market.

45.     Thus, ADM's downward manipulation of the Chicago Benchmark Price would cause EH contracts to trade at artificial prices. This, in turn, would cause actual damages to traders who traded in the EH contract.

46.     From November 1, 2017 through August 31, 2019, CME reports that total volume in the EH contract was 328,024 contracts.

4.     **The Chicago Benchmark Price and Chicago Ethanol Derivatives are highly susceptible to manipulation**

47.     In developing ADM's manipulation scheme, Ray Bradbury and Adam Kuffel recognized four key features of the Chicago Benchmark Price and of Chicago Ethanol Derivatives that made them highly susceptible to manipulation by ADM.

48.     First, both the Chicago Benchmark Price and Chicago Ethanol Derivatives were tied inextricably to trading activity at only one location: the Argo Terminal in Argo, Illinois. ADM had five ethanol production facilities within 250 miles of the Argo Terminal. Combined, these facilities had 1.237 billion gallons of total annual ethanol production capacity. Most of these facilities were

14

able to ship ethanol into the Argo Terminal via railcar, barge, and tanker truck. This meant that ADM, compared to its ethanol producer competitors, had a greater ability to flood the Argo Terminal with ethanol and sell it at lower prices.

49.     Second, the Chicago Benchmark Price is calculated based on bids, offers, and trades occurring during a mere half-hour of daily trading at the Argo Terminal. Because of the MOC window's limited duration and trading volume, ADM could significantly influence the Chicago Benchmark Price downward by concentrating its aggressive pricing and selling into just 30 minutes of a trading day. Moreover, ADM could exert this downward influence on the Chicago Benchmark Price while limiting its losses to a comparatively small volume of physical ethanol trades during the MOC window.

50.     Third, the prices and settlement values of Chicago Ethanol Derivatives are tied to the Chicago Benchmark Price. Settlement of the Chicago Ethanol (Platts) Future contract (the most actively traded ethanol derivative) is "based on the arithmetic average of the high and low quotations from Platts for [the Chicago Benchmark Price] for each business day that it is determined during the contract month," and the value of Chicago Ethanol (Platts) Average Price Options is in turn tied directly to the settlement price of Chicago Ethanol (Platts) Future contracts. Trading prices for the physically settled EH contract are likewise heavily influenced by and highly correlated to the key Chicago Benchmark Price. This meant that ADM's actions during the MOC window at the Argo Terminal could directly influence the prices and settlement values of Chicago Ethanol Derivatives.

51.     Fourth, unique features of Chicago Ethanol Derivatives allowed ADM to take outsized short positions, while also being able to have an outsized downward influence on the Chicago Benchmark Price with a relatively small number of aggressively priced daily trades of physical ethanol—thus enabling ADM to effectively manage and offset the losses associated with those trades. The unique features of Chicago Ethanol Derivatives also incentivized ADM to

manipulate pricing and trading activity during the MOC on every trading day during a contract month where ADM had a large short position. This last component requires some elaboration.

52.     The settlement format of the Chicago Ethanol (Platts) Futures contract makes it a "diminishing balance contract" under CME Rules 559, 560, and 562, as interpreted by CME Group Advisory RA1711-5 (August 11, 2017). "Diminishing balance contracts are specific futures contracts whose front month position in any given contract month diminishes as the contract month progresses toward expiration/month end for purposes of position limits….Diminishing balance contracts are typically those where the final settlement price is equal to the arithmetic average of a determined reference price for each business day that it is determined during the contract month.…"

53.     Up to and including the February 2019 contract, the Chicago Ethanol (Platts) Futures contract had a spot-month position limit of 1,000 (equivalent to 42,000,000 gallons of ethanol). However, this spot-month position limit was only effective at the close of trading three business days prior to the last day of trading of the contract. Until the close of trading three business days prior to the last day of trading of the contract, there was no spot-month position limit – so long as a party was below the 1,000 contract limit by that time, the party could take much larger positions in the contract earlier in the month.

54.     For non-diminishing-balance contracts, this would mean that a party taking huge positions early in the spot month would have to unwind/close those positions before the close of trading three business days prior to the last day of that month's contract trading. Taking such a large position carries the risk that potential counterparties will learn of the need to get below a position limit and use that information as leverage to secure a better price for them/worse price for the party holding the large position.

16

55.     In a diminishing balance contract, however, this problem is avoided, as a trader's number of futures positions vis-à-vis the position limit decays by an amount equal to the party's total futures position divided by the number of trading day in that month. This reflects the amount of contracts the party holds that were "locked in" by each day's price, as each trading day's price settlement has that proportional impact on the final settlement value at the end of month.

56.     Thus, in the CME's example below,[2] a 6,600 futures position in the spot month of October 2015 (with 22 trading days) diminishes or decays by 300 contracts each day (6,600/22), getting under the 1,000 contract spot limit after trading on October 27, 2015 (as it transitions from 1,200 to 900 contracts):

---

[2] CME Group Advisory Number RA1711-5 (August 11, 2017) at 5-6 (available at https://www.cmegroup.com/content/dam/cmegroup/notices/market-regulation/2017/08/RA1711-5.pdf).

| Start of Day Position | Futures Position 2C October 2015 Contract | Futures Equivalent Position 2C October 2015 Contract |
|---|---|---|
| 10/1/2015 | 6,600 | 6,600 |
| 10/2/2015 | 6,600 | 6,300 |
| 10/5/2015 | 6,600 | 6,000 |
| 10/6/2015 | 6,600 | 5,700 |
| 10/7/2015 | 6,600 | 5,400 |
| 10/8/2015 | 6,600 | 5,100 |
| 10/9/2015 | 6,600 | 4,800 |
| 10/12/2015 | 6,600 | 4,500 |
| 10/13/2015 | 6,600 | 4,200 |
| 10/14/2015 | 6,600 | 3,900 |
| 10/15/2015 | 6,600 | 3,600 |
| 10/16/2015 | 6,600 | 3,300 |
| 10/19/2015 | 6,600 | 3,000 |
| 10/20/2015 | 6,600 | 2,700 |
| 10/21/2015 | 6,600 | 2,400 |
| 10/22/2015 | 6,600 | 2,100 |
| 10/23/2015 | 6,600 | 1,800 |
| 10/26/2015 | 6,600 | 1,500 |
| 10/27/2015 | 6,600 | 1,200 |
| 10/28/2015 | 6,600 | 900 |
| 10/29/2015 | 6,600 | 600 |
| 10/30/2015 | 6,600 | 300 |

57.     The diminishing balance nature of the Chicago Ethanol (Platts) Futures contract could be exploited by ADM, allowing it to take short positions in the spot month as large as 6,000-7,000 contracts, representing 50% or more of the open interest in the spot month (and 2-3 times ADM's total monthly ethanol production capacity). ADM could then let those large positions decay down below applicable position limits as the month progressed.

58.     Starting with the March 2019 contract, the CME changed the spot-month limit at the close of trading three business days prior to the last day of trading to 500 (equivalent to 21,000,000 gallons of ethanol). CME has not, however, imposed any position limit for earlier in a trading month, leaving ADM free to use the diminishing balance nature of the Chicago Ethanol (Platts)

Future contract to amass outsized short positions (albeit less outsized than before the changes) in the spot month and let those positions decay downward below applicable position limits.

59.     The final take-away from all of these features is that ADM could sell a comparatively small amount of ethanol at aggressive prices during the MOC window in order to drive the Chicago Benchmark Price down, while at the same time holding and benefitting from disproportionately larger short positions in Chicago Ethanol Derivatives. The lower prices ADM received for physical ethanol during the MOC window were almost certain to be exceeded by gains on much larger short derivatives positions, particularly when repeated across all of the MOC windows within a month. And if market fundamentals outside of ADM's control drove ethanol prices in the spot month upward, ADM could still limit its losses on derivatives shorts via downward manipulation, while at the same time offsetting derivatives losses through higher margins on sales of physical ethanol.

60.     As a more concrete illustration of the math behind ADM's incentive to manipulate, consider the following. The maximum number of ethanol lots ever sold during the daily half-hour MOC window was 37 lots of 5,000 barrels of ethanol (on December 1, 2017), or the equivalent of just 185 Chicago Ethanol (Platts) Futures contracts (which each represent 1,000 barrels). During the Relevant Period, ADM frequently had short positions in the spot month approaching or exceeding 7,000 Chicago Ethanol (Platts) Futures contracts, the equivalent of 350 contracts per MOC window day (7,000 contracts / 20 trading days in typical month = 350). So long as ADM's sales in the MOC window each trading day in the month did not exceed nearly twice the maximum amount of sales that had *ever* occurred during the MOC window (and far fewer than 37 lots were sold during most MOC windows), ADM would profit from manipulation.

5.     **The mechanics of ADM's manipulation**

61.     Ray Bradbury and Adam Kuffel saw the vulnerabilities described above and decided to capitalize on them. In its simplest form, ADM's scheme consisted of two steps that it repeated

over and over each month starting in November 2017. First, ADM placed huge bets in Chicago Ethanol Derivatives in each spot month that the price of ethanol would decrease (a "short position"). Second, during the spot month, ADM drove down the price of ethanol during the MOC window to ensure that its short bets paid off.

62.     ADM accomplished the downward manipulation of the Chicago Benchmark Price via practices that were contrary to ADM's non-manipulation economic interest and to MOC pricing customs. December 1, 2017 offers a representative example of ADM's strategy with respect to the MOC window at the Argo Terminal during the Relevant Period.

63.     On December 1, 2017, rather than acting as a typical seller by engaging in a back-and-forth with Argo ethanol buyers, ADM began "hitting" low bids as soon as MOC trading began. Once the clock struck 1 p.m., ADM hit a low bid that AOT (who also traded physical ethanol at the Argo facility) posted prior to opening. Once that sale was executed, AOT posted another low bid that ADM immediately matched. This process continued throughout the MOC window on December 1, 2017 (when ADM's aggressive hitting of the bid set a then-record for most sales within the MOC window), and indeed was repeated during other MOC windows in the Relevant Period.

64.     Hitting bids at the opening of the MOC window (or aggressively hitting the bid in general) has no rational economic basis other than manipulating downward the price of ethanol at the Argo Terminal.

65.     As a seller of ethanol, ADM had a primary interest in selling ethanol at the highest price possible without losing sales to competitors. By hitting bids immediately or aggressively, ADM gave buyers little opportunity to adjust their bids on ethanol during the MOC window upward. ADM also undercut offers of competing sellers in the MOC window by more than was necessary to secure a given sale of ethanol within the MOC window. As a result, ADM lost money—specifically,

the money it would have received for physical ethanol sales executed at higher prices that would have resulted from normal price negotiation in the MOC window.

66. ADM's practice of aggressively "hitting the bid" and undercutting the current best offer by more than was necessary during the MOC window can be seen in the daily activity reported by Platts. As mentioned earlier, Platts collects data on bids, offers, and trades at the Argo Terminal that occur during the MOC window each trading day. An example of the data collected and reported by Platts from the Argo Terminal is seen from the August 3, 2018 Biofuelscan report reproduced below.

US ethanol bids/offers/trades: (PBF page 209)
- MOC bids: Ethanol: Chicago Argo: Shell bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Eco bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Gunvor bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Valero bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Shell bids $1.4425/gal, Aug 8- Aug 18, 5Kb; BP bids $1.4425/gal, Aug 8- Aug 18, 5Kb; Louis Dreyfus bids $1.4425/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Shell bids $1.55/gal, any-August, 25Kb; Hartree bids $1.54/gal, any-August, 25Kb.
- MOC offers: Ethanol: Chicago Argo: Vitol offers $1.4455/gal, Aug 8- Aug 18, 5Kb; ADM offers $1.4475/gal, Aug 8- Aug 18, 5Kb; Center offers $1.45/gal, Aug 8- Aug 18, 5Kb; CHS offers $1.45/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Hartree offers $1.5650/gal, any-August, 25Kb; BP offers $1.5650/gal, any-August, 25Kb.
- MOC trades reported: Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Gunvor, $1.4450/gal, Aug 8- Aug 18, 5Kb. Other trades reported: None.

67. This excerpted report shows ADM "hitting the bid" as the seller in all 5 trades that occurred during that day's MOC window at $1.4450 per gallon – dropping below its own outstanding offer of $1.4475 per gallon and the best outstanding offer by Vitol at $1.4455 per gallon. Rather than incentivizing Shell and Gunvor to "lift the offer" and come up to Vitol's (or even ADM's) higher offer prices, ADM decided to leapfrog Vitol in order to "hit the bids" of the two potential buyers at $1.4450, even though they were likely willing to pay more. This can be analogized

to a negotiation where two parties make opening demands/offers in anticipation of meeting somewhere in the middle, but one party then simply decides to accept the other party's lowball opening offer that both parties should understand to be simply a starting position rather than a reflection of true willingness to pay. By engaging in a more typical MOC window negotiation process, rather than "hitting the bid" on all five trades, ADM (acting in an economically rational way, without manipulation factored in) might have raised the price on some or even all of the 5 lots it sold to a level greater than $1.4450 (perhaps as high as $1.4455 or higher).

68.     This data also shows the impact that ADM's "hitting of the bid" had on the Platts Chicago Benchmark Price for this day. On August 3, 2018, that price was $1.44525 per gallon, a value reflective of the 5 trades at $1.4450 per gallon and the 2.5 points above the outstanding bid ($1.4450 per gallon by multiple buyers) and 2.5 points below the outstanding offer ($1.4455 per gallon by Vitol) during the MOC. This price would have been higher had buyers in the MOC window been forced to "lift the offer" to the $1.4455 per gallon price quoted by Vitol, rather than by ADM hitting the lower $1.4450 per gallon bid on the 5 consummated trades.

69.     Starting in November 2017 and continuing thereafter, ADM has repeatedly engaged in this practice of aggressively hitting the lower-priced bids of ethanol buyers at Argo during the MOC window. ADM has also consistently shown aggressively priced offers so as to either be the lowest seller offer during the MOC window, or to force a competitor to make an even more aggressive offer in order to offload their ethanol inventory at Argo. Both types of practices were intended to artificially depress the Chicago Benchmark Price calculated during the MOC window and have in fact resulted in artificially depressed Chicago Benchmark Prices on all or virtually all trading days during the Relevant Period.

**6.**     **Evidence indicating that ADM engaged in manipulation**

70.     Ample evidence indicates that ADM has in fact manipulated both the Chicago Benchmark Price and the values of Chicago Ethanol Derivatives during the Relevant Period.

71.     In 2016 and 2017, the falling price of ethanol in the U.S. was squeezing or eliminating the profit margins of ethanol producers, causing them to idle plants or consider exiting the business altogether. Indeed, ADM attempted to sell three of its dry mill ethanol facilities (in Columbus, Nebraska; Cedar Rapids, Iowa; and Peoria, Illinois) beginning in 2016, but it did not obtain adequate bids to justify their sale. Nevertheless, until November 2017, ADM had consistently been one of the largest buyers of ethanol at the Argo Terminal, including during the price-setting MOC window.

72.     Starting shortly before November 2017 and continuing thereafter, under the direction of Ray Bradbury and Adam Kuffel, ADM began to amass huge short positions in Chicago Ethanol Derivatives. These huge positions represented a significant departure from ADM's previous hedging activities and bore no rational relationship to hedging ADM's exposure to physical ethanol sales. In various months during the Relevant Period, ADM acquired as many as 6,000-7,000 Chicago Ethanol (Platts) Futures contracts within the spot month – positions that were over twice as large as ADM's monthly production capacity, and represented 50% or more of the open interest in the relevant contract month.

73.     Also starting in November 2017 and continuing thereafter, ADM suddenly shifted from being one of the largest buyers of ethanol at Argo, including during the MOC window, to being one of the largest sellers—even as ethanol prices continued to decline. By 2018, ADM accounted for roughly 70% of all ethanol sold at the terminal, and roughly 90% of sales during the price-setting MOC window. In the month of November 2018, ADM sold 95% of the ethanol lots that traded during the price-setting MOC window.

23

74.     The shift toward ADM becoming the largest seller of ethanol at the Argo Terminal during the MOC window occurred even as ADM's competitors (including Green Plains, POET, and Valero) cut production runs, shut down or idled plants, or sold ethanol plants due to slumping ethanol prices and margins.

75.     In October 2017, when ADM was the buyer in 32% of the Argo Terminal transactions during the MOC window, the settlement price of the Chicago Ethanol (Platts) Futures contract (which averages the Chicago Benchmark Prices across the entire month) was $1.425 per gallon – a level that was even then considered low and potentially not profitable for ethanol producers.

76.     But in 15 of the following 21 months—when ADM was the dominant seller during the MOC window—the Chicago Ethanol (Platts) Futures contract settled at prices below the $1.425 per gallon level of October 2017:

| Month | Monthly Volume | Settlement Price |
|---|---|---|
| Oct-17 | 131,831 | 1.425 |
| Nov-17 | 109,511 | 1.4045 |
| Dec-17 | 95,604 | 1.2965 |
| Jan-18 | 123,178 | 1.3045 |
| Feb-18 | 96,516 | 1.4423 |
| Mar-18 | 111,301 | 1.4589 |
| Apr-18 | 105,967 | 1.4635 |
| May-18 | 105,619 | 1.46 |
| Jun-18 | 82,702 | 1.4123 |
| Jul-18 | 66,953 | 1.4233 |
| Aug-18 | 111,631 | 1.3561 |
| Sep-18 | 85,728 | 1.2782 |
| Oct-18 | 77,796 | 1.2806 |
| Nov-18 | 87,007 | 1.2357 |
| Dec-18 | 79,017 | 1.2129 |
| Jan-19 | 101,333 | 1.2644 |
| Feb-19 | 92,092 | 1.3321 |
| Mar-19 | 131,299 | 1.3589 |

2:19-cv-02240-CSB-EIL  # 1  Page 29 of 51

| Month | Monthly Volume | Settlement Price |
|-------|----------------|------------------|
| Apr-19 | 110,149 | 1.3205 |
| May-19 | 121,567 | 1.3706 |
| June-19 | 96,843 | 1.5448 |
| July-19 | 96,231 | 1.4953 |

77.     An economically rational actor "buys low and sells high." Yet ADM displayed the exact opposite approach – it was a buyer at the Argo Terminal when prices and margins were higher (pre-November 2017), and shifted toward becoming a massive seller (and remained one) right as prices and margins declined, including in December 2018 when the Chicago Benchmark Price hit 15-year lows. This is strong evidence both of ADM having actually engaged in manipulation and of its manipulation having achieved the desired price-depressing effect.

78.     ADM's aggressive selling of ethanol during the MOC window is also economically irrational in the context of its own ethanol purchases at the Argo Terminal during the Relevant Period. In an effort to drive down the Chicago Benchmark Price, ADM frequently sold more ethanol during the MOC window than it could physically deliver. As a result, ADM was forced to buy ethanol at the Argo Terminal to meet its contracted obligations. ADM routinely did so toward the end of the trading month, at prices that were higher than the prices it had sold ethanol for earlier in the month. This was another example of ADM selling low and buying high.

79.     Notably, from December 1, 2017 to at least March 29, 2019, ADM *never* bought a single lot of ethanol at the Argo Terminal in the price-setting MOC window. But the MOC window is likely where ADM would have found the most competitive price thanks to the public and ostensibly competitive bidding process that was supposed to take place in those 30 minutes. Instead, ADM made all of its physical ethanol purchases outside of the MOC window, thereby avoiding having its own purchases increase the Chicago Benchmark Price and harm ADM's ethanol derivatives positions.

80.    As further evidence of ADM's manipulation, pricing data from the Relevant Period demonstrates that ADM could have received significantly higher prices and profits for its ethanol at other terminals or directly from other potential buyers, even after factoring in differences in transportation costs.

81.    For example, on August 3, 2018—when ADM was the seller in all five MOC trades of ethanol at the Argo Terminal for $1.4450 per gallon—Platts' Biofuelscan report indicated that prices for ethanol at terminals in New York Harbor and Houston were nearly 11-12 cents per gallon higher than at the Argo Terminal:

### US ETHANOL PRICE ASSESSMENTS

| United States (¢/gal) [PBF page 210] | | Low-High | Midpoint | Change |
|---|---|---|---|---|
| Ethanol Chicago (terminal) | AALRI00 | 144.50-144.55 | 144.525 | +0.000 |
| Ethanol Chicago (Rule 11) | AAWD00 | 143.45-143.55 | 143.50 | -1.50 |
| Ethanol swap Chicago (Sep ) | ESCN001 | 143.95-144.05 | 144.00 | +0.00 |
| Ethanol swap Chicago (Oct ) | ESCN002 | 143.45-143.55 | 143.50 | +0.00 |
| Ethanol NYH Barge (Aug) | AAMPF00 | 155.20-155.30 | 155.250 | +0.000 |
| Ethanol NYH Barge (Sep) | AAUEG00 | 153.70-153.80 | 153.750 | +0.000 |
| Ethanol Houston 5-15 Tank | AATG300 | 156.20-156.30 | 156.25 | +0.00 |

82.    This snapshot is consistent with Bloomberg data on reported prices at Argo (ETHNCHIC Index), New York Harbor (ETHNNYPR Index), Gulf Coast (ETHNUSGC Index), and the West Coast (ETHNWCPR Index) during the Relevant Period. That data shows that on average, prices at these other terminals were 10.4 to 22.1 cents higher per gallon than at the Argo Terminal.

83.    An analysis of Bloomberg pricing data also supports the inference that ADM began its manipulation scheme on or around November 2017. In the 17 months between June 1, 2016 and October 31, 2017, the average differential in price between the Argo Terminal and the other three terminals was roughly 4.9-15.5 cents per gallon. This means that, on average, from June 1, 2016 to October 31, 2017, an ethanol producer could have received between 4.9 and 15.5 cents more by selling their ethanol at New York Harbor/Gulf Coast/West Coast than at Argo (with 4.9 cents

representing the additional price at the terminal closest in price to Argo, and 15.5 cents representing the additional price at the terminal highest in price compared to Argo).

84.     The existence of some persistent price differential between Argo and these other terminals is to be expected. It is easier and cheaper to transport ethanol to the Argo Terminal (via barge, railcar, or truck) than to these other major terminals because ethanol is predominantly produced in the Midwest. The persistent differential between the Argo Terminal and the other terminals thus roughly reflected the increased transport costs (and the risk to price changes during transit) involved in shipping ethanol to these other terminals.

85.     But beginning in November 2017 and continuing through at least March 30, 2019, the pre-existing differential suddenly and persistently increased to between 10.4 and 22.1 cents per gallon. There was no corresponding sudden and persistent increase in transport costs that could explain the increase of this inter-terminal price differential. Accordingly, it is reasonable to infer that, since November 2017, the Argo Terminal price has been artificially depressed by 5.5 to 6.6 cents per gallon, on average. An econometric analysis will establish that it was ADM's manipulation that caused this sudden and persistent increase in the inter-terminal price differential, as opposed to other factors. The table below provides some data-points on the differential pre- and post-November 2017.

|  | **Pre-Manipulation** June 1, 2016-October 31, 2017 | **Manipulation Period** November 1, 2017 – March 31, 2019 |
|---|---|---|
| Difference in Price Per Gallon for Ethanol Between the Argo Terminal and the Terminal with the Next-Lowest Price | 4.94 cents per gallon (average) 5 cents per gallon (median) 10 cents per gallon (maximum – July 21, 2017) | 15.48 cents per gallon (average) 15.5 cents per gallon (median) 22 cents per gallon (maximum – October 9, 2017) |
| Difference in Price Per Gallon for Ethanol Between the Argo Terminal and the Terminal with the Highest Price | 10.44 cents per gallon (average) 10 cents per gallon (median) 18.5 cents per gallon (maximum – March 27, 2019) | 22.09 cents per gallon (average) 21 cents per gallon (median) 43.75 cents per gallon (maximum – August 21, 2018) |

86.     To put it another way, assuming that the 4.9 to 15.5 cents per gallon differential from June 1, 2016 to October 31, 2017 represents the average additional transport costs to ship to these other terminals, and those costs did not increase, then ADM could have sold its ethanol for 5.5 to 6.6 cents per gallon more at these other terminals than it received at the Argo Terminal (even after factoring in transport costs) during the Relevant Period after November 1, 2017.

87.     Indeed, while the "average" differential between the Argo price and the terminal with the next-lowest price between June 1, 2016 and October 31, 2017 had been 4.9 cents per gallon, the same differential never fell below that amount after November 1, 2017. The average monthly differential between the Argo Terminal price and the prices at the other major terminals thus persistently increased after November 2017 on an ongoing basis as a result of ADM's manipulation scheme.



88.    On August 3, 2018—the day identified above where ADM was the seller in all five trades during the Argo Terminal MOC period for $1.4450 per gallon—ADM could have received $1.55 per gallon at New York Harbor and Gulf Coast terminals, or even $1.7450 per gallon (30 cents per gallon higher) at West Coast terminals.

89.    Had ADM been acting in an economically rational manner and not engaging in intentional manipulation, it would have sought the highest available price (factoring in the costs of transport) for its physical ethanol sales. During the Relevant Period, the highest available price was not at the Argo Terminal during the MOC window, but rather at other terminals such as New York Harbor, Gulf Coast, and West Coast as the data above demonstrates, or from other non-terminal buyers in the market.

29

90.     The reactions of other sophisticated participants in the ethanol derivatives market to the anomalous pricing coming out of the Argo Terminal post-November 2017 also provides strong evidence of ADM's manipulation scheme. For example, in the spring of 2018, at least one ethanol derivatives trader that suspected manipulation by ADM brought those suspicions to the CME. The CME then requested trading records from ADM. Despite the months-long manipulation, ADM provided a limited production of only a few days' trading records. Due to the informal and incomplete nature of the investigation, ADM was apparently able to hoodwink the CME into believing that its manipulative trading activity was a response to unrelated railroad logistics.

91.     Subsequently, various news stories and industry chatter indicated that some ethanol market participants suspected that ADM was accumulating large short positions in Chicago Ethanol Derivatives while engaging in unprecedented and irrational selling activity during the MOC window.

92.     For instance, on September 12, 2018, Reuters journalist Jarrett Renshaw reported and tweeted that ADM "ramps up ethanol sales in Chicago, irking rivals," noting that ADM had "accounted for roughly 61 percent of the 9.5 million ethanol barrels sold at [the Argo Terminal] between November [2017] and August [2018]," and that "heavy selling by ADM has led traders who have lost money on the slumping ethanol market to complain to S&P Global Platts."[3]

93.     Renshaw also reported on the same day that "[o]n the Chicago Board of Trade, ADM registered all 579 ethanol contracts [the CME's Ethanol Futures Contract, EH] for delivery as

---

[3] https://twitter.com/JarrettRenshaw/status/1039971701763829761;
https://twitter.com/JarrettRenshaw/status/1039971344077795328;
https://www.reuters.com/article/us-usa-ethanol-adm/commodities-giant-adm-ramps-up-ethanol-sales-in-chicago-irking-rivals-idUSKCN1LS303

of Tuesday, each contract representing 29,000 gallons—or enough for about one rail tanker car—the most in the history of the contract, according to CME Group data."[4]

94.    ADM's anomalous pricing and trading behavior at the Argo Terminal after November 2017 led various market participants to complain to Platts about the potential manipulation of the Chicago Benchmark Price. In response to those complaints, Platts paid for and hosted a July 2018 meeting at its offices located at 111 Bagby St. in Houston, Texas, and invited major ethanol producers, brokers, and other stakeholders. Among the approximately 40 participants in the July 2018 meeting were Adam Kuffel of ADM; Sophie Byron and Ian Dudden of Platts; and representatives from Shell, Trafigura, Vitol, CCI, Biourja, Eco-Energy, Green Plains, POET, Mercuria, and Marquis Energy. The CME also sent a senior official – Vish Subramanian, CME Group's Director of Energy Products – to attend the July 2018 meeting.

95.    At the meeting, Platts solicited comments from attendees on its methodology for calculating the Chicago Benchmark Price during the MOC window, whether any changes should be implemented the methodology, and if so, why. In response, some participants pointed to ADM's aggressive selling and hitting the bid during the MOC window as evidence that the benchmark price could be unduly influenced by an aggressive seller.

96.    ADM's representative Adam Kuffel did not directly address the implication that ADM might be having an outsized impact on the Chicago Benchmark Price. Kuffel instead voiced ADM's opposition to an effort by some participants to decrease the ITT deliverable time for ethanol for the MOC window from the current 5 to 15 days forward to just 2 to 10 days forward. Notably, a reduction in the ITT deliverable time would constrain ADM's ability to manipulate the MOC window through aggressive selling of ethanol beyond what ADM could physically deliver.

---

[4] https://twitter.com/JarrettRenshaw/status/1039973948451168256; https://www.reuters.com/article/us-usa-ethanol-adm/commodities-giant-adm-ramps-up-ethanol-sales-in-chicago-irking-rivals-idUSKCN1LS303

Specifically, ADM would have fewer days to find and buy ethanol outside the MOC window to satisfy all of its delivery obligations.

97.     At the end of the meeting, Platts promised to take recommendations from all participants into account, but also indicated that it would not be able to change anything before the beginning of 2019.

98.     Realizing that the Platts methodology was not being changed, Platts' competitor Argus Media saw an opportunity to lobby ethanol stakeholders and the CME to create an alternative to the susceptible-to-manipulation Platts window, based on either an average price throughout the whole day of transactions at the Argo Terminal, or using the so-called "Rule 11" calculation of prices at a railway switch near Chicago where buyers take railcars from sellers and return them after emptying.

99.     Argus invited the CME and other ethanol market participants to a meeting in November 2018 at a hotel in Houston to discuss whether there was demand for a new ethanol derivative product that could generate sufficient liquidity and could not be manipulated by ADM. Argus specifically did not invite ADM to this meeting.

100.     Participants at this meeting included representatives from Trafigura, Eco-Energy, Green Plains, POET, CCI, Mercuria, and Biourja. The CME again sent Vish Subramanian to attend on its behalf. Despite not being invited, Adam Kuffel of ADM nonetheless attended the November 2018 meeting.

101.     At this meeting, Kuffel expressed his opinion that the market was functioning effectively and that ADM saw no reason to change the status quo. Jordan Fife of Biourja asked Kuffel why, if ADM thought the ethanol market was healthy, it brought in railcars to the Argo Terminal against "arbs" (i.e. at lower prices than they could have received via arbitrage at other terminals or from other buyers) in April/May 2018.

102.    Kuffel responded that he was "not at liberty to discuss ADM's strategies in this venue" – a response that did not offer any explanation for ADM's otherwise irrational sale practices at the Argo Terminal.

**7.    ADM's senior executives knew about the manipulation scheme**

103.    The manipulation scheme carried out by Ray Bradbury and Adam Kuffel was not the product of two rogue employees in ADM's ethanol division. The scheme was implemented with the knowledge of senior ADM officials, who were aware that the ethanol division was earning outsized profits from large short positions in Chicago Ethanol Derivatives as a result of ADM's aggressive selling activity during the MOC window at the Argo Terminal.

104.    The ethanol division at ADM routinely generated reports on its operations and its profits/losses for senior ADM officials, who in turn aggregated the reports into company financial reports for disclosure to ADM's investors. Through these reports, senior ADM officials were kept updated on the ethanol division's performance and were aware that the division was generating outsized trading profits despite historically low ethanol margins.

105.    Indeed, senior ADM officials publicly acknowledged the success of the manipulation scheme, though they couched it in euphemism. In an ADM earnings call on November 6, 2018 reporting on the third quarter of 2018 – a time of extremely low ethanol margins during which ADM was aggressively manipulating the Chicago Benchmark Price downward – ADM Executive Vice President and Chief Financial Officer Ray Guy Young reported (discussing the slide below) that ADM's bioproducts team (which included the ethanol group) "did a good job managing risk in [an] extremely weak ethanol industry margin environment." ADM's 10-Q from the third quarter of 2018 reported bioproducts had earned a $43 million operating profit, even as ADM's ethanol producer competitors were suffering losses as a result of this "extremely weak ethanol industry margin environment."



106.    ADM's 2018 10-K filing likewise implicitly acknowledged the success of the manipulation scheme. For instance, ADM stated that for 2018 compared to 2017, "[b]ioproducts results were down as near record industry fuel ethanol inventories pressured margins and production issues in the Decatur, IL corn complex increased costs, partially offset by effective ethanol risk management."[5]   In the same filing, discussing 2017 performance compared to 2016, ADM noted that "[b]ioproducts profit increased due to higher trading results partially offset by slightly lower ethanol margins."

107.    On information and belief, the "effective ethanol risk management" and "higher trading results" in 2017 and 2018 referred to in ADM's 2018 10-K refer to the manipulative scheme discussed in this complaint, and reflect the fact that senior ADM officials such as those involved in preparing ADM's annual report were made aware by Ray Bradbury and Adam Kuffel of the manipulative scheme and its impact on the bioproducts division's profit.

---

[5] ADM 2018 Form 10-K (filed Feb. 19, 2019) at 33.

**8.      Plaintiff AOT was damaged by ADM's manipulation**

108.    During the Relevant Period, AOT was a frequent trader in Chicago Ethanol Derivatives such as Chicago Ethanol (Platts) Futures, and suffered actual damages as a result of ADM's downward manipulation of the Chicago Benchmark Price. What follows is an illustration of how ADM's manipulation damaged AOT's positions in Chicago Ethanol (Platts) Futures.

109.    Because ADM's manipulation was designed to artificially lower the Chicago Benchmark Price during every MOC window during that settlement month, Chicago Ethanol (Platts) Futures traders such as AOT would most immediately suffer actual damages to long positions that they held in a Chicago Ethanol (Platts) Futures spot month contract at the beginning of that spot month.

110.    As seen below, during the Relevant Period AOT entered the spot month with a long position in Chicago Ethanol (Platts) Futures contracts during eight separate months, and in total held a net long position entering spot months across the Relevant Period—positions that would have been damaged by ADM's manipulative scheme:

| Spot Month Contract | AOT's Position in Chicago Ethanol (Platts) Futures (CU) Entering That Spot Month[6] |
|---|---|
| November 2017 | -420 |
| December 2017 | 3,123 |
| January 2018 | 0 |
| February 2018 | -116 |
| March 2018 | -315 |
| April 2018 | 224 |
| May 2018 | -286 |
| June 2018 | -138 |
| July 2018 | 35 |
| August 2018 | 75 |
| September 2018 | 35 |
| October 2018 | 30 |
| November 2018 | 30 |
| December 2018 | 30 |
| January 2019 | 0 |
| February 2019 | 0 |
| March 2019 | 0 |
| April 2019 | -20 |
| May 2019 | -5 |
| **TOTAL** | **2,282** |

111. As noted above in paragraph 37, a 1-cent per gallon change to the Chicago Benchmark Price impacts each Chicago Ethanol (Platts) Futures contract (CU) by $420, and (per paragraphs 85-86) ADM's manipulation reduced the Chicago Benchmark Price by an estimated 5.5-6.6 cents per gallon on average throughout the Relevant Period.

112. Using these estimates and inputs, AOT's long positions (totaling a net of 2,282 contracts across the Relevant Period) entering spot months in the Chicago Ethanol (Platts) Futures contract alone may have suffered actual damages of approximately $5,271,420 (representing a 5.5

---

[6] Positions reflect AOT's net position in Chicago Ethanol (Platts) Futures contracts in the contract month at the end of trading on the last trading day of the month preceding that contract month, with negative numbers indicating a short position and positive numbers indicating a long position. Thus, for the December 2017 contract, AOT's position at the close of trading on November 30, 2017 (the last day of trading before the beginning of the December 2017 spot month) was 3,123 contracts long.

cents per gallon reduction) to $6,325,704 (representing a 6.6 cents per gallon reduction) as a result of ADM's downward manipulation of the Chicago Benchmark Price.

113.    As an active trader in Chicago Ethanol (Platts) Futures, however, AOT's actual damages as a result of ADM's manipulative scheme would not be limited to harm to their long positions entering a spot month. Within a spot month, as AOT bought and sold Chicago Ethanol (Platts) Futures, AOT incurred additional damages as a result of its intra-spot month trading at artificial prices caused by ADM's manipulation, and as a result of ADM's manipulation later within the spot month affecting the settlement of positions taken earlier within that month.

114.    For instance, within December 2017, AOT bought (and thus took a long position) a net 836 Chicago Ethanol (Platts) Futures contracts between December 1-December 13, 2017. Then, from December 14-18, 2017, AOT sold (went short) 490 Chicago Ethanol (Platts) Futures contracts.

115.    As discussed in paragraphs 63-69 above, in December 2017 ADM aggressively "hit the bid" during the MOC window at the Argo Terminal, resulting in ongoing downward manipulation of the Chicago Benchmark Price during and continuing throughout the month.

116.    AOT's trading in the December 2017 Chicago Ethanol (Platts) Futures contract within December 2017 thus resulted in additional losses. The 836 Chicago Ethanol (Platts) Futures contracts that AOT bought (went long on) from December 1-13, 2017 were all purchased at prices *above* the $1.2965 per gallon settlement value of the December 2017 contract – a settlement value that was the result of ADM's successful downward manipulation throughout the month. AOT suffered losses on these transactions, as manipulation later in the month after these contracts were bought decreased their settlement value.

117.    Similarly, 390 of the 490 Chicago Ethanol (Platts) Futures contracts that AOT sold (went short on) from December 14-18, 2017 were sold at prices **below** the $1.2965 per gallon

settlement value of the December 2017 contract. For those contracts, AOT sold at an artificially lower price than they would have been able to sell absent ADM's manipulation earlier in the month, and thus incurred additional actual losses on those contracts.

118. Similar patterns to this—AOT buying/going long on Chicago Ethanol (Platts) Futures contracts early within a contract month, and/or selling/going short on Chicago Ethanol (Platts) Futures contracts later within a contract month—were repeated in contract months throughout the Relevant Period. In each instance, AOT's intra-month trading in Chicago Ethanol (Platts) Futures contracts resulted in AOT incurring additional losses due to ADM's ongoing downward manipulation of the Chicago Benchmark Price throughout that contract month.

**9. The proposed Class that AOT seeks to represent**

119. AOT seeks to represent and certify the following Class under Federal Rule of Civil Procedure 23 (b)(3):

> All persons who traded in or settled positions in Chicago Ethanol (Platts) Futures (CME symbol: CU), Chicago Ethanol (Platts) Average Price Options (CME symbol: CVR), or the CME's Ethanol Futures Contracts (CME symbol: EH) after November 1, 2017, and were damaged as a result of the decrease in the Chicago Ethanol (Terminal) price caused by ADM's trading activity at the Argo Terminal.[7]

120. Excluded from the Classes are: ADM; the officers, directors, or employees of ADM; any entity in which ADM has a controlling interest; any affiliate, legal representative, heir, or assign of ADM and any person acting on their behalf. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate families and judicial staff, as well as any juror assigned to this action.

121. The Class is readily ascertainable based on records and transaction data in the possession of CME.

---

[7] AOT reserves the right to narrow or otherwise amend this Class definition before it files its motion for class certification, including based on discovery obtained from ADM or non-parties.

122.    There are potentially hundreds if not thousands of geographically dispersed Class members, making joinder impracticable.

123.    AOT's claims are typical of the claims of Class members. AOT and other Class members sustained damages arising out of ADM's manipulation in violation of the CEA. The damages and injuries of each member of the Class were directly caused by ADM's wrongful conduct. ADM's defenses with respect to AOT's claims, if any, are typical of defenses to the claims of all Class members.

124.    There are questions of law and fact common to the Class, including, but not limited to, the following:

- whether ADM manipulated Chicago Benchmark Prices or the prices of Chicago Ethanol Derivatives;

- whether ADM's conduct constitutes manipulation under the CEA;

- whether ADM's conduct was willful and intentional;

- the appropriate Class-wide measure of damages, including whether Class members are entitled to additional punitive or exemplary damages equal to two times the amount of their actual damages under the CEA; and

- the appropriate injunctive and other equitable relief for the Class.

125.    These common questions of law and fact predominate over any questions affecting only individual Class members.

126.    AOT will fairly and adequately protect the interests of Class members. AOT's interests are aligned with, and not antagonistic to, those of the other members of the Class, and it has retained counsel competent and experienced in the prosecution of class actions and financial litigation to represent it and the Class.

127.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the

Class would impose heavy burdens on the courts, ADM, and relevant non-parties and would create a risk of inconsistent or varying adjudications. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of Class members to seek redress for the violations of law alleged herein.

## CLAIMS FOR RELIEF

### CLAIM ONE
### Manipulation in Violation of the Commodity Exchange Act

128.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this complaint.

129.    ADM specifically intended to and did manipulate the prices of the following commodities and futures in violation of the CEA, 7 U.S.C. § 1 *et seq.*: (1) ethanol sold at the Argo Terminal; (2) the Chicago Ethanol (Terminal) price calculated based on trading activity during the MOC window at the Argo Terminal; (3) the Chicago Ethanol (Platts) Future (CU) traded on NYMEX; (4) the Chicago Ethanol (Platts) Average Price Options Contract (CVR) traded on NYMEX; and (5) the Ethanol Futures Contracts (EH) traded on CBOT.

130.    ADM possessed the ability to influence the Chicago Ethanol (Terminal) price (and thus the settlement/price of the aforementioned Chicago Ethanol Derivatives contracts linked to that price). ADM successfully created artificial Chicago Ethanol (Terminal) prices by selling ethanol during the price-setting MOC window at prices that were below what ADM could have received at other available terminals or in privately negotiated sales, below what ADM could have realized by negotiating during the MOC window, and at times below ADM's own variable costs of production. ADM did so in order to benefit positions ADM had taken in the aforementioned Chicago Ethanol Derivatives that were priced/settled based on the Chicago Ethanol (Terminal) price.

131.     ADM's manipulative conduct and trading activity alleged herein constituted manipulation of the Chicago Ethanol (Terminal) price used to settle/price the aforementioned Chicago Ethanol Derivatives between November 2017 and the present, in violation of the CEA, 7 U.S.C. §§ 6b(a), 6c(a), 9(1), 9(3), 13(a)(2), and 25(a), as well as 17 C.F.R. § 180.2.

132.     As a direct result of ADM's unlawful conduct, Plaintiff and Class members suffered actual damages and injury in fact due to losses they incurred when trading in the aforementioned Chicago Ethanol Derivatives linked to the Chicago Ethanol (Terminal) price at artificial prices between November 2017 and the present, to which Plaintiff and Class members would not have been subject but for ADM's unlawful conduct alleged herein.

133.     Plaintiff and Class members were further legally injured and suffered injury in fact when they transacted in the aforementioned Chicago Ethanol Derivatives linked to the Chicago Ethanol (Terminal) price between November 2017 and the present in an artificial and manipulated market with the artificial prices created by ADM.

134.     Because ADM's conduct was willful and intentional, Plaintiff and Class members are entitled to additional punitive or exemplary damages equal to no more than two times their actual damages for the violations of the CEA alleged herein.

**PRAYER FOR RELIEF**

135.     Plaintiff requests the following relief:

A.     That the Court enter an order declaring that ADM's actions, as set forth in this complaint, violate the CEA;

B.     That the Court award Plaintiff and the Class damages, punitive and exemplary damages, and/or restitution in an amount to be determined at trial;

C.     That the Court issue appropriate injunctive and other equitable relief against ADM;

D.     That the Court award Plaintiff and the Class pre- and post-judgment interest;

E.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses; and

F.      That the Court award any and all such other relief as the Court may deem just and proper.

Dated:  September 4, 2019

/s George A. Zelcs
George A. Zelcs
John A. Libra
Chad E. Bell
Ryan Z. Cortazar
**KOREIN TILLERY LLC**
205 North Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile:  312-641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
cbell@koreintillery.com
rcortazar@koreintillery.com

Stephen M. Tillery
Michael E. Klenov
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
mklenov@koreintillery.com

*Attorneys for Plaintiff and the Proposed Class*

## APPENDIX 1 - BACKGROUND ON FUTURES AND OPTIONS

1.    **Futures.** A futures contract is a derivative that allows market participants to offset or assume the risk of a price change of an underlying commodity over time. Futures contracts detail the quality and quantity of the underlying commodity (including the place of delivery if physically settled), and are standardized to be identical for all participants to facilitate trading on futures exchanges such as CME. Given the standardization of the contract specifications, the only contract variable is price, which is discovered by bidding and offering (also known as quoting) until a trade occurs. The fact that futures contracts are standardized and exchange-traded makes these instruments indispensable as means of hedging and speculating by commodity producers, consumers, traders, and investors.

2.    A futures contract can be settled in one of two ways. A physically settled futures contract is settled by physical delivery of the designated quantity of the underlying commodity at a predetermined place on a fixed date (the expiration date) at the predetermined price. A cash settled futures contract, by contrast, results in a cash payment between the futures contract parties reflecting the difference between the originally contracted price of the futures contract and the final market price of the futures contract at the time of settlement.

3.    Physical settlements of futures contracts are relatively rare, as the benefits of a contract can be realized without actual physical delivery of the good by closing out a futures position either before settlement (buying a futures contract to offset one you sold earlier, or vice versa), or at settlement (by cash settling with the counterparty to the futures contract). To illustrate, consider the following hypothetical.

4.    In January, a trader believes that the price of ethanol will rise before an April futures contract expires. That trader could buy an April Chicago Ethanol (Platts) Futures contract at $1.50 per gallon in January, giving him control of 1,000 barrels (or 42,000 gallons) of ethanol deliverable in

April.[8] The trader does not have to pay $63,000 ($1.50 per gallon times 42,000 gallons per contract) for the futures contract – rather, the trader pays only an initial margin payment (typically 3%-12% per futures contract, or $1,890-$7,560 in this example).

5.      The trader's position and corresponding profit or loss will fluctuate as the price of the futures contract moves between the time the contract is purchased and the contract's expiration date. The final profit or loss of a trade is realized when the trade either reaches settlement or (more likely) is closed.

6.      Thus, if in February the price of an April Chicago Ethanol (Platts) Futures contract had fallen to $1.00 per gallon, and the trader closed out her position by selling her futures contract at the $1.00 per gallon price, she would have a loss of $21,000 ($0.50 decrease from the $1.50 per gallon purchase price times 42,000 gallons per contract).

7.       If, however, the trader held onto the futures contract and in March the price of the April Chicago Ethanol (Platts) Futures contract had increased to $2.00 per gallon, the trader would get a profit of $21,000 ($0.50 increase from the $1.50 per gallon purchase price times 42,000 gallons) by closing out her position in March.

8.      If you believe prices will increase in the commodity underlying a futures contract, you would buy the contract now and be said to have a "long" position – in other words, you are buying the contract now (at what you believe will be a low price) in order to sell it later (to close out the position) or let it settle (at the settlement date) at what you believe will be a higher price.

9.      If, however, you believe prices will decrease in the commodity underlying a futures contract, you would do the opposite – you would take a "short" position by selling the futures

---

[8] The CME Chicago (Platts) Ethanol Futures and Average Price Option contracts are standardized at 1,000 barrels or 42,000 gallons per contract; the CME's Ethanol Futures Contract (EH) is standardized at 29,000 gallons.

contract now at what you believe will be a higher price, and buy it later (to close out the position) or let it settle at what you believe will be a lower price.

10.     The losses and gains realized by traders do not occur only when traders close out a position or when the contract settles. Both long and short traders must deposit specific amounts of money through margin requirements established by exchanges like CME. The amount of money in these accounts fluctuates based on the daily price of the underlying commodity as CME transfers money between the accounts of long and short positions. So if Trader A sells an ethanol futures contract to Trader B at $1.50 per gallon, money from Trader B's account will be transferred to A's account every day the price of ethanol drops relative to the previous day. By contrast, every day the price of ethanol rises relative to the previous day, money from Trader A's account will be transferred to Trader B. Because of this constant relative movement, traders see (at least, on paper) gains and losses every day regardless of the original price of the contract.

11.     **Options.** An option contract is a type of financial derivative that gives the buyer the right—but not the obligation as with a futures contract—to either buy or to sell a particular commodity at a predetermined price ("strike price"), on or before a specified date in the future (the "expiration date").

12.     A "put" or "put option" is a financial contract that gives the owner the right, but not the obligation, to sell an agreed quantity of a particular commodity at the strike price, by or on the expiration date.  A "call" or "call option" is a financial contract that gives the owner the right, but not the obligation, to buy an agreed quantity of a particular commodity at the strike price, by or on the expiration date.

13.     A European option may be exercised or settled only at the expiration date of the option (i.e., at a single pre-defined point in time). An American option, on the other hand, may be

exercised at any time before the expiration date. Options, like futures, can be settled by either physical delivery or cash-settlement.

14.     Whether an option is exercised depends on whether it is "in-the-money" or "out-of-the-money." An in-the-money call option is one where the strike price is below the current price of the underlying asset. For example, if an option holder owns a call option giving the right to buy ethanol at a price of $1.50 per gallon, and the market price for ethanol is currently $2.00 per gallon, the call option is in-the-money because the option holder could make $0.50 per gallon by exercising the option to buy the ethanol at $1.50 per gallon and immediately sell it for $2.00 per gallon.

15.     An in-the-money put option is one where the strike price is above the current market price of the underlying asset. Thus, if an option holder owns a put option giving the right to sell ethanol at a price of $1.50 per gallon, and the market price for ethanol is currently $1.00 per gallon, the put option is in-the-money because the option holder could make $0.50 per gallon by purchasing ethanol for $1.00 per gallon and then exercising the put option to immediately sell that ethanol for $1.50 per gallon.

16.     An out-of-the-money call option is one where the strike price is above the current price of the underlying asset. In the earlier example, if a trader held a call option giving the right to buy ethanol at $1.50 per gallon but the market price for ethanol is currently $1.00 per gallon, the call option is out-of-the-money (the option holder would not exercise it, since they could buy the ethanol more cheaply at the market price).  Likewise, an out-of-the-money put option is one where the strike price is below the current market price of the underlying asset. Thus, if a trader holding a put option giving the right to sell ethanol at $1.50 per gallon but the current market price of ethanol is $2 per gallon, that put option is out-of-the-money (because the option holder would not exercise it, since they could sell the ethanol at the current market price and make more money).

17.    Whether an option is in or out-of-the-money depends on the relevant benchmark price at the time of option settlement—the at-the-money price. In the case of ethanol, if the at-the-money price is $2.00 per gallon (representing the relevant benchmark price of ethanol at the time of settlement), call options below $2.00 and put options above $2.00 are both in-the-money. An option can be in- or out-of-the-money at one point in time and just the opposite at the time of settlement. A put option to sell ethanol at $1.50 per gallon is out-of-the-money when the at-the-money price is $2.00 per gallon, but in-the-money if the price were to swing below $1.50 per gallon.

18.    The price paid by the buyer of an option and received by the seller of the option is the premium.  Generally speaking, the seller of an option profits if the option is worth less at expiration than the premium received.  This is the case if the option is out-of-the-money at expiration, if the option is at-the-money at expiration, or if the option is in-the-money at expiration by an amount that is less than the premium received.