## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| AOT HOLDING AG, individually and on behalf of all others similarly situated, | Case No. 19-cv-2240 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| ARCHER DANIELS MIDLAND COMPANY, | |
| Defendant. | |

## ANSWER AND AFFIRMATIVE DEFENSES

Defendant Archer Daniels Midland Company ("ADM"), in answer to the Class Action Complaint ("Complaint") filed by AOT Holding AG ("AOT) on September 4, 2019, states as follows:

## PRELIMINARY STATEMENT

ADM responds in this Answer only to the claims that remain after the Court's Order dated May 22, 2020 (Dkt. 45), in which the Court dismissed AOT's Complaint "as to any claims premised under 7 U.S.C. §§ 6c(a) and 6b(a)." (Dkt. 45 at 18). ADM's investigation in this matter continues and ADM reserves the right to supplement or modify any portion of this Answer, including by asserting additional affirmative or other defenses or claims not yet asserted based on discovery or other factual investigations, consistent with the Federal Rules of Civil Procedure and the Court's scheduling order in this matter.

The section headings, "Glossary of Terms" preceding AOT's allegations, and the "Appendix 1 – Background on Futures and Options" immediately following state legal conclusions

to which no answer is required.  To the extent an answer is required, ADM denies the statements therein.

ADM denies all allegations in the Complaint, whether express or implied, that are not specifically admitted below.  Any factual allegation below is admitted only as to the specific admitted facts and not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from the admitted facts.  ADM further denies that AOT is entitled to the relief requested or any other relief.

## SUMMARY OF THE CASE

1.      This lawsuit seeks redress under the Commodity Exchange Act ("CEA") for ADM's manipulation of a key ethanol benchmark price—the Chicago Ethanol (Terminal) price—that is used to price and settle numerous ethanol derivatives traded on the New York Mercantile Exchange ("NYMEX") and Chicago Board of Trade ("CBOT"), both operated by CME Group, Inc.

**ANSWER:**  The allegations in paragraph 1 state legal conclusions to which no answer is required. To the extent an answer is required, ADM admits that AOT purports to seek redress under the CEA and that the NYMEX and CBOT are both operated by CME Group, Inc. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

2.      ADM is one of the largest ethanol producers in the United States.  In late 2017, facing already low margins on its ethanol sales due to a supply glut, ADM tried but failed to sell three of its ethanol facilities.  Rather than closing or idling some of its ethanol mills, which ADM's competitors had already begun to do in response to low prices/margins, ADM chose to take a different tack.  In a plan conceived and orchestrated by two senior members of its ethanol group— Ray Bradbury and Adam Kuffel—ADM placed huge bets

through ethanol derivatives that the price of ethanol would decline further (i.e., placed "short" bets). The value of these derivatives was tied directly to the benchmark Chicago Ethanol (Terminal) price, which is calculated daily by S&P Global Platts ("Platts") based on 30 minutes of ethanol trading activity at the Kinder Morgan Argo Terminal in Argo, Illinois. This 30-minute window is called the Market-on-Close ("MOC") window.

**ANSWER:** ADM admits that it is one of the largest ethanol producers in the United States, and that Ray Bradbury and Adam Kuffel are members of ADM's ethanol group. ADM further admits that three of its facilities that produce ethanol were offered for sale. ADM denies that it engaged in manipulative conduct in the ethanol market. The remaining allegations in paragraph 2 state legal conclusions to which no answer is required. To the extent an answer is required, ADM denies the remaining allegations in this paragraph.

3. To ensure that its derivatives bets would pay off handsomely, in November 2017 ADM began to aggressively sell ethanol during the MOC window by reducing prices and filling the lower-priced bids of various ethanol purchasers in these critical 30 minutes of daily trading. On its face, ADM's behavior appeared economically irrational because it chiseled away at ADM's ethanol profit margins and even drove prices below ADM's variable cost of production. ADM's competitors were largely unwilling to sell at these low prices because they (and ADM) could sell their ethanol at significantly higher prices at other terminals in the U.S. or through private contracts, even after taking additional transport costs into account.

**ANSWER:** ADM admits that it sold ethanol during the MOC window on dates in November 2017, including ethanol bids placed by AOT at the prices offered by AOT. ADM denies that it engaged in manipulative conduct in the ethanol market. ADM is without sufficient information or

knowledge upon which to form a belief as to the truth or validity of the allegations in this paragraph relating to its competitors' behavior and therefore denies the same. The remaining allegations in paragraph 3 state legal conclusions to which no answer is required. To the extent an answer is required, ADM denies the remaining allegations in this paragraph.

4.     The intended and actual effect of ADM's aggressive pricing and filling of lower-priced bids during the MOC window was to manipulate the Platts benchmark price downward. ADM's downward manipulation of physical ethanol prices at the Argo Terminal in turn artificially increased the value of ADM's massive short positions in ethanol derivatives based on those same prices—thus allowing ADM's ethanol group to reap outsized profits despite low or negative margins on physical ethanol sales. ADM's public financial filings have credited this anomalous performance to "effective ethanol risk management." In truth, ADM's actions are "risk management" no more than an owner of a baseball team betting against his team while bribing his players to throw the game is "smart baseball."

**ANSWER:** Denied.

5.     Plaintiff and its counsel's extensive investigation has uncovered substantial evidence of ADM's manipulative scheme. The evidence indicates that, starting in November 2017 and continuing through today (the "Relevant Period"), much of ADM's behavior was economically irrational and contrary to its self-interest as an ethanol producer—unless it was intended to manipulate physical ethanol prices at the Argo Terminal in order to benefit ADM's large short positions in related ethanol derivatives. Thus, the only reasonable conclusion to draw from the evidence is that ADM in fact engaged in precisely this kind of manipulation. The highlights of the key evidence are as follows:

- Before November 2017, when ethanol prices and profit margins were higher, ADM was one of the largest buyers of ethanol at the Argo Terminal. Starting in November 2017 and continuing thereafter, when ethanol prices were lower and profit margins were eroding or non-existent, ADM became the largest seller of ethanol at the Argo Terminal—accounting for roughly 70% of all ethanol sales there.

- Before November 2017, ADM was one the largest buyers of ethanol at the Argo Terminal during the MOC window. Starting in November 2017 and continuing thereafter, ADM became by far the largest seller of ethanol during the MOC window—accounting for roughly 90% of all such sales, and 95% in November 2018.

- Starting in November 2017 and continuing through at least March 29, 2019, ADM was only a seller during the MOC window, and never a buyer.

- Starting in November 2017 and continuing thereafter, ADM routinely sold more ethanol at low prices than it could deliver, including during the MOC window. To satisfy its obligations for those sales, ADM bought ethanol at the end of trading months at higher prices than it had sold ethanol for earlier in the month. ADM made sure to never buy this ethanol during the MOC window, where its purchases might raise the Chicago Ethanol (Terminal) price and thereby negatively impact ADM's short positions in ethanol derivatives.

- Before November 2017, there were steady and consistent differences between the average monthly prices of ethanol at the Argo Terminal and three other major terminals on the East, West, and Gulf Coasts. These differences roughly represented the additional cost of transporting ethanol to the other terminals from the Midwest, where more than 90% of U.S. ethanol is produced.

- Starting in November 2017, these differences between the average monthly prices of ethanol at the Argo Terminal and the three other major terminals suddenly increased, and these increased differentials have persisted ever since. There was no corresponding increase in transport costs that could explain this sudden and persistent increase, indicating that ADM's conduct artificially depressed prices at the Argo Terminal.

- Starting in November 2017 and continuing thereafter, ethanol producers could earn greater profits by selling their ethanol at the three other major terminals due to the substantially higher ethanol prices there, even after taking into account all transport costs. ADM nevertheless chose to dramatically increase its sales at the Argo Terminal at significantly lower prices rather than transport its ethanol to the other terminals.

- Starting shortly before November 2017 and continuing thereafter, ADM amassed huge positions in ethanol derivatives tied to prices at the Argo Terminal. The size of these positions represented a dramatic departure from ADM's previous hedging

activities and can be described only as speculative bets. In some months, ADM took short positions on up to 6,000-7,000 Chicago Ethanol (Platts) Futures contracts, representing 252 to 294 million gallons of ethanol and 50% or more of the open interest in the relevant contract months. These speculative short positions dwarfed ADM's total monthly ethanol production capacity of roughly 133 million gallons.

- Due to the sheer size of ADM's positions and the way that they "decayed" over the course of a relevant "spot" month—as will be explained later—ADM was strongly incentivized to manipulate the Platts benchmark price downward during the MOC window of every trading day within a month. Accordingly, ADM did not make a single purchase of ethanol during the MOC window after November 2017 through at least March 2019, instead acting as the seller in roughly 90% of all MOC transactions.

**ANSWER:** ADM denies that it engaged in manipulative conduct in the ethanol market. The remaining allegations in paragraph 5 state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph. To the extent that the remaining allegations in this paragraph do not state legal conclusions, including allegations regarding an alleged investigation by Plaintiff and its counsel, ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations and therefore denies the same.

6.    ADM's manipulation of ethanol prices at the Argo Terminal, including during the MOC window, has caused hundreds of millions of dollars in damages to entities that traded in derivatives tied to Argo Terminal prices. Plaintiff AOT Holding AG ("AOT"), which traded in such derivatives and suffered damages due to ADM's manipulation, now seeks to represent a class of all similarly situated entities and to hold ADM accountable under the CEA for its willful and intentional misconduct by recovering their actual damages, plus punitive or exemplary damages equal to two times the actual damages sustained by all class members.

**ANSWER:** ADM denies that it engaged in manipulative conduct in the ethanol market. ADM admits that AOT seeks to represent a class as defined in the Complaint. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

## PARTIES

7. Plaintiff AOT Holding AG ("AOT") is a Swiss corporation with its principal place of business at Hinterbergstrasse 16, 6312 Steinhausen, Zug, Switzerland. AOT was one of the most active participants in the ethanol derivatives markets during the Relevant Period and routinely traded in ethanol derivatives tied to the Chicago Ethanol (Terminal) price, including Chicago Ethanol (Platts) Futures. During the Relevant Period, AOT entered into ethanol derivative transactions through traders working for AOT's subsidiary, AOT Energy Americas LLC, which was located at 5847 San Felipe Street, Suite 2850, Houston, TX 77057. Those traders, in turn, placed trades for AOT's account through brokers working in the United States, who would execute the trades on U.S.-based exchanges.

**ANSWER:** ADM admits, upon information and belief, that AOT is a Swiss corporation with its principal place of business at Hinterbergstrasse 16, 6312 Steinhausen, Zug, Switzerland. ADM further admits, upon information and belief, that AOT's subsidiary, AOT Energy Americas LLC, located 5847 San Felipe Street, Suite 2850, Houston, TX 77057, participated in the ethanol derivatives markets between November 2017 and September 2019. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 7 and therefore denies the same.

8. Archer Daniels Midland Company ("ADM") is a corporation organized, created, and existing pursuant to the laws of the state of Delaware with its North American headquarters at 4666 Faries Parkway, Decatur, Illinois 62526. All of ADM's ethanol

trading operations, including its trading in Chicago Ethanol Derivatives, was directed from its North American headquarters in Decatur, Illinois.

**ANSWER:** ADM admits that it is a corporation organized, created, and existing pursuant to the laws of the state of Delaware with its North American headquarters at 4666 Faries Parkway, Decatur, Illinois 62526. ADM further admits that its ethanol trading operations are directed primarily from its North American headquarters in Decatur, Illinois. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, and under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), which explicitly provides for the original jurisdiction of the federal courts over any class action where any member of the plaintiff class is a citizen of a state different from any defendant, and where the matter in controversy exceeds $5,000,000, exclusive of interest and costs. The total claims of class members here exceed $5,000,000 in the aggregate, exclusive of interest and costs.

**ANSWER:** The allegations in paragraph 9 state legal conclusions to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph. For purposes of this action only and solely to conserve the resources of the parties and the Court, ADM does not contest that this Court has jurisdiction over the subject matter of this action.

10.     This Court has personal jurisdiction over ADM because, during the Relevant Period, ADM (1) transacted business in the State of Illinois, including in this District; (2) had substantial contacts with the State of Illinois, including in this District; and (3) committed substantial acts in furtherance of the manipulative scheme alleged herein in the State of Illinois, including in this District. In addition, ADM's conduct was directed

at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the State of Illinois.

**ANSWER:** The allegations in paragraph 10 state legal conclusions to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph. For purposes of this action only and solely to conserve the resources of the parties and the Court, ADM does not contest personal jurisdiction in this judicial district.

11.     Venue is proper in this District under 28 U.S.C. § 1391 (b), (c), and (d). ADM resides, transacts business, and has agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**ANSWER:** The allegations in paragraph 11 state legal conclusions to which no answer is required. To the extent an answer is required, ADM does not contest that venue is proper in this Court for purposes of this action only. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

12.     The activities of ADM were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States, including in the markets for financial derivatives based on ethanol and the market for ethanol itself.

**ANSWER:** ADM admits that it is involved in interstate commerce through at least its trading of ethanol. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

13.     Filing this case in the Urbana Division of the Central District of Illinois is proper because ADM's manipulative activities in violation of the CEA were conceived of and

directed from its North American headquarters in Decatur, Illinois, which is within Macon County, Illinois and part of the Urbana Division per Local Rule 40.1.

**ANSWER:** The allegations in paragraph 13 state legal conclusions to which no answer is required. To the extent an answer is required, ADM does not contest venue is proper in this Court for the purposes of this action only. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

## DETAILED ALLEGATIONS

14. Ethanol is a renewable fuel made primarily from corn.

**ANSWER:** Admitted.

15. The current domestic ethanol market was largely created by federal law and state regulations that set renewable fuel requirements for transportation fuel. In particular, the Energy Independence and Security Act of 2007 set Renewable Fuel Standards that increased the volume of renewable fuel blended into gasoline.

**ANSWER:** Admitted.

16. Renewable Fuel Standards require gasoline producers to buy a certain quantity of renewable fuels (such as ethanol) each year to blend into gasoline used as transportation fuel. Ethanol is the renewable fuel most used by obligated parties to meet this renewable fuel requirement. Legal and regulatory requirements play a large role in the demand for ethanol by creating a class of "ethanol consumers" consisting mostly of refineries, importers, blenders, and general gasoline resellers.

**ANSWER:** Admitted.

17. Buyers in the ethanol market can get their ethanol primarily in two ways. First, they can buy ethanol directly from an ethanol producer, contracting to have the producer ship ethanol straight to the buyer's facilities for blending with gasoline that is then shipped

to retail markets. Second, they can choose to buy ethanol at terminals located throughout the country, where ethanol producers ship and store large quantities of ethanol via railcar, tanker truck, or barge. Ethanol stored at terminals is available for immediate, or "spot," sale to buyers. At these terminals, ethanol and gasoline can be blended onsite for ease of shipment to retail end users; alternatively, buyers can transport the ethanol purchased at terminals back to their own facilities or refineries for blending.

**ANSWER:** Admitted.

18.     Terminals also serve as locations where other buyers who do not blend ethanol for end use can acquire and ship it for resale elsewhere at higher prices. By doing so, such middlemen and resellers can benefit from market arbitrage.

**ANSWER:** Admitted.

19.     Below is a diagram showing the general flow of ethanol production and distribution in the U.S.



Source: Alternative Fuels Data Ctr., U.S. Dep't of Energy, *Ethanol Production & Distribution*, https://afdc.energy.gov/fuels/ethanol_production.html (last visited September 4, 2019).

**ANSWER:** ADM admits that the diagram in paragraph 19 purports to show at a high level the general flow of ethanol production and distribution in the United States, but it lacks sufficient detail on which to provide a further response. Except as expressly admitted, ADM denies the allegations in this paragraph.

20. The Midwest is the epicenter of U.S. ethanol production, dwarfing every other region. The U.S. Energy Information Administration reports that 176 of the 200 ethanol plants in the U.S. (88 percent) are located in the Midwest, in a region defined as Petroleum Administration for Defense District 2, or PADD 2.



PADD regions enable regional analysis of petroleum product supply and movements

Petroleum Administration for Defense Districts

Source: U.S. Energy Information Administration.

**ANSWER:** ADM admits that a significant amount of ethanol is produced in the Midwest. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 20 and therefore denies the same.

21. Ethanol mills in the Midwest also have higher capacities than plants elsewhere in the U.S. As shown in the diagram below, of the country's nearly 16.3-billion-gallon annual production capacity, the Midwest region accounts for more than 14.8 billion gallons (91 percent) of total production. Shipping ethanol out of the Midwest for sale in other regions is therefore a routine part of the ethanol production business.



U.S. fuel ethanol production capacity by region (2014-18)

**ANSWER:** ADM admits that a significant amount of ethanol is produced in the Midwest and that some of that ethanol is shipped to other regions in the United States for sale. ADM further admits that the image provided in paragraph 21 of the Complaint purports to report on the capacity of U.S. fuel ethanol production by region for 2014-2018. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 21 and therefore denies the same.

22. ADM is one of the country's largest producers of ethanol, operating eight mills (a mix of dry and wet mills located in Nebraska, Iowa, Minnesota, and Illinois) capable of producing a total of 1.69 billion gallons of ethanol, or approximately 10% of the U.S. annual ethanol production of 16 billion gallons.

**ANSWER:** ADM admits that ADM is one of the country's largest producers of ethanol and that it operates eight mills that are a mix of dry and wet mills and are located in Nebraska, Iowa, Minnesota, and Illinois. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

23.     The Kinder Morgan Argo Terminal in Argo, Illinois is a critical locus in the Midwest for the spot sale of ethanol, for price discovery in the broader U.S. ethanol market, and for transporting ethanol domestically and internationally to meet demand. Accordingly, the Argo Terminal price for ethanol influences the prices of ethanol sold at other terminals, as well as the prices that private parties negotiate in non-terminal ethanol sales.

**ANSWER:** ADM admits that the Kinder Morgan Argo Terminal in Argo, Illinois is a central location for the spot sale of ethanol and a location through which ethanol may be transported domestically and internationally. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 23 and therefore denies the same.

24.     The Argo Terminal is one of the largest of the approximately 1,200 ethanol terminals in the country and the largest in the critical PADD 2 region. It can handle shipments by rail, truck, and barge. Because of this multimodal capability and its large 54.6-million-gallon capacity, the Argo Terminal serves all segments of ethanol purchasers, from blenders and other end users to resellers and middlemen.

**ANSWER:** ADM admits that the Argo Terminal is one of the largest ethanol terminals in the U.S. and the PADD 2 region. ADM further admits that the Argo Terminal can handle shipments by rail, truck, and barge and serves ethanol purchasers, including blenders, end users, and resellers. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 24 and therefore denies the same.

25.     In recognition of the key role the Argo Terminal plays in the U.S. ethanol market, pricing services such as S&P Global Platts ("Platts") and the Oil Price Information Service

("OPIS") provide benchmark price assessments that reflect the trading price of ethanol at the Argo Terminal on a daily basis. Buyers and sellers of ethanol (whether at other terminals or in private negotiated transactions) use these Argo Terminal price assessments to determine what the fair market value of ethanol is at a given time nationwide. Market participants also use Platts and OPIS data to study market trends and predict future movement in ethanol prices for purposes of strategic planning, including hedging and speculation on ethanol derivatives.

**ANSWER:** ADM admits that the Argo Terminal plays a role in the U.S. ethanol market and that pricing services such as S&P Global Platts and the Oil Price Information Service provide benchmark price assessments that reflect the trading price of ethanol at the Argo terminal on a daily basis. ADM further admits that buyers and sellers of ethanol may use these price assessments to understand the value of ethanol and study market trends. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

26. One of the most important price assessments compiled by Platts at the Argo Terminal is the benchmark Chicago Ethanol (Terminal) price—what this complaint will refer to as the "Chicago Benchmark Price." The Chicago Benchmark Price is calculated every trading day during the Market-on-Close ("MOC") window from 1:00 p.m. to 1:30 p.m. C.T. and is based on Intertank Transfer ("ITT") transactions: ethanol sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale.

**ANSWER:** ADM admits that Platts compiles a price assessment at the Argo Terminal known as the benchmark Chicago Ethanol (Terminal) price, referred to in the Complaint as the "Chicago Benchmark Price." ADM further admits that the Chicago Benchmark Price is calculated every

trading day during the Market-on-Close ("MOC") window from 1:00 pm to 1:30 pm C.T. and is based on Intertank Transfer ("ITT") transactions: ethanol sold from storage tanks and deliverable at the Argo Terminal between 5 and 15 days forward from the date of sale. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

27.    Before each day's MOC window, ethanol buyers post bid prices and ethanol sellers post offer prices. Under normal trading practices, buyers and sellers adjust their bids and offers in response to the prices proposed by their potential counterparties—motivated sellers will decrease their offers to beat the offers of competing sellers, while motivated buyers will increase their bids to beat those of competing buyers. Once there is a match between a buyer bid and a seller offer during the MOC, a sale is consummated.

**ANSWER:** ADM admits that ethanol buyers and sellers may post bid and offer prices, respectively, before the MOC window. ADM further admits that if there is a match between a buyer bid and a seller offer during the MOC, a sale is consummated. Except as expressly admitted, ADM denies the remaining allegations in paragraph 27.

28.    When an ethanol seller agrees to sell ethanol at the posted bid price of a buyer, this practice is known as "hitting the bid." The buyer equivalent to hitting the bid is referred to as "lifting the offer," and occurs when an ethanol buyer agrees to pay the posted offer price quoted by an ethanol seller.

**ANSWER:** ADM admits that "hitting the bid" is a term that can apply when an ethanol seller agrees to sell ethanol at the posted bid price of a buyer. ADM further admits that "lifting the offer" is a term that can apply when an ethanol buyer agrees to pay the posted offer price quoted by an ethanol seller. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

29.    This back-and-forth negotiation between ethanol buyers and sellers is crucial for price discovery in the ethanol market and the calculation of the Chicago Benchmark Price. Without it, the Platts price assessment would lack a strong, market-based foundation.

**ANSWER:** ADM admits that transactions by ethanol buyers and sellers affect price discovery in the ethanol market and calculation of the Chicago Benchmark Price. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

30.    Notably, the Chicago Benchmark Price is also used to establish the value of and to settle several important ethanol derivatives: (1) the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on NYMEX; (2) the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX; and (3) the CME's Ethanol Futures Contract (CME symbol: EH) traded on CBOT.[1] The complaint refers to these futures and options contracts collectively as the "Chicago Ethanol Derivatives."

**ANSWER:** ADM admits that the Chicago Benchmark Price is related to the valuation of the Chicago Ethanol (Platts) Futures contract (CME symbol: CU) traded on NYMEX, the Chicago Ethanol (Platts) Average Price Option (CME symbol: CVR) traded on NYMEX, and the CME's Ethanol Futures Contract (CME symbol: EH) traded on CBOT. ADM further admits that the Complaint refers to these three futures and options contracts collectively as the "Chicago Ethanol Derivatives." Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

31.    A futures contract is a derivative that allows market participants to offset or assume the risk of a price change of an underlying commodity over time. Futures contracts detail

---

[1] Appendix 1, which is incorporated by reference into this complaint, contains a detailed explanation of futures and options contracts, as well as illustrative examples.

the quality and quantity of the underlying commodity (including the place of delivery if physically settled), and are standardized to be identical for all participants to facilitate trading on futures exchanges such as the CME. Given the standardization of the contract specifications, the only contract variable is price, which is discovered by bidding and offering (also known as quoting) until a trade occurs. The fact that futures contracts are standardized and exchange-traded makes these instruments indispensable as means of hedging and speculating by commodity producers, consumers, traders, and investors.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegation that futures contracts are "indispensable as means of hedging and speculating by commodity producers, consumers, traders, and investors" and therefore denies the same. ADM admits the remaining allegations of paragraph 31.

32.     A futures contract can be settled in one of two ways. A physically settled futures contract is settled by physical delivery of the designated quantity of the underlying commodity at a predetermined place on a fixed date (the expiration date) at the predetermined price. A cash settled futures contract, by contrast, results in a cash payment between the futures contract parties reflecting the difference between the originally contracted price of the futures contract and the final market price of the futures contract at the time of settlement. The value of a futures contract fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity.

**ANSWER:** Admitted.

33.     An option contract is a type of financial derivative that gives the buyer the right— but not the obligation as with a futures contract—to either buy or to sell a particular commodity at a predetermined price ("strike price"), on or before a specified date in the

future (the "expiration date"). A "put" or "put option" is a financial contract that gives the owner the right, but not the obligation, to sell an agreed quantity of a particular commodity at the strike price, by or on the expiration date. A "call" or "call option" is a financial contract that gives the owner the right, but not the obligation, to buy an agreed quantity of a particular commodity at the strike price, by or on the expiration date.

**ANSWER:** Admitted.

34.     The value of an option contract also fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity. That value, as well as the decision to exercise the option, depends on whether it is "in-the-money" or "out-of-the-money." An in-the-money call option is one where the strike price is below the current price of the underlying asset. An out-of-the-money call option is one where the strike price is above the current price of the underlying asset. Whether an option is in or out-of-the-money depends on the relevant reference price at the time of option settlement—the at-the-money price.

**ANSWER:** Admitted.

35.     The Chicago Ethanol (Platts) Futures Contract (CME symbol: CU) is the most liquid, or most highly traded, financial derivative tied to the Chicago Benchmark Price. The Chicago Ethanol (Platts) Futures Contract has had an average monthly trading volume on the CME in excess of 99,000 contracts between November 2017 and today.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 35 and therefore denies the same.

36.     Each Chicago Ethanol (Platts) Futures contract is traded on NYMEX, represents 42,000 gallons (or 1,000 barrels) of ethanol, and is valued as the size (42,000 gallons)

multiplied by the floating price quoted in increments of $0.0001, or one-hundredth of a cent, per gallon.

**ANSWER:** Admitted.

37.     Thus, one Chicago Ethanol (Platts) Futures contract with a Chicago Benchmark Price of $1.50 per gallon would be worth $63,000 (42,000 gallons times $1.50 per gallon); if that price were to increase to $2.00 per gallon, the futures contract would be worth $84,000. In other words, any one cent change in the Chicago Benchmark Price results in a $420 change to the value of each Chicago Ethanol (Platts) Futures contract.

**ANSWER:** Admitted.

38.     The Chicago Ethanol (Platts) Futures contract is cash settled, meaning that the contract parties pay each other based on the difference between the contract price and the settlement price, and there is thus no requirement for physical delivery to satisfy the contract.

**ANSWER:** Admitted.

39.     From November 1, 2017 through August 31, 2019, total volume in the Chicago Ethanol (Platts) Futures contract as reported by CME was 2,180,005 contracts.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 39 and therefore denies the same.

40.     The CME also offers Chicago Ethanol (Platts) Average Price Options contracts (CME symbol: CVR), which are financially settled, non-early exercisable options of the underlying Chicago Ethanol (Platts) Futures contract, that are traded on NYMEX. Accordingly, the value of Chicago Ethanol (Platts) Average Price Options is also directly related to the Chicago Benchmark Price calculated by Platts at the Argo Terminal.

**ANSWER:** Admitted.

41. As the CME notes, for the Chicago Ethanol (Platts) Average Price Options, a "call option represents the differential between the final settlement price of the underlying futures less the strike price, or zero, whichever is greater, multiplied by 42,000 gallons. A put option represents the differential between the strike price [less] the final settlement price of the underlying futures, or zero, whichever is greater, multiplied by 42,000 gallons."

**ANSWER:** Admitted.

42. From November 1, 2017 through August 31, 2019, CME reports that total volume in Chicago Ethanol (Platts) Average Price Options was 182,506 contracts.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 42 and therefore denies the same.

43. The CME also offers the CME's Ethanol Futures Contract (CME symbol: EH). The EH contract is a physically settled ethanol futures contract listed on CBOT, with each contract representing 29,000 gallons of ethanol to be delivered in the contract month at the price of the contract.

**ANSWER:** Admitted.

44. While not settled directly to the Chicago Benchmark Price, the market price that EH contracts trade at is heavily influenced by and highly correlated to the Chicago Benchmark Price because traders incorporate changes in the Chicago Benchmark price into their bid and offer prices on the contract, reflecting the Argo Terminal's key role as the largest terminal in the Midwest in price discovery across the United States ethanol market.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 44 and therefore denies the same.

45.     Thus, ADM's downward manipulation of the Chicago Benchmark Price would cause EH contracts to trade at artificial prices.  This, in turn, would cause actual damages to traders who traded in the EH contract.

**ANSWER:** Denied.

46.     From November 1, 2017 through August 31, 2019, CME reports that total volume in the EH contract was 328,024 contracts.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 46 and therefore denies the same.

47.     In developing ADM's manipulation scheme, Ray Bradbury and Adam Kuffel recognized four key features of the Chicago Benchmark Price and of Chicago Ethanol Derivatives that made them highly susceptible to manipulation by ADM.

**ANSWER:** Denied.

48.     First, both the Chicago Benchmark Price and Chicago Ethanol Derivatives were tied inextricably to trading activity at only one location: the Argo Terminal in Argo, Illinois.  ADM had five ethanol production facilities within 250 miles of the Argo Terminal.  Combined, these facilities had 1.237 billion gallons of total annual ethanol production capacity.  Most of these facilities were able to ship ethanol into the Argo Terminal via railcar, barge, and tanker truck.  This meant that ADM, compared to its ethanol producer competitors, had a greater ability to flood the Argo Terminal with ethanol and sell it at lower prices.

**ANSWER:** ADM admits that it has five ethanol production facilities within 250 miles of the Argo Terminal and that combined, these facilities had upwards of one billion gallons of total annual ethanol production capacity. ADM further admits that most of the facilities were able to ship

ethanol into the Argo Terminal via railcar and tanker truck. ADM denies that most of the facilities were able to ship ethanol into the Argo Terminal via barge. The remaining allegations in paragraph 48 of the Complaint state legal conclusions to which no answer is required. To the extent an answer is required, ADM denies the remaining allegations in this paragraph.

49. Second, the Chicago Benchmark Price is calculated based on bids, offers, and trades occurring during a mere half-hour of daily trading at the Argo Terminal. Because of the MOC window's limited duration and trading volume, ADM could significantly influence the Chicago Benchmark Price downward by concentrating its aggressive pricing and selling into just 30 minutes of a trading day. Moreover, ADM could exert this downward influence on the Chicago Benchmark Price while limiting its losses to a comparatively small volume of physical ethanol trades during the MOC window.

**ANSWER:** ADM admits the Chicago Benchmark Price is calculated based on transactions occurring during the MOC window. The remaining allegations in paragraph 49 of the Complaint state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the remaining allegations in this paragraph.

50. Third, the prices and settlement values of Chicago Ethanol Derivatives are tied to the Chicago Benchmark Price. Settlement of the Chicago Ethanol (Platts) Future contract (the most actively traded ethanol derivative) is "based on the arithmetic average of the high and low quotations from Platts for [the Chicago Benchmark Price] for each business day that it is determined during the contract month," and the value of Chicago Ethanol (Platts) Average Price Options is in turn tied directly to the settlement price of Chicago Ethanol (Platts) Future contracts. Trading prices for the physically settled EH contract are likewise heavily influenced by and highly correlated to the key Chicago Benchmark Price. This

meant that ADM's actions during the MOC window at the Argo Terminal could directly influence the prices and settlement values of Chicago Ethanol Derivatives.

**ANSWER:** ADM admits that the prices and settlement values of Chicago Ethanol Derivatives (as defined in the Complaint) are related to the Chicago Benchmark Price. The remaining allegations in paragraph 50 of the Complaint state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the remaining allegations in this paragraph.

51. Fourth, unique features of Chicago Ethanol Derivatives allowed ADM to take outsized short positions, while also being able to have an outsized downward influence on the Chicago Benchmark Price with a relatively small number of aggressively priced daily trades of physical ethanol—thus enabling ADM to effectively manage and offset the losses associated with those trades. The unique features of Chicago Ethanol Derivatives also incentivized ADM to manipulate pricing and trading activity during the MOC on every trading day during a contract month where ADM had a large short position. This last component requires some elaboration.

**ANSWER:** Denied.

52. The settlement format of the Chicago Ethanol (Platts) Futures contract makes it a "diminishing balance contract" under CME Rules 559, 560, and 562, as interpreted by CME Group Advisory RA1711-5 (August 11, 2017). "Diminishing balance contracts are specific futures contracts whose front month position in any given contract month diminishes as the contract month progresses toward expiration/month end for purposes of position limits…. Diminishing balance contracts are typically those where the final

settlement price is equal to the arithmetic average of a determined reference price for each business day that it is determined during the contract month…."

**ANSWER:** Admitted.

53. Up to and including the February 2019 contract, the Chicago Ethanol (Platts) Futures contract had a spot-month position limit of 1,000 (equivalent to 42,000,000 gallons of ethanol). However, this spot-month position limit was only effective at the close of trading three business days prior to the last day of trading of the contract. Until the close of trading three business days prior to the last day of trading of the contract, there was no spot-month position limit — so long as a party was below the 1,000 contract limit by that time, the party could take much larger positions in the contract earlier in the month.

**ANSWER:** ADM admits that before March 2019, the Chicago Ethanol (Platts) Futures contract had a spot-month position limit of 1,000 (equivalent to 42,000,000 gallons of ethanol). Except as expressly admitted, ADM denies the remaining allegations of this paragraph.

54. For non-diminishing-balance contracts, this would mean that a party taking huge positions early in the spot month would have to unwind/close those positions before the close of trading three business days prior to the last day of that month's contract trading. Taking such a large position carries the risk that potential counterparties will learn of the need to get below a position limit and use that information as leverage to secure a better price for them/worse price for the party holding the large position.

**ANSWER:** Denied.

55. In a diminishing balance contract, however, this problem is avoided, as a trader's number of futures positions vis-a-vis the position limit decays by an amount equal to the party's total futures position divided by the number of trading day in that month. This

reflects the amount of contracts the party holds that were "locked in" by each day's price, as each trading day's price settlement has that proportional impact on the final settlement value at the end of month.

**ANSWER:** Denied.

56. Thus, in the CME's example below,[2] a 6,600 futures position in the spot month of October 2015 (with 22 trading days) diminishes or decays by 300 contracts each day (6,600/22), getting under the 1,000 contract spot limit after trading on October 27, 2015 (as it transitions from 1,200 to 900 contracts):

---

[2] CME Group Advisory Number RA1711-5 (August 11, 2017) at 5-6 (*available at* https://www.cmegroup.com/content/dam/cmegroup/notices/market- regulation/2017/08/RA171 l-5.pdf).

| Start of Day Position | Futures Position 2C October 2015 Contract | Futures Equivalent Position 2C October 2015 Contract |
|---|---|---|
| 10/1/2015 | 6,600 | 6,600 |
| 10/2/2015 | 6,600 | 6,300 |
| 10/5/2015 | 6,600 | 6,000 |
| 10/6/2015 | 6,600 | 5,700 |
| 10/7/2015 | 6,600 | 5,400 |
| 10/8/2015 | 6,600 | 5,100 |
| 10/9/2015 | 6,600 | 4,800 |
| 10/12/2015 | 6,600 | 4,500 |
| 10/13/2015 | 6,600 | 4,200 |
| 10/14/2015 | 6,600 | 3,900 |
| 10/15/2015 | 6,600 | 3,600 |
| 10/16/2015 | 6,600 | 3,300 |
| 10/19/2015 | 6,600 | 3,000 |
| 10/20/2015 | 6,600 | 2,700 |
| 10/21/2015 | 6,600 | 2,400 |
| 10/22/2015 | 6,600 | 2,100 |
| 10/23/2015 | 6,600 | 1,800 |
| 10/26/2015 | 6,600 | 1,500 |
| 10/27/2015 | 6,600 | 1,200 |
| 10/28/2015 | 6,600 | 900 |
| 10/29/2015 | 6,600 | 600 |
| 10/30/2015 | 6,600 | 300 |

**ANSWER:** ADM admits that the table contained in paragraph 56 is a correct reproduction of an excerpt from a table on the CME website, and ADM refers to the website itself for a complete statement of its content. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

57. The diminishing balance nature of the Chicago Ethanol (Platts) Futures contract could be exploited by ADM, allowing it to take short positions in the spot month as large as 6,000-7,000 contracts, representing 50% or more of the open interest in the spot month

(and 2-3 times ADM's total monthly ethanol production capacity). ADM could then let those large positions decay down below applicable position limits as the month progressed.

**ANSWER:** ADM denies that it engaged in manipulative conduct in the ethanol market. The allegations in paragraph 57 of the Complaint state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph.

58. Starting with the March 2019 contract, the CME changed the spot-month limit at the close of trading three business days prior to the last day of trading to 500 (equivalent to 21,000,000 gallons of ethanol). CME has not, however, imposed any position limit for earlier in a trading month, leaving ADM free to use the diminishing balance nature of the Chicago Ethanol (Platts) Future contract to amass outsized short positions (albeit less outsized than before the changes) in the spot month and let those positions decay downward below applicable position limits.

**ANSWER:** ADM admits that starting in March 2019, CME changed the spot-month limit at the close of trading three business days prior to the last day of trading to 500, which is equivalent to 21,000,000 gallons of ethanol. ADM further admits that CME has not imposed any position limit for earlier in a trading month. ADM denies that it engaged in manipulative conduct in the ethanol market. The remaining allegations in paragraph 58 of the Complaint state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the remaining allegations in this paragraph.

59. The final take-away from all of these features is that ADM could sell a comparatively small amount of ethanol at aggressive prices during the MOC window in order to drive the Chicago Benchmark Price down, while at the same time holding and

benefitting from disproportionately larger short positions in Chicago Ethanol Derivatives. The lower prices ADM received for physical ethanol during the MOC window were almost certain to be exceeded by gains on much larger short derivatives positions, particularly when repeated across all of the MOC windows within a month. And if market fundamentals outside of ADM's control drove ethanol prices in the spot month upward, ADM could still limit its losses on derivatives shorts via downward manipulation, while at the same time offsetting derivatives losses through higher margins on sales of physical ethanol.

**ANSWER:** ADM denies that it engaged in manipulative conduct in the ethanol market. The allegations in paragraph 59 of the Complaint state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph.

60. As a more concrete illustration of the math behind ADM's incentive to manipulate, consider the following. The maximum number of ethanol lots ever sold during the daily half-hour MOC window was 37 lots of 5,000 barrels of ethanol (on December 1, 2017), or the equivalent of just 185 Chicago Ethanol (Platts) Futures contracts (which each represent 1,000 barrels). During the Relevant Period, ADM frequently had short positions in the spot month approaching or exceeding 7,000 Chicago Ethanol (Platts) Futures contracts, the equivalent of 350 contracts per MOC window day (7,000 contracts / 20 trading days in typical month = 350). So long as ADM's sales in the MOC window each trading day in the month did not exceed nearly twice the maximum amount of sales that had ever occurred during the MOC window (and far fewer than 37 lots were sold during most MOC windows), ADM would profit from manipulation.

**ANSWER:** ADM denies that it engaged in manipulative conduct in the ethanol market. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 60 relating to the maximum number of ethanol lots ever sold during the MOC window and therefore denies the same. The remaining allegations in paragraph 60 state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the remaining allegations in this paragraph.

61.     Ray Bradbury and Adam Kuffel saw the vulnerabilities described above and decided to capitalize on them. In its simplest form, ADM's scheme consisted of two steps that it repeated over and over each month starting in November 2017. First, ADM placed huge bets in Chicago Ethanol Derivatives in each spot month that the price of ethanol would decrease (a "short position"). Second, during the spot month, ADM drove down the price of ethanol during the MOC window to ensure that its short bets paid off.

**ANSWER:** Denied.

62.     ADM accomplished the downward manipulation of the Chicago Benchmark Price via practices that were contrary to ADM's non-manipulation economic interest and to MOC pricing customs. December 1, 2017 offers a representative example of ADM's strategy with respect to the MOC window at the Argo Terminal during the Relevant Period.

**ANSWER:** Denied.

63.     On December 1, 2017, rather than acting as a typical seller by engaging in a back-and-forth with Argo ethanol buyers, ADM began "hitting" low bids as soon as MOC trading began. Once the clock struck 1 p.m., ADM hit a low bid that AOT (who also traded physical ethanol at the Argo facility) posted prior to opening. Once that sale was executed, AOT posted another low bid that ADM immediately matched. This process continued

throughout the MOC window on December 1, 2017 (when ADM's aggressive hitting of the bid set a then-record for most sales within the MOC window), and indeed was repeated during other MOC windows in the Relevant Period.

**ANSWER:** ADM admits that it hit multiple bids posted by AOT on December 1, 2017. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

64.     Hitting bids at the opening of the MOC window (or aggressively hitting the bid in general) has no rational economic basis other than manipulating downward the price of ethanol at the Argo Terminal.

**ANSWER:** Denied.

65.     As a seller of ethanol, ADM had a primary interest in selling ethanol at the highest price possible without losing sales to competitors. By hitting bids immediately or aggressively, ADM gave buyers little opportunity to adjust their bids on ethanol during the MOC window upward. ADM also undercut offers of competing sellers in the MOC window by more than was necessary to secure a given sale of ethanol within the MOC window. As a result, ADM lost money—specifically, the money it would have received for physical ethanol sales executed at higher prices that would have resulted from normal price negotiation in the MOC window.

**ANSWER:** Denied.

66.     ADM's practice of aggressively "hitting the bid" and undercutting the current best offer by more than was necessary during the MOC window can be seen in the daily activity reported by Platts. As mentioned earlier, Platts collects data on bids, offers, and trades at the Argo Terminal that occur during the MOC window each trading day. An example of

the data collected and reported by Platts from the Argo Terminal is seen from the August 3, 2018 Biofuelscan report reproduced below.

US ethanol bids/offers/trades: (PBF page 209)

- MOC bids: Ethanol: Chicago Argo: Shell bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Eco bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Gunvor bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Valero bids $1.4450/gal, Aug 8- Aug 18, 5Kb; Shell bids $1.4425/gal, Aug 8- Aug 18, 5Kb; BP bids $1.4425/gal, Aug 8- Aug 18, 5Kb; Louis Dreyfus bids $1.4425/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Shell bids $1.55/gal, any-August, 25Kb; Hartree bids $1.54/gal, any-August, 25Kb.
- MOC offers: Ethanol: Chicago Argo: Vitol offers $1.4455/gal, Aug 8- Aug 18, 5Kb; ADM offers $1.4475/gal, Aug 8- Aug 18, 5Kb; Center offers $1.45/gal, Aug 8- Aug 18, 5Kb; CHS offers $1.45/gal, Aug 8- Aug 18, 5Kb; Ethanol: FOB NYH: Hartree offers $1.5650/gal, any-August, 25Kb; BP offers $1.5650/gal, any-August, 25Kb.
- MOC trades reported: Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Shell, $1.4450/gal, Aug 8- Aug 18, 5Kb; Chi Argo: ADM-Gunvor, $1.4450/gal, Aug 8- Aug 18, 5Kb. Other trades reported: None.

**ANSWER:** ADM admits that paragraph 66 accurately reproduces an excerpt from a portion of the August 3, 2018 Biofuelscan report, and ADM refers to the report itself for a complete statement of its contents. Except as expressly admitted, ADM denies the remaining allegations in paragraph 66.

67.    This excerpted report shows ADM "hitting the bid" as the seller in all 5 trades that occurred during that day's MOC window at $1.4450 per gallon – dropping below its own outstanding offer of $1.4475 per gallon and the best outstanding offer by Vitol at $1.4455 per gallon. Rather than incentivizing Shell and Gunvor to "lift the offer" and come up to Vitol's (or even ADM's) higher offer prices, ADM decided to leapfrog Vitol in order to "hit the bids" of the two potential buyers at $1.4450, even though they were likely willing to pay more. This can be analogized to a negotiation where two parties make opening demands/offers in anticipation of meeting somewhere in the middle, but one party then

simply decides to accept the other party's lowball opening offer that both parties should understand to be simply a starting position rather than a reflection of true willingness to pay. By engaging in a more typical MOC window negotiation process, rather than "hitting the bid" on all five trades, ADM (acting in an economically rational way, without manipulation factored in) might have raised the price on some or even all of the 5 lots it sold to a level greater than $1.4450 (perhaps as high as $1.4455 or higher).

**ANSWER:** Denied.

68.     This data also shows the impact that ADM's "hitting of the bid" had on the Platts Chicago Benchmark Price for this day. On August 3, 2018, that price was $1.44525 per gallon, a value reflective of the 5 trades at $1.4450 per gallon and the 2.5 points above the outstanding bid ($1.4450 per gallon by multiple buyers) and 2.5 points below the outstanding offer ($1.4455 per gallon by Vitol) during the MOC. This price would have been higher had buyers in the MOC window been forced to "lift the offer" to the $1.4455 per gallon price quoted by Vitol, rather than by ADM hitting the lower $1.4450 per gallon bid on the 5 consummated trades.

**ANSWER:** Denied.

69.     Starting in November 2017 and continuing thereafter, ADM has repeatedly engaged in this practice of aggressively hitting the lower-priced bids of ethanol buyers at Argo during the MOC window. ADM has also consistently shown aggressively priced offers so as to either be the lowest seller offer during the MOC window, or to force a competitor to make an even more aggressive offer in order to offload their ethanol inventory at Argo. Both types of practices were intended to artificially depress the Chicago Benchmark Price calculated during the MOC window and have in fact resulted in

artificially depressed Chicago Benchmark Prices on all or virtually all trading days during the Relevant Period.

**ANSWER:** Denied.

70. Ample evidence indicates that ADM has in fact manipulated both the Chicago Benchmark Price and the values of Chicago Ethanol Derivatives during the Relevant Period.

**ANSWER:** Denied.

71. In 2016 and 2017, the falling price of ethanol in the U.S. was squeezing or eliminating the profit margins of ethanol producers, causing them to idle plants or consider exiting the business altogether. Indeed, ADM attempted to sell three of its dry mill ethanol facilities (in Columbus, Nebraska; Cedar Rapids, Iowa; and Peoria, Illinois) beginning in 2016, but it did not obtain adequate bids to justify their sale. Nevertheless, until November 2017, ADM had consistently been one of the largest buyers of ethanol at the Argo Terminal, including during the price-setting MOC window.

**ANSWER:** ADM admits that three of its dry mill facilities were offered for sale in 2016. Except as expressly admitted, ADM denies the remaining allegations as phrased in paragraph 71.

72. Starting shortly before November 2017 and continuing thereafter, under the direction of Ray Bradbury and Adam Kuffel, ADM began to amass huge short positions in Chicago Ethanol Derivatives. These huge positions represented a significant departure from ADM's previous hedging activities and bore no rational relationship to hedging ADM's exposure to physical ethanol sales. In various months during the Relevant Period, ADM acquired as many as 6,000-7,000 Chicago Ethanol (Platts) Futures contracts within

the spot month – positions that were over twice as large as ADM's monthly production capacity, and represented 50% or more of the open interest in the relevant contract month.

**ANSWER:** The allegations in paragraph 72 state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph.

73. Also starting in November 2017 and continuing thereafter, ADM suddenly shifted from being one of the largest buyers of ethanol at Argo, including during the MOC window, to being one of the largest sellers—even as ethanol prices continued to decline. By 2018, ADM accounted for roughly 70% of all ethanol sold at the terminal, and roughly 90% of sales during the price-setting MOC window. In the month of November 2018, ADM sold 95% of the ethanol lots that traded during the price-setting MOC window.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 73 and therefore denies the same.

74. The shift toward ADM becoming the largest seller of ethanol at the Argo Terminal during the MOC window occurred even as ADM's competitors (including Green Plains, POET, and Valero) cut production runs, shut down or idled plants, or sold ethanol plants due to slumping ethanol prices and margins.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 74 and therefore denies the same.

75. In October 2017, when ADM was the buyer in 32% of the Argo Terminal transactions during the MOC window, the settlement price of the Chicago Ethanol (Platts) Futures contract (which averages the Chicago Benchmark Prices across the entire month)

was $1,425 per gallon – a level that was even then considered low and potentially not profitable for ethanol producers.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 75 and therefore denies the same.

76.     But in 15 of the following 21 months—when ADM was the dominant seller during the MOC window—the Chicago Ethanol (Platts) Futures contract settled at prices below the $1,425 per gallon level of October 2017:

| Month | Monthly Volume | Settlement Price |
|---|---|---|
| Oct-17 | 131,831 | 1.425 |
| Nov-17 | 109,511 | 1.4045 |
| Dec-17 | 95,604 | 1.2965 |
| Jan-18 | 123,178 | 1.3045 |
| Feb-18 | 96,516 | 1.4423 |
| Mar-18 | 111,301 | 1.4589 |
| Apr-18 | 105,967 | 1.4635 |
| May-18 | 105,619 | 1.46 |
| Jun-18 | 82,702 | 1.4123 |
| Jul-18 | 66,953 | 1.4233 |
| Aug-18 | 111,631 | 1.3561 |
| Sep-18 | 85,728 | 1.2782 |
| Oct-18 | 77,796 | 1.2806 |
| Nov-18 | 87,007 | 1.2357 |
| Dec-18 | 79,017 | 1.2129 |
| Jan-19 | 101,333 | 1.2644 |
| Feb-19 | 92,092 | 1.3321 |
| Mar-19 | 131,299 | 1.3589 |
| Apr-19 | 110,149 | 1.3205 |
| May-19 | 121,567 | 1.3706 |
| June-19 | 96,843 | 1.5448 |
| July-19 | 96,231 | 1.4953 |

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 76 and therefore denies the same.

77.     An economically rational actor "buys low and sells high." Yet ADM displayed the exact opposite approach – it was a buyer at the Argo Terminal when prices and margins were higher (pre-November 2017), and shifted toward becoming a massive seller (and remained one) right as prices and margins declined, including in December 2018 when the Chicago Benchmark Price hit 15-year lows. This is strong evidence both of ADM having actually engaged in manipulation and of its manipulation having achieved the desired price-depressing effect.

**ANSWER:** Denied.

78.     ADM's aggressive selling of ethanol during the MOC window is also economically irrational in the context of its own ethanol purchases at the Argo Terminal during the Relevant Period. In an effort to drive down the Chicago Benchmark Price, ADM frequently sold more ethanol during the MOC window than it could physically deliver. As a result, ADM was forced to buy ethanol at the Argo Terminal to meet its contracted obligations. ADM routinely did so toward the end of the trading month, at prices that were higher than the prices it had sold ethanol for earlier in the month. This was another example of ADM selling low and buying high.

**ANSWER:** Denied.

79.     Notably, from December 1, 2017 to at least March 29, 2019, ADM *never* bought a single lot of ethanol at the Argo Terminal in the price-setting MOC window. But the MOC window is likely where ADM would have found the most competitive price thanks to the public and ostensibly competitive bidding process that was supposed to take place in those 30 minutes. Instead, ADM made all of its physical ethanol purchases outside of the MOC

window, thereby avoiding having its own purchases increase the Chicago Benchmark Price and harm ADM's ethanol derivatives positions.

**ANSWER:** ADM denies that it engaged in manipulative conduct in the ethanol market. The remaining allegations in paragraph 79 state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph.

80. As further evidence of ADM's manipulation, pricing data from the Relevant Period demonstrates that ADM could have received significantly higher prices and profits for its ethanol at other terminals or directly from other potential buyers, even after factoring in differences in transportation costs.

**ANSWER:** Denied.

81. For example, on August 3, 2018—when ADM was the seller in all five MOC trades of ethanol at the Argo Terminal for $1.4450 per gallon—Platts' Biofuelscan report indicated that prices for ethanol at terminals in New York Harbor and Houston were nearly 11-12 cents per gallon higher than at the Argo Terminal:

| US ETHANOL PRICE ASSESSMENTS | | | | |
|---|---|---|---|---|
| United States (¢/gal) (PBF page 210) | | Low-High | Midpoint | Change |
| Ethanol Chicago (terminal) | AALRI00 | 144.50-144.55 | 144.525 | +0.000 |
| Ethanol Chicago (Rule 11) | AAWD00 | 143.45-143.55 | 143.50 | -1.50 |
| Ethanol swap Chicago (Sep ) | ESCN001 | 143.95-144.05 | 144.00 | +0.00 |
| Ethanol swap Chicago (Oct ) | ESCN002 | 143.45-143.55 | 143.50 | +0.00 |
| Ethanol NYH Barge (Aug) | AAMPF00 | 155.20-155.30 | 155.250 | +0.000 |
| Ethanol NYH Barge (Sep) | AAUEG00 | 153.70-153.80 | 153.750 | +0.000 |
| Ethanol Houston 5-15 Tank | AATGJ00 | 156.20-156.30 | 156.25 | +0.00 |

**ANSWER:** ADM admits the table contained in paragraph 81 is a correct reproduction of an excerpt from a portion of the August 3, 2018 Platts' Biofuelscan report, and ADM refers to the report itself for a complete statement of its content. Except as expressly admitted, ADM denies the allegations in this paragraph.

82.     This snapshot is consistent with Bloomberg data on reported prices at Argo (ETHNCHIC Index), New York Harbor (ETHNNYPR Index), Gulf Coast (ETHNUSGC Index), and the West Coast (ETHNWCPR Index) during the Relevant Period.  That data shows that on average, prices at these other terminals were 10.4 to 22.1 cents higher per gallon than at the Argo Terminal.

**ANSWER:** ADM denies the allegations in paragraph 82 insofar as they attempt to frame the contents of the reported prices at Argo (ETHNCHIC Index), New York Harbor (ETHNNYPR Index), Gulf Coast (ETHNUSGC Index), and the West Coast (ETHNWCPR Index) as meaning anything different than what the reported prices actually state, and ADM refers to those various indexes for a complete statement of their content.  ADM denies any remaining allegations in this paragraph.

83.     An analysis of Bloomberg pricing data also supports the inference that ADM began its manipulation scheme on or around November 2017.  In the 17 months between June 1, 2016 and October 31, 2017, the average differential in price between the Argo Terminal and the other three terminals was roughly 4.9-15.5 cents per gallon.  This means that, on average, from June 1, 2016 to October 31, 2017, an ethanol producer could have received between 4.9 and 15.5 cents more by selling their ethanol at New York Harbor/Gulf Coast/West Coast than at Argo (with 4.9 cents representing the additional price at the terminal closest in price to Argo, and 15.5 cents representing the additional price at the terminal highest in price compared to Argo).

**ANSWER:** ADM denies that it engaged in a "manipulation scheme" or manipulative conduct in the ethanol market.  ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 83 relating to the average price

differentials between the Argo Terminal and the other three terminals taken over a 17-month period and therefore denies the same. Except as expressly admitted, ADM denies the remaining allegations of this paragraph.

84.　　The existence of some persistent price differential between Argo and these other terminals is to be expected. It is easier and cheaper to transport ethanol to the Argo Terminal (via barge, railcar, or truck) than to these other major terminals because ethanol is predominantly produced in the Midwest. The persistent differential between the Argo Terminal and the other terminals thus roughly reflected the increased transport costs (and the risk to price changes during transit) involved in shipping ethanol to these other terminals.

**ANSWER:** ADM denies the allegations in paragraph 84 as stated.

85.　　But beginning in November 2017 and continuing through at least March 30, 2019, the pre-existing differential suddenly and persistently increased to between 10.4 and 22.1 cents per gallon. There was no corresponding sudden and persistent increase in transport costs that could explain the increase of this inter-terminal price differential. Accordingly, it is reasonable to infer that, since November 2017, the Argo Terminal price has been artificially depressed by 5.5 to 6.6 cents per gallon, on average. An econometric analysis will establish that it was ADM's manipulation that caused this sudden and persistent increase in the inter-terminal price differential, as opposed to other factors. The table below provides some data-points on the differential pre- and post- November 2017.

|  | **Pre-Manipulation** June 1, 2016 – October 31, 2017 | **Manipulation Period** November 1, 2017 – March 31, 2019 |
|---|---|---|
| Difference in Price Per Gallon for Ethanol Between the Argo Terminal and | 4.94 cents per gallon (average) 5 cents per gallon (median) | 15.48 cents per gallon (average) 15.5 cents per gallon (median) |

| | | |
|---|---|---|
| the Terminal with the Next-Lowest Price | 10 cents per gallon (maximum – July 21, 2017) | 22 cents per gallon (maximum – October 9, 2017) |
| Difference in Price Per Gallon for Ethanol Between the Argo Terminal and the Terminal with the Highest Price | 10.44 cents per gallon (average)<br><br>10 cents per gallon (median)<br><br>18.5 cents per gallon (maximum – March 27, 2019) | 22.09 cents per gallon (average)<br><br>21 cents per gallon (median)<br><br>43.75 cents per gallon (maximum – August 21, 2018) |

**ANSWER:** The allegations in paragraph 85 state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph.

86. To put it another way, assuming that the 4.9 to 15.5 cents per gallon differential from June 1, 2016 to October 31, 2017 represents the average additional transport costs to ship to these other terminals, and those costs did not increase, then ADM could have sold its ethanol for 5.5 to 6.6 cents per gallon more at these other terminals than it received at the Argo Terminal (even after factoring in transport costs) during the Relevant Period after November 1, 2017.

**ANSWER:** The allegations in paragraph 86 state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph.

87. Indeed, while the "average" differential between the Argo price and the terminal with the next-lowest price between June 1, 2016 and October 31, 2017 had been 4.9 cents per gallon, the same differential never fell below that amount after November 1, 2017. The average monthly differential between the Argo Terminal price and the prices at the other major terminals thus persistently increased after November 2017 on an ongoing basis as a result of ADM's manipulation scheme.

42



Average Ethanol Price Differential by Month

**ANSWER:** The allegations in paragraph 88 state legal conclusions and argument to which no answer is required. To the extent an answer is required, ADM denies the allegations in this paragraph.

88. On August 3, 2018—the day identified above where ADM was the seller in all five trades during the Argo Terminal MOC period for $1.4450 per gallon—ADM could have received $1.55 per gallon at New York Harbor and Gulf Coast terminals, or even $1.7450 per gallon (30 cents per gallon higher) at West Coast terminals.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 88 and therefore denies the same.

89. Had ADM been acting in an economically rational manner and not engaging in intentional manipulation, it would have sought the highest available price (factoring in the

43

costs of transport) for its physical ethanol sales. During the Relevant Period, the highest available price was not at the Argo Terminal during the MOC window, but rather at other terminals such as New York Harbor, Gulf Coast, and West Coast as the data above demonstrates, or from other non-terminal buyers in the market.

**ANSWER:** Denied.

90. The reactions of other sophisticated participants in the ethanol derivatives market to the anomalous pricing coming out of the Argo Terminal post-November 2017 also provides strong evidence of ADM's manipulation scheme. For example, in the spring of 2018, at least one ethanol derivatives trader that suspected manipulation by ADM brought those suspicions to the CME. The CME then requested trading records from ADM. Despite the months-long manipulation, ADM provided a limited production of only a few days' trading records. Due to the informal and incomplete nature of the investigation, ADM was apparently able to hoodwink the CME into believing that its manipulative trading activity was an answer to unrelated railroad logistics.

**ANSWER:** Denied.

91. Subsequently, various news stories and industry chatter indicated that some ethanol market participants suspected that ADM was accumulating large short positions in Chicago Ethanol Derivatives while engaging in unprecedented and irrational selling activity during the MOC window.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 91 and therefore denies the same.

92. For instance, on September 12, 2018, Reuters journalist Jarrett Renshaw reported and tweeted that ADM "ramps up ethanol sales in Chicago, irking rivals," noting that ADM

44

had "accounted for roughly 61 percent of the 9.5 million ethanol barrels sold at [the Argo Terminal] between November [2017] and August [2018]," and that "heavy selling by ADM has led traders who have lost money on the slumping ethanol market to complain to S&P Global Platts."[3]

**ANSWER:** ADM admits that the quoted language contained in paragraph 92 is a correct reproduction of excerpts from tweets Reuters journalist Jarret Renshaw posted on or around September 12, 2018. ADM refers to the tweets themselves for a complete statement of their content. Except as expressly admitted, ADM denies the remaining allegations in paragraph 92.

93. Renshaw also reported on the same day that "[o]n the Chicago Board of Trade, ADM registered all 579 ethanol contracts [the CME's Ethanol Futures Contract, EH] for delivery as of Tuesday, each contract representing 29,000 gallons—or enough for about one rail tanker car— the most in the history of the contract, according to CME Group data."[4]

**ANSWER:** ADM admits that the quoted language contained in paragraph 93 is a correct reproduction of excerpts from a tweet Reuters journalist Jarret Renshaw posted on or around September 12, 2018. ADM refers to the tweets themselves for a complete statement of their content. Except as expressly admitted, ADM denies the remaining allegations in paragraph 93.

94. ADM's anomalous pricing and trading behavior at the Argo Terminal after November 2017 led various market participants to complain to Platts about the potential manipulation of the Chicago Benchmark Price. In response to those complaints, Platts paid

---

[3] https://twitter.com/JarrettRenshaw/status/1039971701763829761; https://twitter.com/JarrettRenshaw/status/1039971344077795328; https://www.reuters.com/article/us-usa-ethanol-adm/commodities-giant-adm-ramps-up-ethanol-sales-in-chicago-irking-rivals-idUSKCN1LS303

[4] https://twitter.com/JarrettRenshaw/status/1039973948451168256; https://www.reuters.com/article/us-usa-ethanol-adm/commodities-giant-adm-ramps-up-ethanol-sales-in-chicago-irking-rivals-idUSKCN1LS303

for and hosted a July 2018 meeting at its offices located at 111 Bagby St. in Houston, Texas, and invited major ethanol producers, brokers, and other stakeholders. Among the approximately 40 participants in the July 2018 meeting were Adam Kuffel of ADM; Sophie Byron and Ian Dudden of Platts; and representatives from Shell, Trafigura, Vitol, CCI, Biourja, Eco-Energy, Green Plains, POET, Mercuria, and Marquis Energy. The CME also sent a senior official – Vish Subramanian, CME Group's Director of Energy Products — to attend the July 2018 meeting.

**ANSWER:** ADM admits that Platts hosted a meeting in July 2018 at 111 Bagby St. in Houston, Texas, which was attended by industry participants including Sophie Byron and representatives from Shell, Trafigura, Vitol, CCI, BioUrja, Eco-Energy, Green Plains, POET, and Mercuria. ADM further admits that Adam Kuffel was in attendance. ADM denies that it engaged in "anomalous pricing and trading behavior at the Argo Terminal after November 2017." ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 94 and therefore denies the same.

95.     At the meeting, Platts solicited comments from attendees on its methodology for calculating the Chicago Benchmark Price during the MOC window, whether any changes should be implemented the methodology, and if so, why. In response, some participants pointed to ADM's aggressive selling and hitting the bid during the MOC window as evidence that the benchmark price could be unduly influenced by an aggressive seller.

**ANSWER:** ADM admits that methodology to calculate the Chicago Benchmark Price was discussed at this meeting. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 95 and therefore denies the same.

96. ADM's representative Adam Kuffel did not directly address the implication that ADM might be having an outsized impact on the Chicago Benchmark Price. Kuffel instead voiced ADM's opposition to an effort by some participants to decrease the ITT deliverable time for ethanol for the MOC window from the current 5 to 15 days forward to just 2 to 10 days forward. Notably, a reduction in the ITT deliverable time would constrain ADM's ability to manipulate the MOC window through aggressive selling of ethanol beyond what ADM could physically deliver. Specifically, ADM would have fewer days to find and buy ethanol outside the MOC window to satisfy all of its delivery obligations.

**ANSWER:** ADM admits that Adam Kuffel attended the July 2018 meeting hosted by Platts. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

97. At the end of the meeting, Platts promised to take recommendations from all participants into account, but also indicated that it would not be able to change anything before the beginning of 2019.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 97 and therefore denies the same.

98. Realizing that the Platts methodology was not being changed, Platts' competitor Argus Media saw an opportunity to lobby ethanol stakeholders and the CME to create an alternative to the susceptible-to-manipulation Platts window, based on either an average price throughout the whole day of transactions at the Argo Terminal, or using the so-called "Rule 11" calculation of prices at a railway switch near Chicago where buyers take railcars from sellers and return them after emptying.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 98 and therefore denies the same.

99.     Argus invited the CME and other ethanol market participants to a meeting in November 2018 at a hotel in Houston to discuss whether there was demand for a new ethanol derivative product that could generate sufficient liquidity and could not be manipulated by ADM.  Argus specifically did not invite ADM to this meeting.

**ANSWER:**  ADM admits that Argus hosted a meeting in November 2018 at a hotel in Houston. ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 99 and therefore denies the same.

100.     Participants at this meeting included representatives from Trafigura, Eco-Energy, Green Plains, POET, CCI, Mercuria, and Biourja.  The CME again sent Vish Subramanian to attend on its behalf.  Despite not being invited, Adam Kuffel of ADM nonetheless attended the November 2018 meeting.

**ANSWER:**  ADM admits that Adam Kuffel attended a meeting in November 2018 hosted by Argus, which also included representatives from industry participants.  ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the remaining allegations in paragraph 100 and therefore denies the same.

101.     At this meeting, Kuffel expressed his opinion that the market was functioning effectively and that ADM saw no reason to change the status quo.  Jordan Fife of Biourja asked Kuffel why, if ADM thought the ethanol market was healthy, it brought in railcars to the Argo Terminal against "arbs" (i.e. at lower prices than they could have received via arbitrage at other terminals or from other buyers) in April/May 2018.

**ANSWER:**  ADM admits that Adam Kuffel attended a meeting in November 2018 hosted by Argus.  Except as expressly admitted, ADM denies the remaining allegations of this paragraph.

48

102.    Kuffel responded that he was "not at liberty to discuss ADM's strategies in this venue" – a response that did not offer any explanation for ADM's otherwise irrational sale practices at the Argo Terminal.

**ANSWER:** ADM admits that Kuffel expressed that he could not discuss ADM's confidential business strategies at the November 2018 meeting hosted by Argus, which was attended by ethanol industry participants—ADM's direct competitors.  Except as expressly admitted, ADM denies the remaining allegations of this paragraph.

103.    The manipulation scheme carried out by Ray Bradbury and Adam Kuffel was not the product of two rogue employees in ADM's ethanol division.  The scheme was implemented with the knowledge of senior ADM officials, who were aware that the ethanol division was earning outsized profits from large short positions in Chicago Ethanol Derivatives as a result of ADM's aggressive selling activity during the MOC window at the Argo Terminal.

**ANSWER:**  Denied.

104.    The ethanol division at ADM routinely generated reports on its operations and its profits/losses for senior ADM officials, who in turn aggregated the reports into company financial reports for disclosure to ADM's investors.  Through these reports, senior ADM officials were kept updated on the ethanol division's performance and were aware that the division was generating outsized trading profits despite historically low ethanol margins.

**ANSWER:**  ADM admits that it generates financial reports for review by ADM personnel, and also discloses financial reports to ADM's investors in accordance with SEC requirements.  Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

105.    Indeed, senior ADM officials publicly acknowledged the success of the manipulation scheme, though they couched it in euphemism.  In an ADM earnings call on November 6, 2018 reporting on the third quarter of 2018 – a time of extremely low ethanol margins during which ADM was aggressively manipulating the Chicago Benchmark Price downward – ADM Executive Vice President and Chief Financial Officer Ray Guy Young reported (discussing the slide below) that ADM's bioproducts team (which included the ethanol group) "did a good job managing risk in [an] extremely weak ethanol industry margin environment."  ADM's 10-Q from the third quarter of 2018 reported bioproducts had earned a $43 million operating profit, even as ADM's ethanol producer competitors were suffering losses as a result of this "extremely weak ethanol industry margin environment."



**ANSWER:**  ADM admits that the quoted language and graphic contained in paragraph 105 are correct reproductions of excerpts from an edited transcript and slide deck from an ADM earnings call on November 6, 2018.  ADM refers to the transcript and slide deck themselves for a complete statement of their content.  Except as expressly admitted, ADM denies the remaining allegations in paragraph 105.

106.    ADM's 2018 10-K filing likewise implicitly acknowledged the success of the manipulation scheme.    For instance, ADM stated that for 2018 compared to 2017, "[bio]products results were down as near record industry fuel ethanol inventories pressured margins and production issues in the Decatur, IL corn complex increased costs, partially offset by effective ethanol risk management."[5]    In the same filing, discussing 2017 performance compared to 2016, ADM noted that "[bio]products profit increased due to higher trading results partially offset by slightly lower ethanol margins."

**ANSWER:** ADM admits that the quoted language contained in paragraph 106 is a correct reproduction of excerpts from ADM's 10-K filing for the fiscal year that ended December 31, 2018.  ADM refers to the 10-K filing itself for a complete statement of its content.  Except as expressly admitted, ADM denies the remaining allegations in paragraph 106.

107.    On information and belief, the "effective ethanol risk management" and "higher trading results" in 2017 and 2018 referred to in ADM's 2018 10-K refer to the manipulative scheme discussed in this complaint, and reflect the fact that senior ADM officials such as those involved in preparing ADM's annual report were made aware by Ray Bradbury and Adam Kuffel of the manipulative scheme and its impact on the bioproducts division's profit.

**ANSWER:** Denied.

108.    During the Relevant Period, AOT was a frequent trader in Chicago Ethanol Derivatives such as Chicago Ethanol (Platts) Futures, and suffered actual damages as a result of ADM's downward manipulation of the Chicago Benchmark Price.  What follows

---

[5]  ADM 2018 Form 10-K (filed Feb. 19, 2019) at 33.

is an illustration of how ADM's manipulation damaged AOT's positions in Chicago Ethanol (Platts) Futures.

**ANSWER:** ADM admits that AOT traded in Chicago Ethanol (Platts) Futures at times during the Relevant Period as defined in the Complaint. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

109. Because ADM's manipulation was designed to artificially lower the Chicago Benchmark Price during every MOC window during that settlement month, Chicago Ethanol (Platts) Futures traders such as AOT would most immediately suffer actual damages to long positions that they held in a Chicago Ethanol (Platts) Futures spot month contract at the beginning of that spot month.

**ANSWER:** Denied.

110. As seen below, during the Relevant Period AOT entered the spot month with a long position in Chicago Ethanol (Platts) Futures contracts during eight separate months, and in total held a net long position entering spot months across the Relevant Period—positions that would have been damaged by ADM's manipulative scheme:

| Spot Month Contract | AOT's Position in Chicago Ethanol (Platts) Futures (CU) Entering That Spot Month[6] |
|---|---|
| November 2017 | -420 |
| December 2017 | 3,123 |
| January 2018 | 0 |
| February 2018 | -116 |
| March 2018 | -315 |
| April 2018 | 224 |
| May 2018 | -286 |
| June 2018 | -138 |
| July 2018 | 35 |
| August 2018 | 75 |
| September 2018 | 35 |
| October 2018 | 30 |
| November 2018 | 30 |
| December 2018 | 30 |
| January 2019 | 0 |
| February 2019 | 0 |
| March 2019 | 0 |
| April 2019 | -20 |
| May 2019 | -5 |
| **TOTAL** | **2,282** |

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 110 and therefore denies the same. ADM specifically denies that it engaged in a "manipulation scheme" or manipulative conduct in the ethanol market.

111.    As noted above in paragraph 37, a 1-cent per gallon change to the Chicago Benchmark Price impacts each Chicago Ethanol (Platts) Futures contract (CU) by $420, and (per paragraphs 85-86) ADM's manipulation reduced the Chicago Benchmark Price by an estimated 5.5-6.6 cents per gallon on average throughout the Relevant Period.

---

[6] Positions reflect AOT's net position in Chicago Ethanol (Platts) Futures contracts in the contract month at the end of trading on the last trading day of the month preceding that contract month, with negative numbers indicating a short position and positive numbers indicating a long position. Thus, for the December 2017 contract, AOT's position at the close of trading on November 30, 2017 (the last day of trading before the beginning of the December 2017 spot month) was 3,123 contracts long.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 111 and therefore denies the same. ADM specifically denies that it engaged in any manipulation of ethanol markets.

112. Using these estimates and inputs, AOT's long positions (totaling a net of 2,282 contracts across the Relevant Period) entering spot months in the Chicago Ethanol (Platts) Futures contract alone may have suffered actual damages of approximately $5,271,420 (representing a 5.5 cents per gallon reduction) to $6,325,704 (representing a 6.6 cents per gallon reduction) as a result of ADM's downward manipulation of the Chicago Benchmark Price.

**ANSWER:** Denied.

113. As an active trader in Chicago Ethanol (Platts) Futures, however, AOT's actual damages as a result of ADM's manipulative scheme would not be limited to harm to their long positions entering a spot month. Within a spot month, as AOT bought and sold Chicago Ethanol (Platts) Futures, AOT incurred additional damages as a result of its intra-spot month trading at artificial prices caused by ADM's manipulation, and as a result of ADM's manipulation later within the spot month affecting the settlement of positions taken earlier within that month.

**ANSWER:** Denied.

114. For instance, within December 2017, AOT bought (and thus took a long position) a net 836 Chicago Ethanol (Platts) Futures contracts between December 1-December 13, 2017. Then, from December 14-18, 2017, AOT sold (went short) 490 Chicago Ethanol (Platts) Futures contracts.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 114 and therefore denies the same.

115.     As discussed in paragraphs 63-69 above, in December 2017 ADM aggressively "hit the bid" during the MOC window at the Argo Terminal, resulting in ongoing downward manipulation of the Chicago Benchmark Price during and continuing throughout the month.

**ANSWER:** Denied.

116.     AOT's trading in the December 2017 Chicago Ethanol (Platts) Futures contract within December 2017 thus resulted in additional losses. The 836 Chicago Ethanol (Platts) Futures contracts that AOT bought (went long on) from December 1-13, 2017 were all purchased at prices *above* the $1.2965 per gallon settlement value of the December 2017 contract – a settlement value that was the result of ADM's successful downward manipulation throughout the month. AOT suffered losses on these transactions, as manipulation later in the month after these contracts were bought decreased their settlement value.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 116 relating to the prices at which AOT purchased ethanol contracts from December 1 to 13, 2017, and therefore denies the same. ADM denies the remaining allegations of this paragraph.

117.     Similarly, 390 of the 490 Chicago Ethanol (Platts) Futures contracts that AOT sold (went short on) from December 14-18, 2017 were sold at prices *below* the $1.2965 per gallon settlement value of the December 2017 contract. For those contracts, AOT sold at an artificially lower price than they would have been able to sell absent ADM's

manipulation earlier in the month, and thus incurred additional actual losses on those contracts.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 117 relating to the prices at which AOT sold ethanol contracts from December 14 to 18, 2017, and therefore denies the same. ADM denies the remaining allegations in this paragraph.

118. Similar patterns to this—AOT buying/going long on Chicago Ethanol (Platts) Futures contracts early within a contract month, and/or selling/going short on Chicago Ethanol (Platts) Futures contracts later within a contract month—were repeated in contract months throughout the Relevant Period. In each instance, AOT's intra-month trading in Chicago Ethanol (Platts) Futures contracts resulted in AOT incurring additional losses due to ADM's ongoing downward manipulation of the Chicago Benchmark Price throughout that contract month.

**ANSWER:** ADM is without sufficient information or knowledge upon which to form a belief as to the truth or validity of the allegations in paragraph 118 relating to AOT's trading pattern throughout the Relevant Period, and therefore denies the same. ADM denies any remaining allegations in this paragraph.

119. AOT seeks to represent and certify the following Class under Federal Rule of Civil Procedure 23 (b) (3):

All persons who traded in or settled positions in Chicago Ethanol (Platts) Futures (CME symbol: CU), Chicago Ethanol (Platts) Average Price Options (CME symbol: CVR), or the CME's Ethanol Futures Contracts (CME symbol: EH) after

November 1, 2017, and were damaged as a result of the decrease in the Chicago Ethanol (Terminal) price caused by ADM's trading activity at the Argo Terminal.[7]

**ANSWER:** ADM admits only that AOT seeks to represent and certify the class as defined in paragraph 119. ADM denies that AOT is a proper class plaintiff and further denies that the proposed class meets the requirements for certification. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

120. Excluded from the Classes are: ADM; the officers, directors, or employees of ADM; any entity in which ADM has a controlling interest; any affiliate, legal representative, heir, or assign of ADM and any person acting on their behalf. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate families and judicial staff, as well as any juror assigned to this action.

**ANSWER:** ADM admits only that AOT purports to list those individuals and companies excluded from the proposed class in paragraph 120. Except as expressly admitted, ADM denies the remaining allegations in this paragraph.

121. The Class is readily ascertainable based on records and transaction data in the possession of CME.

**ANSWER:** Paragraph 121 states a legal conclusion as to which no answer is required. To the extent an answer is required, ADM denies the allegations contained in this paragraph.

122. There are potentially hundreds if not thousands of geographically dispersed Class members, making joinder impracticable.

---

[7] AOT reserves the right to narrow or otherwise amend this Class definition before it files its motion for class certification, including based on discovery obtained from ADM or non-parties.

**ANSWER:** Paragraph 122 states a legal conclusion as to which no answer is required. To the extent an answer is required, ADM denies the allegations contained in this paragraph.

123. AOT's claims are typical of the claims of Class members. AOT and other Class members sustained damages arising out of ADM's manipulation in violation of the CEA. The damages and injuries of each member of the Class were directly caused by ADM's wrongful conduct. ADM's defenses with respect to AOT's claims, if any, are typical of defenses to the claims of all Class members.

**ANSWER:** Paragraph 123 states a legal conclusion as to which no answer is required. To the extent an answer is required, ADM denies the allegations contained in this paragraph.

124. There are questions of law and fact common to the Class, including, but not limited to, the following:

• whether ADM manipulated Chicago Benchmark Prices or the prices of Chicago Ethanol Derivatives;

• whether ADM's conduct constitutes manipulation under the CEA;

• whether ADM's conduct was willful and intentional;

• the appropriate Class-wide measure of damages, including whether Class members are entitled to additional punitive or exemplary damages equal to two times the amount of their actual damages under the CEA; and

• the appropriate injunctive and other equitable relief for the Class.

**ANSWER:** Paragraph 124 states a legal conclusion as to which no answer is required. To the extent an answer is required, ADM denies the allegations contained in this paragraph.

125. These common questions of law and fact predominate over any questions affecting only individual Class members.

**ANSWER:** Paragraph 125 states a legal conclusion as to which no answer is required. To the extent an answer is required, ADM denies the allegations contained in this paragraph.

126. AOT will fairly and adequately protect the interests of Class members. AOT's interests are aligned with, and not antagonistic to, those of the other members of the Class, and it has retained counsel competent and experienced in the prosecution of class actions and financial litigation to represent it and the Class.

**ANSWER:** Paragraph 126 states a legal conclusion as to which no answer is required. To the extent an answer is required, ADM denies the allegations contained in this paragraph.

127. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts, ADM, and relevant non-parties and would create a risk of inconsistent or varying adjudications. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of Class members to seek redress for the violations of law alleged herein.

**ANSWER:** Paragraph 127 states a legal conclusion as to which no answer is required. To the extent an answer is required, ADM denies the allegations contained in this paragraph.

## CLAIMS FOR RELIEF

## CLAIM ONE

### Manipulation in Violation of the Commodity Exchange Act

128. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this complaint.

**ANSWER:** ADM restates and incorporates by reference herein its answers to each of the foregoing allegations of this Complaint.

129.    ADM specifically intended to and did manipulate the prices of the following

commodities and futures in violation of the CEA, 7 U.S.C. § 1 et seq.: (1) ethanol sold at

the Argo Terminal; (2) the Chicago Ethanol (Terminal) price calculated based on trading

activity during the MOC window at the Argo Terminal; (3) the Chicago Ethanol (Platts)

Future (CU) traded on NYMEX; (4) the Chicago Ethanol (Platts) Average Price Options

Contract (CVR) traded on NYMEX; and (5) the Ethanol Futures Contracts (EH) traded on

CBOT.

**ANSWER:** Denied.

130.    ADM possessed the ability to influence the Chicago Ethanol (Terminal) price (and

thus the settlement/price of the aforementioned Chicago Ethanol Derivatives contracts

linked to that price).    ADM successfully created artificial Chicago Ethanol (Terminal)

prices by selling ethanol during the price-setting MOC window at prices that were below

what ADM could have received at other available terminals or in privately negotiated sales,

below what ADM could have realized by negotiating during the MOC window, and at

times below ADM's own variable costs of production.    ADM did so in order to benefit

positions ADM had taken in the aforementioned Chicago Ethanol Derivatives that were

priced/settled based on the Chicago Ethanol (Terminal) price.

**ANSWER:** Denied.

131.    ADM's manipulative conduct and trading activity alleged herein constituted

manipulation of the Chicago Ethanol (Terminal) price used to settle/price the

aforementioned Chicago Ethanol Derivatives between November 2017 and the present, in

violation of the CEA, 7 U.S.C. §§ 6b(a), 6c(a), 9(1), 9(3), 13(a)(2), and 25(a), as well as

17 C.F.R. § 180.2.

**ANSWER:** Denied as to the statutory sections remaining after the Court's Order of May 22, 2020 on ADM's Motion to Dismiss the Complaint. No answer is required as to the dismissed sections of the CEA.

132.    As a direct result of ADM's unlawful conduct, Plaintiff and Class members suffered actual damages and injury in fact due to losses they incurred when trading in the aforementioned Chicago Ethanol Derivatives linked to the Chicago Ethanol (Terminal) price at artificial prices between November 2017 and the present, to which Plaintiff and Class members would not have been subject but for ADM's unlawful conduct alleged herein.

**ANSWER:** Denied.

133.    Plaintiff and Class members were further legally injured and suffered injury in fact when they transacted in the aforementioned Chicago Ethanol Derivatives linked to the Chicago Ethanol (Terminal) price between November 2017 and the present in an artificial and manipulated market with the artificial prices created by ADM.

**ANSWER:** Denied.

134.    Because ADM's conduct was willful and intentional, Plaintiff and Class members are entitled to additional punitive or exemplary damages equal to no more than two times their actual damages for the violations of the CEA alleged herein.

**ANSWER:** Denied.

**PRAYER FOR RELIEF**

135.    Plaintiff requests the following relief:

A.    That the Court enter an order declaring that ADM's actions, as set forth in this complaint, violate the CEA;

B.      That the Court award Plaintiff and the Class damages, punitive and exemplary damages, and/or restitution in an amount to be determined at trial;

C.      That the Court issue appropriate injunctive and other equitable relief against ADM;

D.      That the Court award Plaintiff and the Class pre- and post-judgment interest;

E.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses; and

F.      That the Court award any and all such other relief as the Court may deem just and proper.

**ANSWER:**  Paragraph 135 contains AOT's prayer for relief to which no answer is required.  To the extent an answer is required, ADM denies that AOT is entitled to any relief.

## ADM'S AFFIRMATIVE DEFENSES

Without admitting liability as to any of the claims asserted in this Complaint, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that otherwise would rest with Plaintiff and/or one or more of the unnamed putative class members (collectively with Plaintiff, "Putative Class Members"), ADM asserts the following affirmative defenses. ADM's investigation in this matter continues and ADM reserves the right to supplement or modify any portion of this Answer, including by asserting additional affirmative or other defenses or claims not yet asserted based on discovery or other factual investigations, consistent with the Federal Rules of Civil Procedure and the Court's scheduling order in this matter.

## FIRST AFFIRMATIVE DEFENSE: UNCLEAN HANDS

1.      AOT's claims and the claims of the Putative Class Members are barred, in whole or in part, by the doctrine of unclean hands to the extent that AOT and/or certain Putative Class Members acted fraudulently, in bad faith, or inequitably in their dealings with ADM, in transactions at the Argo Terminal, and in the ethanol market generally as part of the same transactions or events on which AOT sues.

2.      Upon information and belief, AOT, through the actions of its employees, including but not limited to Brendan Reich and Lance Perdue, attempted to artificially drive up the price of ethanol through various means, including but not limited to soliciting other market participants to join AOT in creating an artificial price, and by purchasing massive amounts of ethanol in the MOC window at Argo in order to drive up the price of ethanol to capitalize on AOT's long position in ethanol futures contracts entering into the December 2017 spot month.

3.      Upon information and belief, AOT, through the actions of its employees, including but not limited to Reich and Perdue, circulated false information concerning potential changes in tariffs for Chinese exports in an effort to create an increase in demand for ethanol.

4. Upon information and belief, AOT, under the strategic direction of Reich and Perdue, aggressively purchased ethanol at Argo during the MOC window to create a false impression of an increase in demand coming from China. Upon information and belief, AOT bought 655,000 barrels of ethanol from the period between December 1 and 13 of 2017. ADM sold AOT some, but not nearly all, of the physical ethanol it purchased during this period.

5. Upon information and belief, the ethanol AOT bought in early December had delivery windows in early- to mid-December. As deliveries of physical ethanol were made to AOT at the Argo Terminal, AOT did not have the logistics in place to adequately handle its commitments. Consequently, AOT was charged with storage fees for ethanol for which it could not take delivery.

6. Facing mounting storage fees and with delivery of physical ethanol it had purchased continuing, AOT engaged in cross-channeling to free up space at the Argo Terminal. In other words, AOT shipped physical ethanol in barges on the Chicago River from the Argo Terminal to another location, with no intent to sell or use the product. Rather, AOT's intent was to move the product to enable AOT to buy more product and manipulate the price of ethanol. AOT's intent was also to avoid selling the ethanol it had purchased because doing so would risk impacting price against the way in which AOT was attempting to artificially drive the market price.

7. AOT was ultimately forced to liquidate its massive ethanol purchases in December 2017 and early 2018, due at least in part to a lack of storage space, at a price well below market.

8. While AOT's intention in purchasing the massive quantities of ethanol was to cause or at least give the appearance of increased price and demand, this fire sale of AOT's massive ethanol purchases put downward pressure on the Chicago Benchmark Price of ethanol.

9. AOT's claims are therefore barred by the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE: ESTOPPEL

10.     ADM repeats and incorporates by reference allegations 1-9 of its affirmative defenses.  AOT and the claims of the Putative Class Members are barred, in whole or in part, by principles of estoppel (or similar equitable principles) because AOT and certain of the Putative Class Members engaged in conduct designed to impact the price of ethanol and Chicago Ethanol Derivatives—including posting bids which were accepted by ADM at the very prices the Complaint claims were artificial.  As such, AOT and/or the Putative Class Members caused or contributed to the existence of any potential artificial price, either as the sole cause or as an intervening or contributing cause, as well as any alleged damages resulting from the artificial price.

## THIRD AFFIRMATIVE DEFENSE: LACHES

11.     AOT's claims and the claims of the Putative Class Members are barred by laches and/or waiver because AOT and the Putative Class Members have unreasonably delayed their assertion of the claims so as to cause prejudice to ADM.

12.     The Complaint allegations demonstrate that to the extent AOT had any viable claims relating to ADM's alleged conduct, AOT was aware of the conduct as early as December 2017 and unreasonably failed to take action for months or years.

13.     This unreasonable and inexcusable delay prejudiced ADM.

14.     The claims of the Putative Class Members are similarly barred, in whole or in part, by the doctrine of latches due to the unreasonable delay in bringing these claims and resulting harm to ADM from such delay.

## FOURTH AFFIRMATIVE DEFENSE: ASSUMPTION OF THE RISK

15.     ADM repeats and incorporates by reference allegations 1-9 of its affirmative defenses.  To the extent that any fault or causation for AOT's alleged damages or those of the

Putative Class Members is assessed against ADM, ADM is entitled to an offset of any liability because AOT and/or the Putative Class Members willingly entered into the contracts at issue and voluntarily assumed the risk that they could lose money in trading. Accordingly, any losses sustained by AOT and/or the Putative Class Members were caused in whole or in party by their own conduct, meaning that any claim for damages is barred or must be reduced or offset.

## FIFTH AFFIRMATIVE DEFENSE: FAILURE TO MITIGATE

16.      ADM repeats and incorporates by reference allegations 1-9 of its affirmative defenses. AOT's claims as well as those of the Putative Class are barred, in whole or in part, by their failure to mitigate or to take reasonable efforts to mitigate, minimize, or avoid their alleged damages.

## SIXTH AFFIRMATIVE DEFENSE: STATUTE OF LIMITATIONS

17.      The Putative Class Members' claims are barred, in whole or in part, by the statutes of limitation applicable to their claims, including but not limited to the two-year limitations period set forth in 7 U.S.C. § 25(c). To the extent the discovery rule applies to any of the Putative Class Members' claims, those claims are still barred, in whole or in part, because the time for filing after discovery has expired under applicable statutes of limitation.

## SEVENTH AFFIRMATIVE DEFENSE: LACK OF STANDING

18.      ADM repeats and incorporates by reference allegations 1-9 of its affirmative defenses. AOT's claims and the claims of the Putative Class Members are barred, in whole or in part, because they lack standing to maintain some or all of their claims. For example, AOT as well as some or all of the Putative Class Members have not suffered any injury or harm as a result of any action, conduct, statement, or omission by ADM, and thus do not have a legally cognizable injury as required by Article III of the U.S. Constitution.

## EIGHTH AFFIRMATIVE DEFENSE: DOUBLE RECOVERY IS BARRED

19.     AOT's and the Putative Class Members' claims are barred, in whole or in part, to the extent the sections of the CEA listed in Claim 1 would permit the Putative Class Members to obtain double recovery for the same alleged injuries.

## NINTH AFFIRMATIVE DEFENSE: ADEQUATE REMEDY AT LAW

20.     AOT and the Putative Class Members are not entitled to injunctive relief because, to the extent that they are entitled to any remedy, they have an adequate remedy at law.

## TENTH AFFIRMATIVE DEFENSE: RATIFICATION

21.     To the extent that ADM's actions are found to have caused any injury to AOT and/or the Putative Class Members, AOT and/or the Putative Class Members are barred from recovering for such injury to the extent that AOT and/or the Putative Class Members ratified ADM's conduct by executing trades with ADM or anyone else.

## ELEVENTH AFFIRMATIVE DEFENSE: IN PARI DELICTO

22.     ADM repeats and incorporates by reference allegations 1-9 of its affirmative defenses.  To the extent that ADM's actions are found to have caused any injury to AOT and/or the Putative Class Members, AOT and/or the Putative Class Members are barred from recovering for such injury by the doctrine of *in pari delicto*.

## PRAYER FOR RELIEF

WHEREFORE, ADM respectfully requests judgment dismissing the Complaint on the merits, in its entirety and with prejudice, awarding Defendants costs and disbursements incurred in this action, and awarding such additional relief as this Court may deem just and appropriate.

## JURY DEMAND

ADM requests a trial by jury on all issues so triable.

Dated: June 5, 2020

Respectfully submitted,
ARCHER DANIELS MIDLAND COMPANY

By: s/ *Stephen V. D'Amore*
One of Its Attorneys

Stephen V. D'Amore
Samantha M. Lerner
Reid F. Smith
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
sdamore@winston.com
slerner@winston.com
rfsmith@winston.com
T: (312) 558-5600
F: (312) 558-5700

*Counsel for Defendant Archer Daniels Midland
Company*

# CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2020, I caused the foregoing to be served on the following by filing it with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record, including the following:

George A Zelcs
John A. Libra
Chad E. Bell
Ryan Z. Cortazar
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
T: (312) 641-9750
F: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
cbell@koreintillery.com
rcortazar@koreintillery.com

Stephen M. Tillery
Michael E. Klenov
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, Missouri 63101
T: (314) 241-4844
F: (314) 241-3525
stillery@koreintillery.com
mklenov@koreintillery.com

*Attorneys for Plaintiff AOT Holding AG and the Proposed Class*

By: s/ *Stephen V. D'Amore*
One of Its Attorneys

Stephen V. D'Amore
Samantha M. Lerner
Reid F. Smith
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
sdamore@winston.com
slerner@winston.com
rfsmith@winston.com
T: (312) 558-5600
F: (312) 558-5700

*Counsel for Defendant Archer Daniels Midland Company*