IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| AOT HOLDING AG et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 19-CV-2240 |
| | ) | |
| v. | ) | Hon. Colin S. Bruce |
| | ) | Magistrate Judge Eric I. Long |
| ARCHER DANIELS MIDLAND CO., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| MIDWEST RENEWABLE ENERGY LLC et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-CV-2212 |
| | ) | |
| v. | ) | Hon. Colin S. Bruce |
| | ) | Magistrate Judge Eric I. Long |
| ARCHER DANIELS MIDLAND CO., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| UNITED WISCONSIN GRAIN PRODUCERS LLC et al., | ) | |
| | ) | |
| | ) | Case No. 20-CV-2314 |
| Plaintiffs, | ) | |
| | ) | Hon. Colin S. Bruce |
| v. | ) | Magistrate Judge Eric I. Long |
| | ) | |
| ARCHER DANIELS MIDLAND CO., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| GREEN PLAINS TRADE GROUP LLC et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-CV-2332 |
| | ) | |
| v. | ) | Hon. Colin S. Bruce |
| | ) | Magistrate Judge Eric. I. Long |
| ARCHER DANIELS MIDLAND CO., | ) | |
| | ) | |
| Defendant. | ) | |

**ADM'S OPPOSITION TO**
**<u>PLAINTIFFS' JOINT MOTION TO COMPEL</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 4

I.    Plaintiffs misstate the legal standards governing their Motion............................ 4

II.    ADM was not obliged to preserve documents for Plaintiffs in this litigation because of "rancor from ethanol participants," negative media coverage, or tweets on Twitter. ............................................................... 6

III.    The ██████████████████████ did not oblige ADM to preserve documents for Plaintiffs. ................................................................... 8

A.    ██████████████████████████ did not put ADM on notice of imminent litigation. ..................................... 9

B.    ████████████████████████████ did not put ADM on notice of imminent litigation. .............................................. 10

C.    ADM's decisions to issue three legal holds in 2019 were prudent and calibrated. ............................................................... 11

D.    Even if a preservation duty arose from ████████████ ████████████—not Plaintiffs. ..................................... 13

E.    Even if a preservation duty arose from ████████████, the documents Plaintiffs seek are outside the scope of the inquiries. ........ 15

F.    ADM's privilege log does not show litigation was imminent in 2018. ........................................................................... 16

IV.    Plaintiffs do not provide an adequate factual basis for their contention that ADM's production is deficient. .......................................... 17

V.    Additions to ADM's legal holds do not call for discovery on discovery. ............ 22

CONCLUSION ................................................................................................... 23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bombardier Recreational Prod. v. Arctic Cat,*
    2014 WL 10714011 (D. Minn.) ...................................................................................8, 17

*Carpenter v. Scott,*
    2017 WL 4270624 (C.D. Ill.)...........................................................................................4

*In re Delta/AirTran Baggage Fee Antitrust Litig.,*
    770 F. Supp. 2d 1299 (N.D. Ga. 2011) ........................................................................9, 14

*DR Distrib. V. 21 Century Smoking,*
    2021 WL 185082 (N.D. Ill.) ...........................................................................................22

*Fisher v. Ciba Specialty Chems.,*
    2007 WL 987457 (S.D. Ala.)............................................................................................6

*Freedman v. Weatherford Int'l,*
    2014 WL 4547039 (S.D.N.Y.).......................................................................................5, 6

*Grant v. Witherspoon,*
    2019 WL 7067088 (S.D.N.Y.)..........................................................................................6

*Gross v. Chapman,*
    2020 WL 4336062 (N.D. Ill.) ...........................................................................................5

*Horner v. ELM Locating & Util. Servs.,*
    2013 WL 12241533 (C.D. Ill.).............................................................................4, 5, 14, 21

*Karrani v. JetBlue Airways,*
    2019 WL 2269817 (W.D. Wash.) ......................................................................................6

*McDaniel v. Loyola Univ. Med. Ctr.,*
    2014 WL 1775685 (N.D. Ill.) .........................................................................................22

*Peerless Indus. v. Crimson AV,*
    2014 WL 3497697 (N.D. Ill.) ...........................................................................................5

*Point Blank Sols. v. Toyobo Am.,*
    2011 WL 1456029 (S.D. Fla.) ........................................................................................14

*In re Pradaxa Prod. Liab. Litig.,*
    2013 WL 5377164 ...........................................................................................................5

*Tate & Lyle Ams. v. Glatt Air Techniques*,
   2014 WL 10209161 (C.D. Ill.)................................................................5, 17

*Todd by Todd v. Merrell Dow Pharms.*,
   942 F.2d 1173 (7th Cir. 1991) .........................................................................5

*Trask-Morton v. Motel 6 Operating L.P.*,
   534 F.3d 672 (7th Cir. 2008) .......................................................................4, 5

*ValuePart v. Clemens*,
   2006 WL 8460312 (N.D. Ill.) ...........................................................................5

**Statutes**

7 U.S.C. § 6i..............................................................................................................9

**Other Authorities**

Fed. R. Civ. P. 26(a)(1)........................................................................................22

Fed. R. Civ. P. 26(b)(5)(A)(ii) ............................................................................17

Fed. R. Civ. P. 26(e)(1)(A) .................................................................................17

Fed. R. Civ. P. 37(e)............................................................................................15

Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger &
   The Process*, 20 Sedona Conf. J. 341, 371 at Guideline 1 (2019.) .........................5, 13, 15, 22

# INTRODUCTION

In this Circuit and elsewhere, taking discovery about an opponent's discovery efforts is strongly disfavored. Courts allow it only in the rare case of a factual showing of a *material* deficiency. Requests for "discovery on discovery" are always closely scrutinized, and for good reason. In addition to being harassing and adding expense to litigation, discovery into the process of discovery invades attorney–client privilege and should not be countenanced without substantial justification.

Plaintiffs have pushed to lower that high bar since the very first days of these cases. Before ADM produced a single document, Plaintiffs served the very same requests for discovery on discovery that are now the subject of their Motion to Compel. This Court properly rejected their early attempts to audit ADM's discovery process, entering an ESI protocol that ended Plaintiff AOT's early push for discovery on discovery. (Dkt. 38 ¶ 24.) The current Motion recycles the very same discovery on discovery that was served at the outset of the case, taking another run at the same issue.

Beyond recycled arguments, Plaintiffs' Motion fails of its own accord because it does not provide the substantial factual basis needed to justify discovery on discovery. Namely, Plaintiffs do not (because they cannot) support their assertion that ADM's production of documents in this litigation is materially deficient. ADM did precisely what the rules require. It issued a comprehensive legal hold immediately following the filing of the first of Plaintiffs' lawsuits and, since then, has produced more than 2.3 million pages of documents. Whatever Plaintiffs could or should have done on their own accord to preserve their spoliation arguments—e.g., bring suit sooner or send a preservation notice—ADM had no duty to preserve documents *for this litigation* before Plaintiffs filed their first lawsuit in September 2019.

1

Because Plaintiffs cannot show that a legal hold *relating to this litigation* should have been issued earlier, their claim that "large swaths of ESI . . . is missing" rings hollow. ESI is "missing" in a relevant sense only if it became missing after the date on which it should have been preserved. But when that preservation date is properly applied to this case, there are no "large swaths" of missing ESI.

To manufacture a duty to preserve reaching back as much as 20 months before these cases were filed, Plaintiffs first try to string together scattered media accounts and Twitter Tweets that they claim are suggestive of disgruntled competitors. Plaintiffs then point to communications ADM had with its regulators in 2018. Plaintiffs also complain about alleged production gaps in ADM's massive production, but those complaints fall apart when reviewed in detail. Each of these arguments, whether viewed independently or collectively, does not satisfy Plaintiffs' burden to show material deficiencies that would pry open the door to discovery on discovery.

First, Plaintiffs cannot show that media coverage about a change in ADM's market strategy, market participant rumblings about that change, or Tweets—none of which even mentions the possibility of litigation—amounts to the kind of notice of imminent litigation that would trigger a duty to preserve under the law of this Circuit. Imminence is the touchtone of the Seventh Circuit's standard—albeit a standard that the Court will not find mentioned anywhere in Plaintiffs' Motion. In fact, no lawsuit was filed for over a year after the media coverage and the 2018 inquiries from regulators.

Second, especially in regulated markets, not every contact with regulators requires documents to be preserved for litigation. ███████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

█████████████████████████

   Third, Plaintiffs fail to specify any material deficiencies in ADM's production from a period after a legal hold was properly put in place. Nor could they. ADM's discovery efforts were massive: a review of millions of documents from 15 custodians and several noncustodial sources, leading to the production of over 2.3 million pages, including vast numbers of the very types of electronic communications on which Plaintiffs' Motion is focused. This Opposition and its **Appendix A** examine and refute Plaintiffs' relative handful of claimed deficiencies, which range from minor complaints to rank speculation about documents they claim *should* exist.

Plaintiffs have written a colorful motion. But it is based on half-truths, omitted facts, and a misstated legal standard. It strings together out-of-context statements and snippets of documents from a still-developing discovery record to paint ADM in a false light. The time for merits arguments will come, but not in a discovery motion. Worse, this Motion has been planned since the very beginning of these cases, which explains why the scope of AOT's request for "fulsome responses and document productions" to Interrogatory Nos. 3, 4, 5, 6, 7 and Requests for Production 1, 2, 3, 8, and 46 is so untethered to the supposed deficiencies identified in Plaintiffs' Motion. This Court should not be fooled. ADM acted responsibly at every stage, and there is no cause for prolonging these cases, increasing their cost, and unnecessarily invading attorney–client privilege by authorizing an inquisition into ADM's proper document preservation practices.

## ARGUMENT

### I.  Plaintiffs misstate the legal standards governing their Motion.

The misguided nature of Plaintiffs' Motion is exposed at the outset by its misleading statement of the standard that determines whether there is a duty to preserve. Plaintiffs ask this Court to impose a duty "when an organization is on notice of a credible probability that it will become involved in litigation." (Mem. at 19.) That is not the Seventh Circuit's standard.

The Seventh Circuit does not impose a duty to preserve simply because there could be a lawsuit at some point down the road. Instead, the test is whether the party "knew, or should have known, that ***litigation was imminent***." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (emphasis added). That is the test courts in this district apply. *E.g.*, *Carpenter v. Scott*, 2017 WL 4270624, at *2 (C.D. Ill.) (citing *Trask-Morton*); *Horner v. ELM Locating & Util. Servs.*, 2013 WL 12241533, at *2 (C.D. Ill.) (citing *Trask-Morton* and other Seventh Circuit decisions). As another court explained, "at least in the Seventh Circuit," the test is ***not*** whether

"litigation was reasonably foreseeable"—the test Plaintiffs want to apply here (Mem. at 19)—but instead whether "litigation was imminent." *In re Pradaxa Prod. Liab. Litig.*, 2013 WL 5377164, at *9, *10 (S.D. Ill.) (rejecting the decision in *Micron Tech. v. Rambus*, 645 F.3d 1311, 1320 (Fed. Cir. 2011), on which Plaintiffs' argument is based (Mem. at 19)).

Applying that test, the Seventh Circuit and its district courts require more than a possibility of litigation. Examples of events showing that litigation is imminent include "a demand letter" from an attorney who is ready to sue, *Trask-Morton*, 534 F.3d. at 681; a notice of a charge of discrimination filed with the EEOC, *Horner*, 2013 WL 12241533, at *3; and a letter seeking the preservation of evidence for a lawsuit, *Tate & Lyle Ams. v. Glatt Air Techniques*, 2014 WL 10209161, at *2 (C.D. Ill.); *Peerless Indus. v. Crimson AV*, 2014 WL 3497697, at *4 (N.D. Ill.); *ValuePart v. Clemens*, 2006 WL 8460312, at *11 (N.D. Ill.)

Plaintiffs likewise ignore the legal standard that courts apply when reviewing requests for discovery on discovery. A plaintiff's "speculation that [defendant] must possess unspecified additional information is not sufficient grounds to embark upon a virtually boundless fishing expedition." *Todd by Todd v. Merrell Dow Pharms.*, 942 F.2d 1173, 1178 (7th Cir. 1991). Accordingly, "requests for such 'meta-discovery' should be closely scrutinized in light of the danger of extending the already costly and time-consuming discovery process *ad infinitum*." *Freedman v. Weatherford Int'l*, 2014 WL 4547039, at *2 (S.D.N.Y.) "'[T]here should be no discovery on discovery, absent . . . specific, tangible, evidence-based indicia (versus general allegations of deficiencies or mere 'speculation') of a material failure by the responding party to meet its obligations. A requesting party has the burden of proving a specific discovery deficiency in the responding party's production.'" *Gross v. Chapman*, 2020 WL 4336062, at *2 (N.D. Ill.) (quoting *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles*

*for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1 (2018)).[1] The party must

also prove that the deficiency is material and of a sufficiently large scope to make discovery on

discovery proportional to the needs of the case. *E.g.*, *id.* at *3 (rejecting "meta-discovery" after

plaintiffs discovered 18 missing emails in a production of 4.4 million pages).

    Lastly, Plaintiffs fail to recognize the standard courts apply when reviewing the adequacy

of a party's production. "Due to the ever-increasing volume of electronically stored information

and the multitude of devices that generate such information, perfection in preserving all relevant

electronically stored information is often impossible." The Sedona Conference, *Commentary on

Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 352 (2019).[2]

As a result, it is "unreasonable to expect parties to take every conceivable step or

disproportionate steps to preserve each instance of relevant electronically stored information."

*Id.* Only "reasonable and good faith efforts" are required. *Id.*

**II.     ADM was not obliged to preserve documents for Plaintiffs in this litigation based on
            "rancor from ethanol participants," negative media coverage, or Tweets on Twitter.**

    The complaints in this litigation make clear that all Plaintiffs were aware of ADM's shift

from predominantly buying to predominantly selling ethanol at the Argo Terminal. (AOT Compl.

¶ 5; Green Plains Compl. ¶ 119; MRE Compl. ¶ 73; UWGP Compl. ¶ 12.) Despite being aware

---

[1] *See also Grant v. Witherspoon*, 2019 WL 7067088, at *1 (S.D.N.Y.) (a party seeking "discovery on discovery" "must provide an 'adequate factual basis' to justify the discovery"); *Karrani v. JetBlue Airways*, 2019 WL 2269817, at *4 (W.D. Wash.) ("Such 'meta-discovery' is highly disfavored, and courts may only allow such discovery 'where there is some indication that a party's discovery has been insufficient or deficient.'").

[2] *See also Freedman v. Weatherford Int'l*, 2121 LAK JCF, 2014 WL 4547039, at *3 (S.D.N.Y.) ("The Federal Rules of Civil Procedure do not require perfection. [Defendant] has reviewed millions of documents and produced hundreds of thousands, comprising nearly 4.4 million pages, in this case. It is unsurprising that some relevant documents may have fallen through the cracks."); *Fisher v. Ciba Specialty Chems.*, 2007 WL 987457, at *3 (S.D. Ala.) ("The rules of discovery do not demand perfection, clairvoyance, or miracle workings in the production of documents.").

of this activity, no plaintiff sent ADM a demand letter of the type cited by courts in other document preservation cases. *See supra* at 5. No plaintiff sent ADM a notice of intent to file a lawsuit. And no plaintiff sent a letter asking ADM to preserve documents for a potential lawsuit.

Having given ADM no sign of an imminent lawsuit, Plaintiffs ask this Court to impose a duty to preserve based on scattered noise about ADM's ethanol business. They cite the following:

1.    A May 2018 Tweet on Twitter. It questions the actions of an unnamed ethanol producer. Another Twitter user responds, guessing the Tweet was about ADM. (Bell Ex. 17.) There is no mention of litigation.

2.    A September 2018 Reuters article about ADM "irking rivals." The article characterizes ADM's ethanol futures position as "not unusual" and explains "upheaval in the domestic ethanol market as U.S. demand flatlined." There is no mention of litigation. (Bell Ex. 22.)

3.    ████████████████████████████████████████████
      ████████████████████████████████████████ (Bell Ex. 25.)

4.    A May 2018 email from a nonlawyer at ADM. It notes one sentence, in an external newsletter, that questions ADM's trading strategy. ████████████
      ████████████████████████████████████ Neither the email nor the newsletter mentions litigation. (Bell Ex. 16.)

None of this, individually or together, could reasonably have signaled to ADM that a lawsuit was about to be filed. ADM's ethanol trades take place in the open market, and competition sometimes frustrates market participants. But it does not mean imminent litigation. And indeed, no Plaintiff or other market participant did anything in 2018 to show litigation was imminent.

Plaintiffs' fallacy is illustrated by the fact that they do not seem to know, even in retrospect, *when* the duty to preserve was triggered. The materials discussed above, which range from May to December 2018, lead Plaintiffs to posit that the right date might be "as early as January 2018" (Mem. at 3), or perhaps "as early as April" (*id.* at 15) or "in April and June" (*id.* at 19), or "in April or June" (*id.* at 20), or May (*id.* at 6). Those options span 15 to 20 months *before*

*Plaintiffs actually sued.* Plaintiffs cannot say when the duty was triggered because there are no events in 2018 that signaled a particular party was about to sue. And Plaintiffs never attempt to explain the range of documents that ADM should have preserved in response to the Reuters article or anything else.

Nor do privileged discussions with an ADM in-house business unit attorney signal imminent litigation, as Plaintiffs suggest. (Bell Exs. 16-17.) The inference that talking to an in-house attorney sets the date for preserving documents for litigation is based on faulty logic. It also demonstrates the deep policy implications and danger of Plaintiffs' Motion, which seeks to invade or draw negative inferences from ADM's communications with counsel. *Bombardier Recreational Prod. v. Arctic Cat*, 2014 WL 10714011, at *15 (D. Minn.) (denying motion to compel deposition on counsel's efforts to collect and produce documents, finding it "treads dangerously close to encroaching on attorney work product privilege.") The vast majority of communications between employees and in-house counsel have nothing to do with litigation. Delving into them, or drawing an inference from the existence of the communication itself, threatens the attorney–client privilege and the important policies underlying it. *Bombardier* at *15.

**III.   The ████████████████████████ did not oblige ADM to preserve documents for Plaintiffs.**

Beyond industry media rumblings and Twitter, Plaintiffs argue that ADM had a duty to preserve documents for Plaintiffs in these civil cases as soon as ████████████████ ████████████████. Plaintiffs argue, seemingly in the alternative, that a duty arose following ████████████████████████. (Mem. at 18-22.) ████████████ ████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

Back in 2018, ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████;

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1308 (N.D. Ga. 2011)

(the recipient of a demand for information should not anticipate litigation if prior demands for

information did not result in litigation). ████████████████████████

███████████████████████████████████████████████

████████████████████████████.

### A. ████████████████████████████████████ **did not put ADM on notice of imminent litigation.**

Plaintiffs contend that ████████████████████████████████

████████. (Bell Ex. 1.) ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████.[3] In their Motion, Plaintiffs refer to "the alleged manipulation that ADM was

_____

[3] ███████████████████████████████████████████████
███████████████████████████████████████████████

aware of by April 2018" (Mem. at 2), but that is false. ████████████████

███████████████████████████ Under these circumstances, no litigation was imminent,

and ADM appropriately did not put in place a legal hold.[4]

████████████████████████████████████████████████. (Ex. 1 to

Decl. of Reid Smith in Supp. of ADM's Opp'n to Pls.' Mot. to Compel ("Smith" Ex. 1.) ████

████████████████████████████████████ (*id.*), ████████████

████████████████. (Bradbury Aff. ¶ 4.) ████████████████████

████████████████████████████████████████████████

████████ (Bradbury Aff. ¶¶ 4, 8.) Litigation was not imminent in April 2018, so ADM had

no duty to preserve documents.

     **B.**    ███████████████████████████████████
**did not put ADM on notice of imminent litigation.**

     On June 28, 2018, ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████. Days earlier, Ray Bradbury informed Chris Cuddy, the head of

──────────────────

███████████████████████████████████████████████
████████████████████████████

[4] Plaintiffs' entire characterization of the ████████ is misleading. First, nothing in the request
supports Plaintiffs' statement that ████████████████████████████████████
████████████████████████████████ (Mem. at 4.) Second, ████████
████████████████████████ (Mem. at 4.)
████████████████████████████████████████████████
████████████ Third, the fact that ████████████████████████████
██████████████████. It has
nothing to do with her role in developing an e-Discovery playbook, a conference she spoke at, or
ADM's internal audit notes. (Mem. at 4-5.) ██████████████████████████████
██████████████████████████.

ADM's ethanol-making business unit, via a text message, that ███████████████

████████████████████████████████████████████████████████

████████████████████████ (Bell Ex. 3.) Plaintiffs imply that the mention of an

accusation should have signaled litigation was imminent. But the very same communication

makes clear that the people involved did not view litigation as imminent. In the portion of

Bradbury's text omitted from Plaintiffs' Motion, the text message reads: "I don't believe we have

anything to be concerned about. Just wanted to keep you posted." (*Id.*)[5]

      Plaintiffs seek to link the ████████████████ in a manner that is far closer than the

inquiries support. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

      On July 30, ████████████████████████████████████

████████████████████████████████. (Smith Ex. 2; Smith Ex. 3.) And in

August 2018, ████████████████████████████ (Smith Ex. 4; Smith Ex. 5; Smith

Ex. 6.) This important fact is also omitted from Plaintiffs' Motion. But it is essential to

understanding the chronology and undercuts the premise of Plaintiffs' Motion—i.e., that every

inquiry by a regulator is a sign that litigation is coming. Under these circumstances, there was no

reason to believe at any time that litigation was imminent, so ADM had no duty to preserve

documents.

      **C.**    **ADM's decisions to issue three legal holds in 2019 were prudent and calibrated.**

---

[5] Plaintiffs had a chance to ask Mr. Cuddy whether he believed litigation was imminent when he saw this text message. They did not do so.

On January 3, 2019, ███████████████. (Smith Ex. 7.) ███████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████ (Bradbury Aff. ¶ 7.)

Issuing a hold in January 2019 was responsible (and Plaintiffs in these cases have benefited from it). But it was issued ██████████████, not from a belief that these civil lawsuits by traders like AOT or competitors were imminent. Moreover, there is no basis to argue that the adequacy of the January 2019 legal hold should be judged against the scope of allegations made in this later-filed litigation. It was appropriately calibrated to the circumstances. The present cases allege manipulation from November 2017 through September 2019, but ████ ██████████████████████████████. (Smith Ex. 7, ¶ 16.)

In March 2019, █████████████████████████████████. (Smith Ex. 8.) ████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████. (Bradbury Aff. ¶ 8.)

Again, ADM's legal hold was prudent—and, again, Plaintiffs in the instant case have benefited from it—but it was not issued because competitor lawsuits were imminent. And that second legal hold was also appropriately calibrated to the circumstances. Plaintiffs cannot rightly complain that the scope of the second hold, █████████████████████, did not match the scope of their own later allegations.



Finally, with respect to the litigation that is the subject of this Motion, ADM received the first market participant complaint after it was filed in September 2019. At that time, ADM put in place a third legal hold—this time specifically for Plaintiffs' benefit and responsive to the allegations made in the complaint. (Bradbury Aff. ¶ 9.)

Plaintiffs' motion also misses a fundamental point. ADM could have observed market rancor, or been engaged with regulators, but not anticipated this litigation. It is perfectly logical, but in no way suggestive of imminent litigation, that ADM's change in strategy would rankle others in the ethanol market, among them the inexperienced plaintiff trader AOT (who had placed a sizable long bet on ethanol and was, as explained in ADM's other pleadings in this case, engaged in a coordinated effort to manipulate the market upward) and the other plaintiff producers (who for years had grown accustomed to ADM's prior strategy of slowing its plants to decrease supply during down cycles). And it was perfectly logical that regulators with whom ADM regularly interacts would ask for information about ADM's change in strategy— information ADM provided to them years ago. But market rancor and requests from regulators is a far cry from anticipating imminent civil litigation from market participants. This is particularly true given the failure of any trader or producer to serve ADM with any notice of potential litigation or send a document preservation notice. These were tools available to Plaintiffs had they been contemplating litigation as far back as early 2018, which appears to be the earliest date Plaintiffs now seek to impose a burden on ADM to have anticipated this litigation.[6]

**D.    Even if a preservation duty arose from** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮**—not Plaintiffs.**

---

[6] Preservation notice letters are a tool suggested by the Sedona Conference to be used by litigants to notify an opposing party of the probability of litigation. *See* The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 371 at Guideline 1 (2019.)

The ████████████████████████ did not create a duty for ADM to issue a legal

hold. But even if we assume charitably that they had, Plaintiffs cannot show that ADM owed its

competitors, including Plaintiffs, a duty to preserve. Accordingly, even if there had been a notice

that ███████████████████████████████████████████████████████████

████████████████, that notice would not create a duty to preserve documents in anticipation of

a lawsuit by some *other* party (Plaintiffs) that is *not* known to be about to sue.

In *Horner*, 2013 WL 12241533, at *3 n.1, for example, one former employee notified her

employer of her intent to sue, but the court held that notice did not alert the employer that a

second employee would sue, so the notice "did not impose a duty owed" to the second employee

to preserve documents. Similarly, in *In re Delta,* 770 F. Supp. 2d at 1307, the Department of

Justice served on Delta a civil investigative demand, which private plaintiffs tried to turn into a

duty to preserve documents for their own civil lawsuit, which they filed just three months later.

The court did not allow it: "Delta owed no preservation duty to Plaintiffs that it could have

breached." *Id.* at 1308. If a preservation duty was owed to anyone, it was to the Department of

Justice, which alone was entitled to enforce it. *Id.*; *see also Point Blank Sols. v. Toyobo Am.*, 2011

WL 1456029, at *26 (S.D. Fla.) ("A lawsuit filed by [a different plaintiff] and a subpoena issued

by the government do not necessarily mean that [defendant] should have at that time anticipated

litigation with [plaintiff] or that [plaintiff] can take advantage of an evidence-preservation duty

owed by [defendant] to [the other plaintiff] or different government agencies.")

The situation here is the same. Even if Plaintiffs could somehow show that ████████

██████████████ made ADM responsible for preserving documents—a conclusion that is not

supported by the facts—that duty would run only ████████████████, not to Plaintiffs who had not

yet revealed their plans. Plaintiffs point to the Reuters article about competitors from September

2018 (Mem. at 7), but it did not say any competitor planned to sue ADM, and indeed one portion of the article described ADM's conduct as "a major ethanol producer . . . having a short position in futures as a hedge against physical price declines is **_not unusual_**." (Bell Ex. 22.) A full year then passed before any competitor lawsuit was filed. Until it was, ADM owed Plaintiffs no duty to preserve.

       **E.**      **Even if a preservation duty arose from** ███████████████████ **, the documents Plaintiffs seek are outside the scope of the inquiries.**

Plaintiffs' motion proceeds as if all they need to show is that ████████████████ should have resulted in ADM putting in place *some* legal hold. If there should have been *any* legal hold, their theory seems to go, then *all* documents that Plaintiffs wished to find must be "missing" and therefore improperly destroyed.

That is not how preserving documents works. "[T]he scope of any legal preservation effort is bounded by the claims made or issues involved in the matter. There is no obligation to preserve data that falls outside those boundaries." *Commentary on Legal Holds*, 20 Sedona Conf. J. at 391. In other words, when thinking about preservation, "[c]ourts should consider the extent to which . . . the information would be relevant" to the threatened litigation. Adv. Comm. Note (2015) to Fed. R. Civ. P. 37(e). When only "limited information about . . . prospective litigation" is available at the time, courts cannot allow themselves to be "blinded . . . by hindsight arising from familiarity with an action as it is actually filed." *Id.*

Plaintiffs make no attempt to connect the documents they now seek to the scope of any reasonable litigation hold that ████████████████ could have prompted. ████████████ ████████████████████████████████████████████ ████████████████████████████████████. ADM was already

required ███████████ to preserve those books and records, so whether or not ADM implemented a legal hold on them was irrelevant.



. Thus, even if ADM had implemented a hold for ████████████, it (appropriately) would not have covered the years of electronic communications that Plaintiffs now seek.

### F.   ADM's privilege log does not show litigation was imminent in 2018.

When producing documents to Plaintiffs, ADM prepared a log identifying documents withheld because they were designated as non-discoverable based on the attorney–client privilege, the attorney work product doctrine, or both. Given the expansive scope of Plaintiffs' document requests, the broad search for documents that ADM conducted, and the millions of pages of documents that ADM reviewed, the original log included over 1,500 documents.

After Plaintiff AOT sent a letter questioning and challenging the designations for many of those documents, ADM resolved to revisit and reassess each one to ensure all designations were correct. As part of that work, counsel for ADM conducted a further investigation that included the issue of when litigation first became imminent. Once counsel obtained a more complete understanding of the circumstances of ████████████, it was apparent that some attorney work product designations had been asserted too early in time. The result of counsel's reassessment of the log was that some documents were removed and produced to Plaintiffs, and no documents before 2019 were designated as attorney work product.

Plaintiffs' challenge thus succeeded in reducing the number of documents on ADM's log and the number of designations on the remaining documents. But now Plaintiffs are *objecting* to

ADM *removing* work product designations, on the theory that the original, erroneous designations amount to a concession that ADM expected litigation in 2018.

That is an argument Plaintiffs cannot win under the Federal Rules of Civil Procedure. As part of its response to Plaintiffs' document requests, ADM was required to provide a log of documents withheld as privileged or work product. Fed. R. Civ. P. 26(b)(5)(A)(ii). Then, as ADM "learn[ed] that [its] . . . response is incomplete or incorrect," ADM was required to "supplement or correct its . . . response." *Id.* at 26(e)(1)(A). The rules recognize that discovery responses are neither immutable nor always perfect, and litigants are required to update them when necessary. It turned out to be necessary here, and Plaintiffs should not be allowed to seek a litigation advantage in the form of punishing ADM for following the rules. A concededly erroneous and withdrawn work product designation is not a proper ground for finding that a defendant expected litigation earlier than the defendant actually did. *Tate & Lyle*, 2014 WL 10209161, at *2 (holding that documents were required to be preserved when a preservation letter was received, not earlier on account of a work product assertion that was withdrawn).[7]

## IV.   Plaintiffs do not provide an adequate factual basis for their contention that ADM's production is deficient.

Plaintiffs' detour into market rumblings, tweets, and regulator inquiries can be best understood as a diversion. A diversion is needed because the motion comes nowhere close to

---

[7] Plaintiffs suggest that if this Court is not inclined to grant their motion, it should at least conduct an in camera review of 62 documents on the log that relate to ████████████. (Mem. at 3.) Those documents are no longer designated as attorney work product, but they are privileged attorney–client communications—a designation Plaintiffs' motion does not challenge. For the same reasons expressed by the court in *Bombardier*, 2014 WL 10714011, at *15, ADM would strongly prefer not to have its privileged documents reviewed at all. But if the Court deems it necessary, ADM will make the documents available for in camera review. Counsel for ADM reviewed them again when preparing this Opposition, and they do not show that litigation was imminent in 2018.

17

meeting Plaintiffs' actual burden needed to justify discovery on discovery. Specially, Plaintiffs' motion comes nowhere close to showing the existence of material and large-scale deficiencies in ADM's production from the date a legal hold was appropriately put in place for this litigation.

To anchor their argument, Plaintiffs quote a decision from then-Magistrate Judge Bernthal authorizing such discovery due to "'the virtual absence of ESI produced by Defendants.'" (Mem. at 14 (quoting *Andreatta-Carlock v. Williamson*, 2011 WL 308608, at *4 (C.D. Ill.)).) The virtual absence of ESI is the polar opposite of the present case, in which ADM produced vast amounts of electronically stored information, including electronic communications of the nature and type that Plaintiffs allege are missing. ADM collected and reviewed data from 15 custodians and several non-custodial sources. ADM reviewed millions of documents, from which over 2.3 million pages were produced.

At the root of Plaintiffs' complaints of "missing" data is their expectation, untethered to the facts or evidence, that ADM's custodians must have communicated about work in a certain way, via certain media. Ray Bradbury oversaw the ethanol traders, who include Adam Kuffel, Daniel Overberg, Colin Graves, Jennifer Bareksten, Sean Miller, and Chris Kopelke. The traders' desks were in one room, around six feet apart. (Smith Ex. 9; Smith Ex. 10; Smith Ex. 11.) Their proximity enabled the traders to speak easily, look at each other's computer screens, and keep up to date on trading in real time, usually without writing to one another. (Smith Ex. 9.)

The traders' physical proximity and ability to talk in the room cut down on their need for electronic communications. (Smith Ex. 11.) When they did communicate electronically about their work, it was most often by email or ICE Chat—a messaging system used with brokers and to execute trades. Messaging by texts was sometimes used when employees were away from the

office; they less often messaged through Skype Chats[8]; and infrequent messaging through an application called "WhatsApp" was almost always reserved for personal matters. (Smith Ex. 9; Smith Ex. 10; Smith Ex. 12; Smith Ex. 13.) To the extent that any of these forms of electronic communications were preserved and contained responsive, non-privileged information, ADM produced them. And again, ADM's production in this case totaled more than 2.3 million pages.

Attached as **Appendix A** to this Opposition is an expanded version of the chart appearing on pages 11–12 of Plaintiffs' motion, demonstrating Plaintiffs' failure to identify any material deficiencies in ADM's production. Setting aside their repeated assertions that documents are "missing" *before* ADM properly put in place the first legal hold in January 2019, the most salient of Plaintiffs' mischaracterizations of the discovery record are discussed below.

**Jennifer Bareksten.** Plaintiffs claim to be missing (1) her texts after October 28, 2018 and (2) her Skype Chats. Neither of these two arguments holds water. On the first, they know, from taking her deposition for ten hours, that she left ADM's ethanol group in October or November 2018. (Smith Ex. 10.) There are no relevant texts after her departure. On the second, ███████████████████████████████████████████████, all existing documents were preserved and reviewed, and none of Bareksten's Skype Chats were relevant to these cases or responsive to the requests for production.

**Chris Cuddy.** Plaintiffs claim to have received one of Cuddy's Skype Chats. But ADM produced some others and produced more than 1,000 Skype records from all custodians in this matter. If Mr. Cuddy had regularly used Skype for business and if, as Plaintiffs claim, "Skype

---

[8] Plaintiffs' assertion that "Skype Chat was the primary means of business-related communication within ADM" (Mem. at 15) is not supported by any citation or evidence, because it is false. For example, Overberg testified that he "[v]ery rarely" communicated with Kuffel using Skype if Kuffel was in the office. (Smith Ex. 11.)

Chat was the primary means of business-related communications within ADM" (Mem. at 15), his Skype messages would have appeared numerous times in the records of others. But during the ten hours of his deposition, despite apparently "missing" all but one of these records, Plaintiffs did not even bother asking him any questions about Skype Chats. If they had a legitimate need for discovery about Skype Chats, his deposition was the time to ask those questions. Their decision not to ask cannot be the reason for discovery on discovery now.

**Colin Graves.** Plaintiffs claim to be missing Graves's texts after March 4, 2019. That is wrong. ADM preserved and collected texts from Graves—almost 4,200 in all—and produced the few relevant ones, including one from June 17, 2019 (Smith Ex. 14), which ADM produced before Plaintiffs moved to compel. Graves left ADM's ethanol group in November 2018, as Plaintiffs acknowledge (Mem. at 8), so it is not surprising that he had few relevant texts in March 2019 and later. Though they had ten hours to do so, Plaintiffs did not ask Graves about his use of text message related to issues in the instant case after his departure from the ethanol group.

**Chris Kopelke.** Plaintiffs claim to be missing his Skype Chats after November 2, 2018. They are not "missing." ADM preserved and reviewed them, but none were relevant to these cases or responsive to the requests for production.

**Adam Kuffel.** Plaintiffs claim to be missing his WhatsApp messages. Kuffel's WhatsApp messages were preserved as of the legal hold put in place for the instant litigation in September 2019. There were no relevant messages upon preservation in September 2019 and Kuffel had no obligation to preserve WhatsApp messages for this litigation before September

2019.[9] What's more, Kuffel used WhatsApp almost exclusively for personal communications.[10] WhatsApp was never used for ethanol trades, which were handled via email and ICE Chat. Kuffel recalls only one potentially relevant WhatsApp message from before that time, a personal conversation between him and a broker that included some discussion of or reference to the ethanol market. All trades handled by that broker are shown in emails and ICE Chats with Kuffel, which ADM produced to Plaintiffs. ADM even described the subject matter of the one WhatsApp message to Plaintiffs, which is a step beyond what is required by the ESI protocol since the message existed before litigation was anticipated. (Dkt. 38 ¶ 24; Bell Ex. 26 at 8 n.3.) Plaintiffs may, of course, also ask Kuffel about it at his upcoming deposition.

Plaintiffs argue that ADM's recent supplemental production of text messages from other custodians includes texts from 2019 that were not produced from Kuffel's files. (Mem. at 17-18.) Plaintiffs identify two texts. The first, from January 11, 2019, was ███████████████ ████████████ in ADM's first production in these cases. The other text, from March 6, 2019, was produced by ADM to Plaintiffs on July 1, 2020. ADM has the custodial versions of these texts from Kuffel's files but did not produce them, because they were duplicates of what was produced.

---

[9] Plaintiffs also complain that Kuffel turned in his old phone to ADM and received a new one in July 2018. (Mem. at 2, 16.) The exhibit Plaintiffs cite shows that the phone was an iPhone 5s; it was discontinued by Apple over two years earlier. This was a routine turnover of a device and, as such, is not evidence of improper conduct. *Horner v. ELM Locating & Util. Servs.*, 2013 WL 12241533, at *3 (C.D. Ill.). At that time, as explained above, ADM was not obliged to preserve documents for Plaintiffs. The first lawsuit was not filed until well over a year after Kuffel received a new phone.

[10] At Mr. Overberg's deposition, Plaintiffs asked what he meant when he wrote that Kuffel used WhatsApp because "there is no log." (Mem. at 16.) Overberg testified that he was referring to Kuffel's conversations "regarding personal things or, you know, something in personal life that he didn't want to shout over Cloud 9 that everybody in the office could hear." (Overberg Day 2 Rough Tr. 102:7-9.)

**Cady Roberts** and **Tony Schmoldt.** Roberts and Schmoldt were not ethanol traders. They supported the ethanol group in the areas of logistics (Roberts) and financial planning and analysis (Schmoldt). Plaintiffs claim to be missing their text messages. That is because ADM never agreed to produce their text messages, having understood Plaintiffs to be seeking mobile data only from traders and from custodians whose mobile data ███████████████████. ADM offered to confer about the production of Roberts's and Schmoldt's mobile data (Bell Ex. 8; Bell Ex. 29 at 6), but Plaintiffs did not take ADM up on the offer.

**V.   Additions to ADM's legal holds do not call for discovery on discovery.**

Plaintiffs imply that ADM's litigation holds must have been deficient because additional custodians were added over time. (Mem. at 8-9.) Their zeal to pin a spoliation charge on ADM has led them to label as a deficiency something that is a best practice. As the Sedona Principles recognize, "later information may require an organization to reevaluate its determination and may result in a conclusion that . . . new information alters the scope of the preservation obligation for . . . pending litigation." *Commentary on Legal Holds*, 20 Sedona Conf. J. at 373. "Perfection is not the standard" for preserving electronically stored information; what is required is a good-faith effort that by necessity is often iterative in nature. *DR Distrib. V. 21 Century Smoking*, 2021 WL 185082, at *5 (N.D. Ill.); *see also McDaniel v. Loyola Univ. Med. Ctr.*, 2014 WL 1775685, at *2 (N.D. Ill.) (adding 20 custodians to a litigation hold after almost a year of litigation). Adding custodians as claims become better understood, requests to produce documents are received, or negotiations with opposing counsel take place is a sign of diligence rather than bad faith.

Plaintiffs also argue that ADM must have acted improperly because it ended up preserving documents from more than the three employees originally identified in its Rule 26(a)(1) disclosures. Wrong again. The rule requires a party to identify "each individual likely to

have discoverable information . . . that the disclosing party may use to support its claims or defenses." ADM initially identified three such individuals, but ADM nonetheless properly added custodians as described above. Indeed, Plaintiff AOT also added custodians in this iterative process. The number of custodians with *any* discoverable information is, in every lawsuit, larger than the subset the disclosing party intends to rely on. There was nothing wrong with ADM's disclosures or legal holds.

## **<u>CONCLUSION</u>**

This Court should deny Plaintiffs' Joint Motion to Compel.

Dated: June 8, 2021                                Respectfully submitted,

By: <u>*s/ Stephen V. D'Amore*</u>
  Stephen V. D'Amore
  Samantha M. Lerner
  Reid F. Smith
  WINSTON & STRAWN LLP
  35 West Wacker Drive
  Chicago, Illinois 60601
  (312) 558-5600
  sdamore@winston.com
  slerner@winston.com
  rfsmith@winston.com

  *Counsel for Defendant*
  *Archer Daniels Midland Company*

**APPENDIX A**

| Custodian | ESI Category | Missing Date Range | ADM's Response |
|---|---|---|---|
| Adam Kuffel | Text Messages | Before 11/09/2018 | Not missing. No legal hold before 2019. |
| Adam Kuffel | Skype Chats | Before 01/10/2019 | Not missing. No legal hold before 2019. |
| Adam Kuffel | WhatsApp Messages | All | Not missing. No legal hold before 2019. ADM discovered one message from *before* the legal hold for *this* litigation and described it to Plaintiffs. |
| Ray Bradbury | Skype Chats | Before 01/24/2019 | Not missing. No legal hold before 2019. |
| Daniel Overberg | Text Messages | Before 12/19/2018 | Not missing. No legal hold before 2019. |
| Daniel Overberg | Skype Chats | Before 01/14/2019 | Not missing. No legal hold before 2019. |
| Chris Cuddy | Skype Chats | All (other than one) | Not missing. No legal hold before 2019. Rarely used Skype. Post-legal hold messages were reviewed and produced if responsive. |
| Colin Graves | Text Messages | Before 10/25/2018 and after 03/04/2019 | Not missing. No legal hold before 2019. Post–March 2019 messages reviewed; none deemed responsive. |
| Jennifer Bareksten | Text Messages | Before 05/16/2018 and after 10/28/2018 | Not missing. No legal hold before 2019. Post legal-hold data reviewed; none deemed responsive. |
| Jennifer Bareksten | Skype Chats | All | Not missing. No legal hold before 2019. One relevant, responsive chat produced. All other Skype chats reviewed; none deemed responsive. |
| Tony Schmoldt | Text Messages | All | Not missing. |

| Custodian | ESI Category | Missing Date Range | ADM's Response |
|---|---|---|---|
| | | | No agreement to produce. Awaiting meet and confer. |
| Cady Roberts | Text Messages | All | Not missing. No agreement to produce. Awaiting meet and confer. |
| Chris Kopelke | Skype Chats | After 11/02/2018 | Not missing. No legal hold before 2019. Post legal hold data reviewed; none deemed responsive. |
| Rachel Hudson | Text Messages | Before 08/09/2018 | Not missing. No legal hold before 2019. Post-legal hold data reviewed and produced if responsive. |

## <u>CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT</u>

I hereby certify that on June 8, 2021 that the above Memorandum of Law complies with this Court's June 8, 2021 Order granting a 1,000 word extension to the type volume limitation set forth in Local Rule 7.1(B)(4)(b), in that it contains 7,859 words, which includes all headings, footnotes, and quotations (but excludes case captions, tables of contents and authorities, signature blocks, and certificates of compliance and service), as calculated by the word count feature on Microsoft Word.

By:   *s/ Stephen V. D'Amore*
Stephen V. D'Amore
Samantha M. Lerner
Reid F. Smith
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
sdamore@winston.com
slerner@winston.com
rfsmith@winston.com

James C. Kearns
HEYL, ROYSTER, VOELKER & ALLEN
301 N. Neil St., Ste. 505
Champaign, IL 61820
JKearns@heylroyster.com
T: (217) 344-0060

*Counsel for Defendant*
*Archer Daniels Midland Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 8, 2021, I caused the foregoing to be served on the counsel of record, including those identified below, by filing it with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record, and via electronic mail.

Stephen M. Tillery
Michael E. Klenov
Carol L. O'Keefe
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
T: (314) 241-4844
F: (314) 241-3525
stillery@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

George A. Zelcs
John A. Libra
Chad E. Bell
Ryan Z. Cortazar
KOREIN TILLERY LLC
205 North Michigan Ave., Suite 1950
Chicago, IL 60601
T: (312) 641-9750
F: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
cbell@koreintillery.com
rcortazar@koreintillery.com

*Counsel for Plaintiffs AOT Holding AG, Maize Capital Group LLC, and the Proposed Class*

Marvin A. Miller
Andrew Szot
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
Tel: (312) 332-3400
mmiller@millerlawllc.com
aszot@millerlawllc.com

Christopher Lovell
Christopher McGrath
Merrick S. Rayle
LOVELL STEWART HALEBIAN
JACOBSON LLP
500 Fifth Avenue, Suite 2440
New York, NY 10110
Tel: (212) 608-1900
clovell@lshllp.com
cmcgrath@lshllp.com
mrayle@lshllp.com

Joshua H. Grabar
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiff MRE and the Proposed Class*

Adam J. Levitt
John E. Tangren
Mark S. Hamill
DiCELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
Alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
mhamill@dicellolevitt.com

Greg G. Gutzler
DICELLO LEVITT GUTZLER LLC
444 Madison Avenue, Fourth Floor
New York, New York 11022
Tel.: (646) 933-1000
Ggutzler@dicellolevitt.com

*Counsel for GPRE Plaintiffs and the Proposed Class*

Austin B. Cohen
Keith J. Verrier
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
acohen@lfsblaw.com
kverrier@lfsblaw.com

Joseph L. Olson
MICHAEL BEST & FRIEDRICH LLP
790 N. Water Street, Suite 2500
Milwaukee, WI 53202
Telephone: (414) 271-6560
Facsimile: (414) 277-0656
jlolson@michaelbest.com

*Counsel for UWGP Plaintiffs*

By: s/ *Stephen V. D'Amore*
Stephen V. D'Amore
Samantha M. Lerner
Reid F. Smith
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
sdamore@winston.com
slerner@winston.com
rfsmith@winston.com
T: (312) 558-5600

James C. Kearns
HEYL, ROYSTER, VOELKER & ALLEN
301 N. Neil St., Ste. 505
Champaign, IL 61820
JKearns@heylroyster.com
T: (217) 344-0060

*Counsel for Defendant*
*Archer Daniels Midland Company*